UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY AND CASUALTY
INSURANCE COMPANY, ALLSTATE
FIRE AND CASUALTY INSURANCE
COMPANY, ALLSTATE VEHICLE AND
PROPERTY INSURANCE COMPANY
f/k/a DEERBROOK INSURANCE
COMPANY, AND ALLSTATE
NEW JERSEY INSURANCE COMPANY,

Civil Action No.

                    *Plaintiffs*,

vs.

MARC KIRSHNER, D.C., HEALTH FIRST
MEDICAL, P.C., MIDAS MEDICAL CENTER,
P.C., THE PHYSICAL MEDICINE AND
REHABILITATION CENTER, P.C. d/b/a THE
MEDICAL CENTER, P.C., JENNIFER NETTER,
D.C., LORELEI DAVIDSON, M.D., JENNIFER
LYNNE, D.C., JAMES W. MARSHALL, JR.,
D.O., FRANCISCO CARBONE AND JOSEPH
HADDAD,

                    *Defendants*.

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

The plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property

& Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle &

Property Insurance Company f/k/a Deerbrook Insurance Company, and Allstate New Jersey

Insurance Company (collectively "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink,

P.C., allege as follows:

I.     **INTRODUCTION**

1.     This is a case about a chiropractor and confessed felon, Marc Kirshner, D.C. ("Kirshner"), who, working in concert with (a) former physician, Francisco Carbone ("Carbone"), (b) licensed physician, James W. Marshall, Jr., D.O. ("Marshall"), (c) personal injury attorney, Joseph Haddad ("Haddad") (and his law practice – Law Offices of Joseph Haddad), (d) associated licensed medical providers/clinic employees, Jennifer Netter, D.C. ("Netter"), Lorelei Davidson, M.D. ("Davidson"), and Jennifer Lynne, D.C. ("Lynne"), and (e) medical facilities, Health First Medical, P.C. ("Health First"), Midas Medical Center, P.C. ("Midas"), and The Physical Medicine and Chiropractic Center, P.C. d/b/a The Medical Center, P.C. ("The Medical Center") (collectively "PC Defendants"), defrauded Allstate by perpetrating a medical billing fraud scheme in violation of state and federal law.

2.     Each of the individuals and entities listed above conspired with one another to accomplish and/or further the objectives of the scheme detailed herein.

3.     Following an investigation by the Federal Bureau of Investigation ("FBI"), Kirshner, Carbone, Marshall, Netter, and Lynne were charged and later pled guilty to health care fraud and related charges in connection with this medical billing fraud scheme.

4.     The primary objective of the defendants' scheme to defraud was to (a) perform medically unnecessary treatments and tests, (b) bill Allstate for services not actually rendered, and (c) inflate the value of patients' claims to obtain larger first-party payments and third-party settlements from Allstate.

5.     The defendants accomplished their scheme by: (a) performing fraudulent initial examinations to provide a basis for reimbursement; (b) creating patient records that included fictitious (i) subjective symptom complaints, (ii) objective findings, (iii) and/or diagnoses to support the provision of medical services; (c) exaggerating patients' injuries by assigning false and/or inflated permanent disability ratings ("PDR"); (d) prescribing narcotic medicine to enhance

artificially the appearance of severe/significant injury to inflate claim settlement values; (e) ordering and performing worthless nerve conduction velocity ("NCV") tests, the results of which were never used to determine, alter, or amend the patients' course of treatment; (f) prescribing chiropractic treatment to each patient for a period of six (6) months regardless of actual need; (g) artificially inflating the charges submitted in connection with initial examinations and re-evaluations (i.e., "upcoding"); and (h) creating and submitting invoices to Allstate containing charges for treatment/testing that was unnecessary, unwarranted, unlawfully performed, and/or never actually rendered.

6.      The medical documentation created by the defendants in connection with persons eligible for insurance coverage under Allstate insurance policies was false because nothing contained in the patient records was a legitimate representation of the patients' true medical conditions, and the medical treatment and testing purportedly provided was equally false because such services were never intended to address or improve the patients' physical condition, and the results of the testing administered by the defendants were never intended to guide or inform the future care of the patients.

7.      Following the provision of testing and treatment, the defendants submitted, through the U.S. Mail, documents and invoices related to such services with the specific intent of causing Allstate to pay the defendants under the Med Pay (i.e., "first-party") portion of the patients' and/or insureds' automobile insurance contracts.

8.      In other cases, the defendants created records and invoices representing their treatment and testing with the knowledge that such records (and the findings and statements contained therein) would be used by their patients (and their patients' personal injury counsel) in seeking payment and/or settlement for bodily injury (i.e., "third-party") claims under Allstate automobile insurance contracts.

9.      Overall, Allstate reasonably relied on this false medical documentation in paying over $345,868.00 to the defendants for purported patient treatment and testing.

3

10.     All of the acts and omissions of the defendants described throughout this Complaint were undertaken intentionally.

11.     The defendants' insurance fraud scheme was designed to, and did, in fact, result in the payment of insurance proceeds from Allstate to, or on behalf of, the defendants.

12.     In each claim detailed throughout this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants perpetrated their fraudulent scheme.

13.     By this Complaint, Allstate brings this action against the defendants seeking money damages for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c)-(d)); (b) common law fraud; (c) violation of the Connecticut Unfair Trade Protection Act ("CUTPA"); (d) violation of the Connecticut Health Insurance Fraud Act ("CHIFA"); and (e) unjust enrichment.  In addition, Allstate seeks declaratory relief pursuant to 28 U.S.C. § 2201.

14.     Allstate's claim for compensatory damages includes (a) payments made by Allstate to the defendants in reliance upon the defendants' false medical documentation, (b) treble damages as authorized by law, (c) statutory interest, (d) costs, and (e) attorneys' fees.

## II.     THE PARTIES

### A.     PLAINTIFFS

15.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Vehicle and Property Insurance Company f/k/a Deerbrook Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal places of business in Northbrook, Illinois.

16.     Allstate New Jersey Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Bridgewater, New Jersey.

**B.**    **OWNER OF THE PC DEFENDANTS**

1.    **MARC KIRSHNER, D.C.**

17.    Marc Kirshner, D.C. resides in and is a citizen of the State of Connecticut.

18.    At all relevant times, Kirshner was licensed by the State of Connecticut to practice chiropractic medicine (License No. 000952).

19.    At all relevant times, Kirshner was, and continues to be, a director, officer, and/or shareholder of the PC Defendants.

20.    At all relevant times, Kirshner was, and continues to be, an owner, manager, and/or employee of the PC Defendants.

**C.**    **PC DEFENDANTS**

21.    The PC Defendants are medical professional service corporations that are owned by Kirshner, and operated by Kirshner and/or his co-conspirators.

22.    Health First, Midas and The Medical Center all operate out of the same location— 1867 Summer Street, Stamford, CT ("1867 Summer Street").

1.    **HEALTH FIRST MEDICAL P.C.**

23.    Kirshner is the owner of Health First Medical, P.C.

24.    Health First is a Connecticut medical professional service corporation with its principal place of business at 1867 Summer Street.

25.    Health First also purportedly maintains clinic locations in Bridgeport and Norwalk, CT.

26.    According to its corporate filings, Kirshner is Health First's president and director, and Davidson is the corporation's secretary.

27.    Health First purports to provide chiropractic, physical therapy, rehabilitative, and physiotherapy services.

### 2.   MIDAS MEDICAL CENTER, P.C.

28.   Kirshner is the owner of Midas Medical Center, P.C.

29.   Midas is a Connecticut medical professional service corporation with its principal place of business at 1867 Summer Street.

30.   According to its corporate filings, Kirshner is Midas's president and director, and Davidson is the corporation's secretary.

31.   Midas purports to provide diagnostic testing to patients, such as NCV tests.

### 3.   THE PHYSICAL MEDICINE AND REHABILITATION CENTER, P.C. D/B/A THE MEDICAL CENTER, P.C.

32.   Kirshner is the owner of The Physical Medicine and Rehabilitation Center, P.C. d/b/a The Medical Center, P.C.

33.   The Medical Center is a Connecticut medical professional service corporation with its principal place of business at 1867 Summer Street.

34.   According to its corporate filings, Kirshner is The Medical Center's president, director and treasurer, and Davidson is the corporation's secretary.

35.   The Medical Center purports to provide chiropractic, physical therapy, rehabilitative, and physiotherapy services.

### D.   EMPLOYEES OF THE PC DEFENDANTS

36.   At all relevant times, the employees of the PC Defendants knowingly and intentionally conspired to create false and fraudulent medical documentation seeking payment from Allstate for services that were unnecessary, unreasonable, unwarranted, and/or not actually rendered.

37.   The employees of the PC Defendants then submitted, and/or caused to be submitted, false medical documentation to Allstate through the U.S. Mail seeking payment for insurance proceeds.

6

### 1.   JENNIFER NETTER, D.C.

38.   Jennifer Netter, D.C. resides in and is a citizen of the State of Connecticut.

39.   At all relevant times, Netter was licensed by the State of Connecticut to practice chiropractic medicine (License No. 001427).

40.   At all relevant times, Netter was, and continues to be, a manager and/or employee of Health First.

### 2.   LORELEI DAVIDSON, M.D.

41.   Lorelei Davidson, M.D. resides in and is a citizen of the State of New York.

42.   At all relevant times, Davidson was licensed by the State of Connecticut (License No. 044106) and by the State of New York (License No. 206144) to practice medicine.

43.   At all relevant times, Davidson was, and continues to be, a director, officer, shareholder, manager and/or employee of (a) Health First, (b) Midas, and (c) The Medical Center.

44.   Davidson is featured in the "Meet the Doctor" section of The Medical Center's website.[1]

### 3.   JENNIFER LYNNE, D.C.

45.   Jennifer Lynne, D.C. resides in and is a citizen of the State of Connecticut.

46.   At all relevant times, Lynne was licensed by the State of Connecticut to practice chiropractic medicine (License No. 001402).

47.   At all relevant times, Lynne was, and continues to be, a manager and/or employee of Health First.

### E.   CO-CONSPIRATOR DEFENDANTS

### 1.   JAMES W. MARSHALL, JR., D.O.

48.   James W. Marshall, Jr., D.O. resides in and is a citizen of the State of Connecticut.

---

[1] http://physmedchiro.com/custom_content/c_90864_meet_the_doctor.html (last visited on May 28, 2012).

49.     At all relevant times, Marshall was licensed by the State of Connecticut to practice medicine (License No. 000204).

50.     Beginning in 2006, Marshall conspired with Kirshner and others to execute a scheme and artifice to defraud Allstate by writing prescriptions for controlled substances for persons who were not Marshall's patients.

51.     Marshall then submitted, and/or caused to be submitted, claims to Allstate based on these false prescriptions.

            2.      FRANCISCO CARBONE

52.     Francisco Carbone resides in and is a citizen of the State of Connecticut.

53.     Carbone was a licensed physician in the State of Connecticut until his license was formally revoked in 2005 for his active participation in multiple health care fraud schemes.

54.     Beginning in 2006, Carbone conspired with Kirshner and others to execute a scheme and artifice to defraud Allstate by creating and submitting false and fraudulent medical documentation seeking payment from Allstate for services that were unnecessary, unreasonable, unwarranted, and/or not actually rendered.

55.     Carbone then submitted, and/or caused to be submitted, false medical documentation to Allstate through the U.S. Mail seeking payment for insurance proceeds.

            3.      JOSEPH HADDAD, ESQ.

56.     Joseph Haddad is an attorney licensed to practice law in the State of Connecticut.

57.     Beginning in 2006, Haddad conspired with Kirshner and others to defraud Allstate by submitting inflated bills for medical treatment that was unnecessary, worthless, and often based on fictitious clinical findings and/or diagnoses.

58.     The defendants' scheme to defraud was dependent upon a steady flow of chiropractic patients/automobile accident victims.

59.     To fulfill this need, Kirshner routinely provided Haddad with cash, knowing that Haddad would use this money to recruit victims of automobile accidents, and steer these individuals to Kirshner for treatment.

60.     Haddad would then submit settlement demand packages to Allstate through the U.S. Mail seeking settlement and/or payment of the recruited individuals' claims.

## III.   JURISDICTION AND VENUE

61.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331 (federal question), 18 U.S.C. §§ 1962(c)-(d), and 18 U.S.C. § 1964.  Supplemental jurisdiction over the state law claims is proper under 28 U.S.C. § 1367.

62.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (diversity of citizenship).

63.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states.

64.     The vast majority of the wrongful acts known to Allstate as alleged herein with particularity were carried out within the District of Connecticut.

65.     Venue is proper under 28 U.S.C. § 1391(c).

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

66.     The defendants, without the knowledge or consent of the plaintiffs, agreed and conspired together to devise and participate in a scheme to defraud Allstate by creating and submitting false and fraudulent medical records and invoices demanding payment for treatments and tests purportedly provided to motor vehicle accident patients.

67.     These records, bills and other medical documents were false and fraudulent because they: (a) demanded payment for treatments and tests that were not actually rendered to patients; (b) demanded payment for the performance of treatments that were predicated entirely on bogus initial examinations; (c) contained false permanent impairment ratings that were not derived in conformity

9

with the American Medical Association's ("AMA") Guidelines; (d) consisted of treatments and tests that were ordered and performed for a period of six (6) months pursuant to a pre-determined protocol designed to maximize the charges submitted directly or indirectly to Allstate, not to facilitate the treatment of patients; (e) concerned treatments and tests that were inappropriate and unjustified as to the type, necessity, and/or amount based on the documented and clinically-reasonable needs of the patients; and (f) misrepresented and/or fabricated test results and diagnoses (i.e., electrodiagnostic testing) to provide a basis for reimbursement, and to justify the performance of additional treatments.

68.     The defendants intentionally executed a scheme and artifice to defraud Allstate by creating, or causing to be created, medical documentation that falsely described (a) the nature of the patient's condition, (b) the supposed medical necessity for extended chiropractic treatment, and (c) the nature of the treatments rendered to the patients.

69.     The defendants conspired to provide unnecessary, unwarranted and undelivered chiropractic services to Allstate insureds/claimants.

70.     The defendants conspired and agreed to create medical documentation that falsely described the patient's subjective condition (i.e., the patient's own description of the patient's health) and the patient's objective condition (i.e., the chiropractor's objective findings of the patient's condition, based upon an examination, range of motion test, or other objective criteria) to provide a basis for reimbursement, and justify the continuation of patient treatment.

71.     The defendants further conspired and agreed to falsely document permanent partial disability ratings to establish and/or enhance personal injury claims and settlements in cases involving Allstate.

72.     Pursuant to the billing scheme, Haddad dictated (and Kirshner obeyed) the amount of treatments his clients would receive at the PC Defendants.

73.     The defendants conspired and agreed to treat all patients for a minimum of six (6) months without any regard to the individual needs of the patient.

74.     The defendants' medical documentation created the appearance that additional chiropractic and other treatments were medically necessary, thereby justifying additional treatment by defendants when such additional treatment was not medically necessary, if ever rendered at all.

75.     The defendants submitted Med-Pay claims through the U.S. Mail directly to Allstate for patients who allegedly treated at the PC Defendants in connection with automobile accident injury claims.

76.     The defendants also treated patients for whom claims were not directly submitted to Allstate, but for whom the defendants expected to be paid out of an eventual personal injury claim, settlement or lawsuit verdict paid by Allstate.

77.     In many cases, the defendants' medical documentation was submitted, through the U.S. Mail, as part of the settlement demand packages by the patient or his/her legal representative in support of the underlying tort claim.

78.     The defendants' medical documentation was designed to substantiate a patient's claim for damages in connection with personal injury claims, settlements, and lawsuits for which Allstate ultimately was responsible pursuant to its contractual obligation to indemnify its insured(s).

79.     The inclusion of the defendants' exaggerated, misrepresented and fabricated reports in settlement demand packages artificially inflated settlement values.

80.     The defendants intended that Allstate would rely upon the accuracy of their medical documentation when making claim payment decisions.

81.     Because the defendants' treatment and testing (including the results therein) was bogus, the defendants had no right to be reimbursed for such services.

## V.  CRIMINAL ACTIONS AND DISCIPLINARY PROCEEDINGS

### A.  CRIMINAL INFORMATIONS

82.    The federal government conducted an investigation concerning certain persons named as defendants in this Complaint, which consisted of a fourteen (14) month operation conducted by FBI undercover officers and agents.

83.    As part of its investigation, FBI agents staged an automobile accident and were recruited by an attorney, and subsequently directed to treat with various doctors and chiropractors under investigation in connection with this fraud scheme detailed herein.

84.    The FBI obtained voluminous documents and recordings—via its undercover operation, search warrant, and from various financial institutions—which were sufficient to establish, beyond a reasonable doubt, the perpetration of the fraud scheme detailed herein.

85.    On December 7, 2011, Kirshner pled guilty to a one (1) count Information charging him with conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, in connection with his participation in a scheme to defraud insurers by creating and submitting false medical documentation.

86.    On July 20, 2011, Netter pled guilty to a one (1) count Information charging her with conspiracy to make false statements relating to health care matters in violation of 18 U.S.C. § 371 and § 1035, in connection with her participation in a scheme to defraud insurers by creating and submitting false medical documentation.

87.    On July 19, 2011, Carbone pled guilty to a four (4) count Information charging him with (a) conspiracy to commit mail fraud  (defrauding insurance carriers) in violation of 18 U.S.C. § 1349, (b) conspiracy to commit mail fraud  (defrauding the State of Connecticut) in violation of 18 U.S.C. § 1349, (c) making false statements relating to health care matters in violation of 18 U.S.C. § 1035, and (d) conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C).

88.     The charges against Carbone arose from his participation in a scheme to defraud insurers by creating and submitting false medical documentation.

89.     On March 1, 2011, Marshall pled guilty to a one (1) count Information charging him with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(C).

90.     On March 15, 2012, Lynne pled guilty to a one (1) count Information charging her with conspiracy to make false statements relating to health care matters in violation of 18 U.S.C. § 371 and § 1035, in connection with her participation in a scheme to defraud insurers by creating and submitting false medical documentation.

       1.     *UNITED STATES V. KIRSHNER*, CASE NO. 3:11-CR-00232-SRU-1 (D. CONN.)

91.     From December 2006 until February 2010, Kirshner knowingly and willfully agreed with an unnamed attorney (now known to be Haddad) and others to participate in a scheme whereby they submitted medical documentation that materially exaggerated the severity of patient injury and the cost of medical care to insurance companies, such as Allstate, for the settlement of accident cases to obtain larger insurance settlements than would otherwise be warranted. *See* Exhibit 1.

92.     As part of the scheme, Kirshner worked with Haddad to recruit victims of automobile accidents, and steer those individuals to Kirshner for treatment.

93.     Kirshner also instructed employees of the PC Defendants to perform medically unnecessary tests, and allowed Haddad to direct the medical treatment of his clients.

94.     Following the treatment of patients, Kirshner and his co-conspirators used the U.S. Mail to transmit medical documents to Allstate.

95.     These documents were intended to inflate the value of the patients' insurance claims.

96.     Kirshner met with Haddad, and provided him with cash, knowing that Haddad would use the cash to recruit automobile accident victims as clients. The cash payments received by Haddad totaled more than $100,000.

97.     Kirshner allowed Haddad to dictate the amount his clinics would be paid for services rendered, which resulted in the creation and submission of artificially inflated medical bills to insurance companies.

98.     Kirshner established a predetermined protocol of treatment that lasted six (6) months, regardless of the patient's individual medical needs.

99.     Pursuant to Kirshner's protocol, after six (6) months of treatment, each patient represented by Haddad received a PDR, regardless of the permanency of the patient's medical condition.

100.    Kirshner allowed Haddad to influence Kirshner and his employees' medical decision-making by following Haddad's demand that every Haddad-represented client receive certain treatment and testing, regardless of medical need. Kirshner never challenged Haddad's referral of Haddad-represented patients to Carbone for additional treatment and testing, even though Kirshner knew that Carbone had previously lost his license to practice medicine.

101.    Kirshner directed his employees to perform useless diagnostic tests (i.e., NCVs) whenever a patient's symptoms could possibly implicate such testing, even though Kirshner knew that the results of the tests would never be used to determine the course of treatment.

102.    Kirshner arranged for Carbone to order the NCV tests because Kirshner believed that insurance companies would give greater weight to the legitimacy of the test if the test was ordered by a medical doctor, which would increase the likelihood of higher settlements.

103.    Kirshner never discontinued or concluded patient treatment until instructed to do so by Haddad.

104.    Kirshner knew that the PC Defendants were reimbursed out of the settlement money the patients obtained from insurance carriers, and also knew that the settlement amount was dependent upon (a) the apparent severity of the patient's injury, and (b) the medical bills generated through patient treatment.

105.    Kirshner allowed Haddad to dictate how much the PC Defendants would be paid for the medical services rendered, which allowed Haddad to misrepresent the cost of treatment to insurance carriers, such as Allstate.

106.    Haddad mailed settlement demand packages to insurance carriers, including Allstate, through the U.S. Mail, and Allstate mailed settlement checks, and related documents, to Haddad in reliance on the false medical documentation created by, or on behalf of, Kirshner and his co-conspirators.

107.    Kirshner had full knowledge of the fraud scheme perpetrated against various insurance carriers, including Allstate. *See* Exhibit 2.

108.    Kirshner acknowledged that he, along with his co-conspirators, actively participated in the fraudulent billing scheme. *Id.*

2.    *UNITED STATES V. NETTER*, CASE NO. 3:11-CR-00126-SRU-1 (D. CONN.)

109.    On July 20, 2011, Netter waived her right to be indicted and pled guilty to conspiracy to make false statements relating to health care matters in violation of 18 U.S.C. § 371 and § 1035. *See* Exhibit 3.

110.    At the direction of Kirshner, Netter intentionally inflated patients' medical bills by creating the appearance that treatments were actually rendered and/or justified based on the nature and extent of the patients' purported injuries.

111.    Pursuant to Kirshner's instructions, Netter routinely established six (6) month treatment regimens for patients, regardless of medical need.

112.    Netter conspired with Kirshner and others to create and submit false medical documentation to justify a greater settlement with insurance providers, such as Allstate.

113.    Specifically, Netter and her co-conspirators falsified medical records by: (a) preparing initial reports of a patient's condition that fabricated range of motion examination results to indicate injury, fail to inquire or omit information regarding a patient's preexisting injuries, and draw

15

causal connections between injury and accidents suffered without inquiry of preexisting conditions;
(b) preparing inaccurate notes of subjective, objective, assessment and plan information (commonly
referred to as "SOAP notes"), such notes often being completed without the patient seeing the
chiropractor; (c) preparing SOAP notes inconsistent with the patient's subjective assessment in
certain circumstances where the patients were seen by the chiropractor; and (d) preparing a final
report of condition that fabricated the severity of the condition, indicated limitations of patient's
range of motion inconsistent with the patient's true condition, and included unsupported permanent
partial disability ratings.

> 3. *UNITED STATES V. CARBONE*, CASE NO. 3:11-CR-00124-SRU-1 (D. CONN.)

114.   On July 19, 2011, Carbone waived his right to be indicted and pled guilty to a four
(4) count Information charging him with (a) conspiracy to commit mail fraud in violation of 18
U.S.C. § 1349 (to defraud insurance carriers), (b) conspiracy to commit mail fraud in violation of 18
U.S.C. § 1349 (to defraud the State of Connecticut), (c) making false statements relating to health
care matters in violation of 18 U.S.C. § 1035, and (d) conspiracy to distribute controlled substances
in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C).  *See* Exhibit 4.

115.   Carbone conspired with Kirshner, Haddad and others to obtain money from insurance
companies, such as Allstate, by means of materially false and fraudulent pretenses, representations,
and promises.

116.   Haddad routinely used Carbone as a treating and prescribing physician, even after
Carbone's license was revoked in 2005.

117.   Kirshner—knowing that Carbone had lost his license to practice medicine—arranged
for Carbone to order NCV tests whenever a patient's symptoms could possibly warrant same, even
though Kirshner knew that the results of the tests would never be used to determine the course of
treatment.

118.     Kirshner had Carbone order these tests because he believed Allstate would give greater weight to the legitimacy of the test if the test was ordered by a medical doctor, which increased the likelihood of higher settlements.

119.     Carbone also prescribed narcotic pain medication for patients in Haddad's cases.

120.     Carbone fabricated medical records to bolster patients' cases and prepared false final reports—often fabricating the patients' injuries and medical condition—when, in fact, Carbone never actually performed any medical examination.

121.     Carbone's final reports were included in the settlement packages submitted by Haddad to the insurance companies, such as Allstate.

122.     Kirshner knew that his clinics were being reimbursed from settlement monies paid by Allstate (and other insurance companies), and that amount of the insurers' settlement payments depended upon (a) the apparent severity of the patient's injury, and (b) the medical bills generated through patient treatment.

123.     Carbone—working in concert with Kirshner, Haddad, and others—accomplished the objects of their conspiracy by: (a) exaggerating the nature and extent of patients' injuries; (b) performing unnecessary treatment and diagnostic testing; (c) prescribing narcotic medication to increase the eventual settlement paid out by insurance companies; (d) creating and submitting materially false records of patients' conditions; (e) fabricating and falsifying medical records; (f) requiring unnecessary chiropractic treatment for a period of six (6) months; (g) ordering and billing for diagnostic tests of questionable medical value; (h) overstating the causal nexus between the automobile accident and the alleged injury or PDR; and (i) overstating the true medical/chiropractic bills to insurance providers.

    4.     *UNITED STATES V. MARSHALL*, CASE NO. 3:11-CR-00039-SRU-1 (D. CONN.)

124.     On March 1, 2011, Marshall waived his right to be indicted and pled guilty to a one (1) count Information charging him with conspiracy to distribute controlled substances outside the

scope of the usual course of professional practice in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(C). *See* Exhibit 5.

125.   Marshall conspired with Carbone, Haddad, and others to defraud insurance carriers by submitting false medical documentation seeking reimbursement for fraudulent treatment and testing services.

126.   Marshall wrote prescriptions for narcotic medications (often on Carbone's letterhead) at the request of Carbone, who Marshall knew had previously lost his license to practice medicine in March 2005.

127.   Marshall also wrote these prescriptions for controlled substances without ever personally meeting, examining, or consulting with the patients receiving the prescriptions.

128.   Upon information and belief, Kirshner knew that Marshall was fraudulently prescribing narcotics to patients to create the appearance that their injuries were more severe than actually sustained.

129.   Marshall then submitted, and/or caused to be submitted, claims to Allstate and others through the U.S. Mail based on these false prescriptions.

     5.   *UNITED STATES V. LYNNE*, CASE NO. 3:11-CR-00126-SRU-1 (D. CONN.)

130.   On March 15, 2012, Lynne waived her right to be indicted and pled guilty to conspiracy to make false statements relating to health care matters in violation of 18 U.S.C. § 371 and § 1035. *See* Exhibit 6.

131.   Lynne—pursuant to Kirshner's instructions—routinely established six (6) month treatment regimens for patients, regardless of medical need.

132.   Lynne conspired with Kirshner and others to create and submit false medical documentation to justify a greater settlement with insurance providers, such as Allstate.

B.    **DISCIPLINARY PROCEEDINGS**

1.    MARC KIRSHNER, D.C.

133.    In November 2008, the Connecticut Department of Health implemented a disciplinary action against Kirshner based on his failure to meet the standard of care and/or his failure to comply with applicable regulations.

134.    On November 4, 2008, the Department of Health placed Kirshner's license on probation for a period of one year, and Kirshner signed a Consent Order (Petition No. 2007-0426-007-003) agreeing not to contest the matter.

135.    Through his Consent Order, Kirshner acknowledged that he: (a) permitted an unlicensed person to perform physical therapy on patients; (b) provided professional healthcare services through persons whose scope of licensure did not permit them to perform such services; (c) violated Connecticut General Statutes, section 20-32a, by practicing chiropractic medicine under a corporate name that did not contained his own name; (d) created bills for services that misidentified the practitioner who provided the service, or the licensure of the provider; and (e) failed to meet the standards of documentation, including failure to maintain adequate charts, and failure to conform to Regulations of Connecticut State Agencies § 19a-14-40.

2.    LORELEI DAVIDSON, M.D.

136.    In November 2008, Davidson signed a Consent Order (Petition No. 2007-0427-001-074) with the Connecticut Department of Health agreeing not to contest the allegations that she, while "an employee of one or more professional corporations which are owned and/or controlled by Marc Kirshner, D.C.," (a) failed to meet the standards of documentation, including inadequate charts and failure to conform to Regulations of Connecticut State Agencies § 19a-14-40; (b) allowed one or more unlicensed person(s) to provide physical therapy to her patients; (c) allowed one or more licensed person(s) to provide care to her patients outside the scope of that licensed person's licensure; and (d) created bills, or permitted the professional corporation to prepare and submit bills on her

behalf, that failed to identify which provider performed the services, and/or that misidentified the practitioner who provided the services, and/or misidentified the licensure of the provider.

137.    Davidson was ordered to pay a civil penalty of $5,000.00.

138.    In December 2009, the New York State Board for Professional Medical Conduct also entered into a consent agreement (Order BPMC #09-223) with Davidson related to the Connecticut action described above.

139.    The New York BPMC stated that "[t]he conduct resulting in the Connecticut Board disciplinary action against [Davidson] would constitute misconduct under the laws of New York state."

140.    Davidson was censured and reprimanded, and ordered to pay a fine of $2,500.00.

## VI.    SPECIFIC ALLEGATIONS REGARDING FRAUDULENT MEDICAL BILLING SCHEME

141.    At all relevant times, the defendants intentionally executed a scheme and artifice to defraud Allstate by creating, and/or causing to be created, medical documentation that falsely represented (a) the nature of the patients' conditions, (b) the diagnostic test results and/or diagnoses, (c) the treatment and testing actually rendered to patients, and (d) the purported medical reasonableness and necessity of the medical services.

142.    The defendants then submitted, and/or caused to be submitted, claims for payment under Connecticut's insurance laws to Allstate based on this false medical documentation.

143.    The defendants also submitted, and/or caused to be submitted, invoices to Allstate as part of settlement demand packages mailed to Allstate by patients and/or their legal representatives in connection with personal injury claims, settlements, and lawsuits.

144.    In doing so, the defendants created and submitted false medical documentation to Allstate—directly or indirectly—through the U.S. Mail seeking payment.

145.    At all relevant times, the defendants acted with the specific intent to inflate their

20

patients' medical bills by creating the appearance that such treatment and testing was actually

performed and/or was necessary and warranted based on the nature and extent of the patients'

purported injuries.

A.    MEDICALLY USELESS ELECTRODIAGNOSTIC TESTS

1.    GENERAL ALLEGATIONS

146.    During the relevant time period, Carbone referred patients to Midas—a diagnostic

testing company owned by Kirshner—to receive nerve conduction velocity ("NCV") testing.

147.    The defendants routinely ordered and performed NCV tests whenever a patient's

purported symptoms could possible warrant such a test, even though Kirshner knew that the results

of the NCV studies would never be used to determine, alter and/or conclude the patient's course of

treatment.

148.    Pursuant to the defendants' scheme, Haddad and Kirshner prepared lists of Haddad's

clients who should receive the testing.

149.    These lists were then provided to Carbone, who referred the clients to Midas for such

testing.

150.    Kirshner had Carbone order the electrodiagnostic tests because Kirshner believed that

insurance companies would give greater weight to the tests if they were ordered by a medical doctor.

151.    The defendants' pre-determined recipe of NCV testing was not tailored to the

individual medical needs of the patients; rather, patients received electrodiagnostic testing regardless

of their purported injuries.

152.    As part of their illegal billing scheme, the defendants submitted fabricated NCV

reports, findings, and data to Allstate to substantiate (a) their fraudulent claims for payment, or (b)

patients' claims for damages in connection with personal injury claims, settlements, and lawsuits

involving Allstate.

153.    The NCV reports, findings, and data submitted to Allstate by the defendants were

false and fraudulent whereas they (a) concerned charges for NCV studies that were performed inaccurately, or fabricated; (b) contained fictitious measurements and/or unwarranted diagnoses, which were improperly used to develop and validate patients' treatment plans; (c) misrepresented the clinical condition and medical status of the patient; and (d) concerned NCV studies that were performed pursuant to the defendants' protocol approach to electrodiagnostic testing in violation of the American Medical Association's ("AMA") CPT guidelines and/or were wholly unwarranted.

154.    The defendants used these fabricated test results to deceive Allstate into believing that the treatment plans—which were developed pursuant to these bogus diagnostic test results—were comprised of necessary and compensable services.

155.    The performance of these fraudulent NCV studies did not aid in the assessment and/or treatment of the patients/Allstate insureds; rather, the tests were designed to artificially enrich the defendants by falsely representing patients' purported conditions and need for medical care.

156.    The defendants submitted, and/or caused to be submitted, claims for payment under Connecticut's insurance laws directly to Allstate based on this false medical documentation.

157.    The defendants also submitted, and/or caused to be submitted, invoices to Allstate as part of settlement demand packages mailed to Allstate by patients and/or their legal representatives in connection with personal injury claims, settlements, and lawsuits.

158.    During the relevant time period, the defendants created and submitted false medical documentation through the U.S. Mail seeking payment for examinations.

159.    At all relevant times, the defendants acted with the specific intent to inflate their patients' medical bills by creating the appearance that such treatment and testing was necessary and warranted based on the nature and extent of the patients' purported injuries.

a.    *NCV Tests*

160.    Diagnostic tests, such as nerve conduction velocity (NCV) tests and electromyography (EMG) tests, are used for diagnosing the existence, nature, extent, and specific

location of abnormalities (i.e., neuropathies) in the peripheral nerves and nerve roots.

161.    NCVs are non-invasive tests in which peripheral nerves in the hands, feet, arms, and legs are stimulated with electrical currents.

162.    The velocity, amplitude, and shape of the response are then recorded by electrodes attached to the surface of the skin, and are compared with universally accepted normal responses to identify the existence, nature, extent, and specific location of any abnormalities in the peripheral nerves.

163.    NCVs are used to evaluate both sensory and motor nerves, which is often necessary following automobile accidents because many nerves have both sensory and motor nerve fibers, and it is difficult to determine whether damage has occurred to the sensory nerves, the motor nerves, or both.

 2.    SPECIFIC ALLEGATIONS OF WRONGDOING REGARDING ELECTRODIAGNOSTIC TESTING

 a.    *Failure to Perform the Requisite EMGs*

164.    According to the American Association of Neuromuscular & Electrodiagnostic Medicine (AANEM), EMGs and NCVs should be performed together in the vast majority of cases.

165.    A diagnosis of radiculopathy can only be rendered using electromyography, and cannot be based entirely on nerve conduction velocity test results.

166.    Thus, a diagnosis of radiculopathy that is rendered utilizing NCV test results—instead of EMG tests or a combination of EMGs and NCVs—is wholly unwarranted and medically useless.

167.    In every case, the defendants only performed NCV studies on patients, and failed to utilize EMGs.

168.    Despite the fact that the defendants never performed any EMGs on patients, they improperly diagnosed numerous patients with lumbar radiculopathy based solely on NCV tests.

169.    Since the defendants failed to perform the necessary studies (i.e., EMGs) to warrant a finding of radiculopathy, the defendants' diagnostic tests had no medical value.

170.    The defendants used these test results to deceive Allstate into believing that the treatment plans—which were developed pursuant to these bogus diagnostic test results—were comprised of necessary and compensable services.

171.    The defendants' performance of these NCV studies, without the necessary accompanying EMG tests, did not aid in the assessment and/or treatment of the patients/Allstate insureds; rather, the tests were designed to artificially enrich the defendants by falsely representing patients' purported conditions and need for medical care.

       b.    *Fraudulent Diagnoses of Radiculopathy*

172.    The purpose of electrodiagnosis is to provide a carefully determined and accurate diagnosis.

173.    If a healthcare professional fails to provide a diagnosis after a diagnostic test is performed, the test is medically unnecessary and, as a result, not compensable.

174.    In many cases, the defendants failed to document any diagnosis after the NCV studies were performed on patients.

175.    Furthermore, even when a diagnosis was provided, the defendants routinely misrepresented the test results by representing radiculopathy in only one area (i.e., the lumbosacral region).

176.    No radiculopathies were diagnosed at the cervical level in the upper limb studies.

177.    The fact that the defendants failed to even document any diagnosis in many cases indicates that they did not use the testing for its intended purpose (i.e., a diagnostic tool), but rather utilized it as part of the examination process to justify the continued treatment of patients.

178.    Moreover, the diagnosis of radiculopathy without utilizing the requisite EMG studies resulted in medically impossible findings, and also demonstrates that the defendants fabricated the

diagnoses.

179.    The defendants used these fabricated test results to deceive Allstate into believing that the treatment plans—which were developed pursuant to these bogus diagnostic test results—were comprised of necessary and compensable services.

180.    The performance of these fraudulent NCV studies did not aid in the assessment and/or treatment of the patients/Allstate insureds; rather, the tests were designed to artificially enrich the defendants by falsely representing patients' purported conditions and need for medical care.

c.      *Fictitious Diagnoses of Neuropathy*

181.    Motor vehicle accidents rarely cause neuropathy.

182.    Only six percent (6%) of all Americans suffer from peripheral neuropathy, which includes both motor vehicle accident victims and non-motor vehicle accident victims.

183.    Even though only six percent (6%) of all Americans has peripheral neuropathy, the defendants diagnosed neuropathy in the majority of their patients.

184.    Moreover, in the majority of cases, patients were diagnosed with neuropathy in multiple nerves.

185.    The defendants' neuropathy diagnosis rate is medically impossible.

186.    The defendants used these diagnoses to deceive Allstate into believing that the treatment plans---which were developed based on these diagnoses—were comprised of necessary and compensable services.

d.      *Fictitious Measurements*

187.    The performance of motor nerve conduction velocity tests requires that the distance between the proximal and distal stimulation cites be carefully measured.

188.    These measurements are rarely identical.

189.    In virtually every one of the defendants' studies, however, the velocity measurements were identical.

190.    Such identical measurements indicates that the defendants either never performed the measurements, or the measurements were entirely fabricated to exaggerate the patients' injuries, and to provide a basis for the continuation of treatment.

191.    The defendants used these fabricated test results to deceive Allstate into believing that the treatment plans—which were developed based on these measurements—were comprised of necessary and compensable services.

e.    *Overutilization of NCV Studies*

192.    A medical professional conducting NCV studies should use a progressive (i.e., "dynamic") approach.

193.    A "protocol" approach to NCV testing is not appropriate.

194.    Failure to utilize a dynamic approach often results in the overutilization of such testing.

195.    Overutilization of NCV tests is particularly likely to occur where a protocol approach is used, in which all patients receive the same studies, regardless of the suspected diagnosis and/or the patient's purported medical condition.

196.    The number of NCV studies should vary in the clinical setting based on (a) the patient's symptoms, (b) the provider's objective findings, and (c) the suspected diagnosis.

197.    Further, the number of nerves tested should be the minimum necessary to address the clinical issue.

198.    The American Medical Association's ("AMA") *CPT Assistant* states that the number of NCV studies needed for a diagnosis of radiculopathy is the vast majority of cases is three (3) motor nerve conduction studies, and two (2) sensory nerve conduction studies.

199.    Thus, a diagnosis of radiculopathy rarely requires more than five (5) nerve conduction studies.

200.    Here, the defendants inappropriately utilized a "protocol" approach to the NCV

26

studies.

201.    The use of a protocol approach for the selection of NCV testing is a clear violation of the CPT guidelines.

202.    Further, all the defendants' patients received a minimum of eight (8) studies, regardless of their subjective symptoms.

203.    The defendants utilized the same ten (10) studies (i.e., the same pattern of ten (10) nerves were used) in virtually every upper limb study.

204.    Additionally, the defendants utilized the same eight (8) studies (i.e., the same pattern of eight (8) nerves were used) in the majority of lower limb studies.

205.    The defendants' protocol approach to NCV studies, regardless of the patients' symptoms and objective findings, completely ignored the entire electrodiagnostic process.

206.    Accordingly, the defendants' studies were not reasonable or medically necessary.

207.    The defendants used these fabricated test results to deceive Allstate into believing that the treatment plans—which were developed pursuant to these bogus diagnostic test results— were comprised of necessary and compensable services.

**B.    FRAUDULENT PATIENT EXAMINATIONS**

208.    As part of their billing scheme, the defendants submitted fabricated reports, findings and data to Allstate to substantiate (a) their fraudulent claims for payment, or (b) patients' claims for damages in connection with personal injury claims, settlements, and lawsuits involving Allstate.

209.    The medical reports, notes, and invoices submitted by the defendants in support of the initial examinations were false and fraudulent whereas they: (a) contained charges for complex examinations even though the exams were merely cursory; (b) contained fictional data and/or objective findings, which were improperly used to develop and validate patients' treatment plans; (c) overstated the casual relationship between the patients' purportedly injuries and the motor vehicle accident; (d) misrepresented that all of the necessary components of the examinations were actually

performed and/or accurately recorded; and (e) contained charges for examinations that were not performed consistent with the AMA CPT requirements and/or were wholly unwarranted.

210.    Examination, evaluation, and the establishment of a diagnosis are all part of the process that helps the healthcare provider determine an appropriate treatment plan specifically designed to aid in each individual patient's care, recovery, and rehabilitation.

211.    A legitimate examination has three (3) components: (a) the patient/client history; (b) the systems review; and (c) tests and measures.

212.    The "patient history" is defined as a systematic gathering of past and current information related to why the patient is seeking medical services.  The data obtained (i.e., through an interview, a review of the patient's records, or from other sources) includes, among other things, family history, general health status, medical/surgical history, current conditions, and chief complaints.

213.    The "systems review" is a brief examination of the anatomical and physiological status of a patient's systems (i.e., cardiovascular/pulmonary, musculoskeletal, and neuromuscular systems).

214.    After a comprehensive examination and questioning process, the healthcare provider determines the patient's needs, and generates diagnostic hypotheses that may be further investigated by utilizing specific tests and measures.

215.    "Tests and measures" are used to: (a) rule in (or rule out) causes of impairment and functional limitations; (b) establish a diagnosis, prognosis, and plan of care; and (c) select interventions.

216.    The defendants customarily submitted charges for patient initial office visits under CPT Code 99204.  The criteria developed by the AMA to properly assign this CPT code to medical billing invoices include the components illustrated in the chart below.

| | HISTORY | EXAMINATION | MEDICAL DECISION MAKING | FACE TO FACE TIME |
|---|---|---|---|---|
| 99201 | Problem focused | Problem focused | Straight forward | 10 minutes |
| 99202 | Expanded problem focused | Expanded problem focused | Straight forward | 20 minutes |
| 99203 | Detailed | Detailed | Low complexity | 30 minutes |
| 99204 | Comprehensive | Comprehensive | Moderate complexity | 45 minutes |
| 99205 | Comprehensive | Comprehensive | High complexity | 60 minutes |

217.   The factors considered to determine the "complexity" of medical decision making in

arriving at a proper CPT code assignment include:

| | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF COMPLICATIONS AND/OR MORBIDITY OR MORTALITY |
|---|---|---|---|
| **Straight forward decision making (CPT Code 99201-99202)** | Minimal | Minimal or none | Minimal |
| **Low complexity decision making (CPT Code 99203)** | Limited | Limited | Low |
| **Moderate complexity medical decision making (CPT Code 99204)** | Multiple | Moderate | Moderate |
| **High complexity medical decision making (CPT Code 99205)** | Extensive | Extensive | High |

218.   To warrant a medical bill demanding payment for CPT Code 99204, the

injury/condition would necessarily require:

  (a)   moderate risk of mortality, morbidity and/or complications;

  (b)   moderate diagnoses and review of complex data; and

  (c)   the defendants to: (a) obtain comprehensive patient histories;
       (b) conduct comprehensive examinations; and (c) evaluate a

patient (face-to-face) interaction for approximately 45 minutes.

219.    By creating medical bills that included CPT codes, then causing such invoices to be mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

220.    However, all of the bills prepared and submitted by the defendants were submitted under improper and/or deceptive CPT codes.

221.    The defendants submitted, or caused to be submitted, this false medical documentation to Allstate—directly or indirectly—through the U.S. Mail seeking payment for unwarranted initial examinations and/or re-evaluations.

222.    In reasonable reliance on the defendants' false medical documentation, Allstate made payments to the defendants for said fraudulent medical services.

223.    In reasonable reliance on the defendants' false medical documentation, Allstate also mailed settlement checks to patients and/or their legal representatives, and a portion of said settlement funds were then used to reimburse the defendants for chiropractic services purportedly rendered to the patients/Allstate insureds.

        1.    INITIAL PATIENT EXAMINATIONS

224.    The defendants materially misrepresented the initial examinations of patients.

225.    Based upon the medical documentation submitted by the defendants, the defendants' use of CPT Code 99204 was unwarranted because the defendants' medical documentation created in connection with such charges failed to meet the minimum threshold necessary to bill CPT Code 99204.

226.    With respect to each patient who treated at the PC Defendants, the defendants failed to document the necessary history required by CPT Code 99204.  Accordingly, such billing is non-compensable.

227.    With respect to each patient who treated at the PC Defendants, the defendants failed to document the necessary examination required by CPT Code 99204. Accordingly, such billing is non-compensable.

228.    With respect to each patient treated at the PC Defendants, the defendants failed to document the necessary complexity of medical decision making required by CPT Code 99204. Accordingly, such billing is non-compensable.

229.    With respect to each patient who treated at the PC Defendants, the defendants failed to document the necessary complexity of data to be reviewed required by CPT Code 99204. Accordingly, such billing is non-compensable.

230.    With respect to each patient who treated at the PC Defendants, the defendants failed to document the necessary risk of complication and/or morbidity or mortality required by CPT Code 99204. Accordingly, such billing is non-compensable.

231.    None of the patients who treated at the PC Defendants exhibited the necessary moderate risk of morbidity and/or mortality required by CPT Code 99204.

232.    The defendants submitted, and/or caused to be submitted, claims directly to Allstate based on this false medical documentation.

233.    The defendants also submitted, and/or caused to be submitted, invoices to Allstate as part of settlement demand packages mailed to Allstate by patients and/or their legal representatives in connection with personal injury claims, settlements, and lawsuits.

234.    Because the defendants' initial examinations were non-compensable, and because the defendants made numerous material misrepresentations regarding the provision of these examinations, Allstate is entitled to recover payments made directly to the defendants in connection with the examinations, and any payments made to the defendants as the result of the settlement of the patients' bodily injury claims.

### 2.   PATIENT RE-EVALUATIONS

235.   The defendants' medical documentation is also false and misleading in connection with their bills for patient re-evaluations. The defendants failed to document the necessary criteria required to bill re-evaluations under CPT Code 99214 in connection with each of the patients treated at the PC Defendants.

236.   Accordingly, Allstate is entitled to recover all payments made directly to defendants in connection with the examinations, and any payments made to the defendants as the result of the settlement of the patients' bodily injury claims.

### B.   FABRICATED EXAMINATION FINDINGS

### 1.   FAILURE TO PROPERLY DOCUMENT PRE-EXISTING INJURIES

237.   The purpose of a physical examination is to diagnose the condition, assess the need for care, and determine the type(s) and frequency of treatment.

238.   An examination should include a comprehensive assessment of the patient's present *and* past history to (a) evaluate the patient's current condition, (b) establish a diagnosis, and (c) determine the appropriate course of care, based on the clinical findings.

239.   Comprehensive patient histories help identify any unique circumstances or conditions that require a modification as to the type and/or frequency of treatment.

240.   Comprehensive patient histories (including, but not limited to, information pertaining to pre-existing injuries) is also necessary to establish a causal relationship between the motor vehicle accident and the patient's current condition, and to determine the treatment necessary to return the patient to pre-injury status.

241.   Deviating from the proper examination process, the defendants failed to adequately document patients' past histories, and/or the relationship between the patients' present histories and their pre-existing injuries (of a same or similar nature).

242.   By ignoring patients' past histories, the defendants attempted to mask the potential

32

adverse effect that any pre-existing injury could have on the causal relationship between the motor vehicle accident and the patient's current condition.

243.    The defendants intentionally omitted patients' past histories in a deliberate attempt to create a false impression that the injuries sustained were directly attributable to the motor vehicle accident, and that an extended course of treatment was necessary.

244.    Such conduct directly corresponds to the criminal allegations made against the defendants.

245.    Netter—along with Kirshner and others—prepared initial reports of a patient's condition that would fail to inquire or omit information regarding a patient's pre-existing injuries, and draw causal connections between injury and accidents suffered without inquiry of pre-existing conditions.

246.    This was accomplished to minimize the impact of the patients' past medical histories, exaggerate the patients' current injuries as they relate to the motor vehicle accident, and to create a justification for the continuation of patient care.

2.    UNSUBSTANTIATED "BILATERAL" EXAMINATION FINDINGS

247.    Proper protocol dictates that if a test is "positive," the healthcare professional must not only appropriately document the findings of the test, but also follow up with other tests to more clearly define the problem or condition.

248.    However, in virtually every case, the defendants simply reported "positive" tests results, without documenting any specifics regarding how or why the test results were abnormal.

249.    The defendants also routinely reported "bilateral" findings, despite contrasting patient histories.

250.    It is not clinically possible that so many patients would present with bilateral findings.

251.    To regard these findings as a true and accurate representation of the patients'

33

purported conditions, one would have to accept the illogical proposition that each individual (a) struck the same exact parts of the motor vehicle (center, back and front) (b) with both arms and legs in the same position, (c) looking straight ahead.

252.    Therefore, the defendants' examination findings were contrived to exaggerate the patients' purported injuries for the specific purpose of justifying the provision of unnecessary services.

C.    FALSE PERMANENT DISABILITY RATINGS

253.    As part of their scheme, the defendants routinely assigned false permanent disability ratings to exaggerate the patients' injuries to establish a basis for reimbursement of insurance proceeds.

254.    A permanent disability rating (PDR) is assigned when there is no expected change in a patient's condition over the course of one (1) year (i.e., the patient has reached maximum medical improvement ("MMI")).

255.    The impairment does not indicate a disability of job performance, but rather is a functional assessment of a person's ability to perform the normal activities of daily living ("ADL") (i.e., self-care, daily physical activity, sensory/feelings, sleep, and sexual functions).

256.    Reporting an impairment of injury represents that the person's condition cannot be resolved, and will affect the patient's ADL from that point forward.

257.    The defendants employed a predetermined protocol of treatment pursuant to which Kirshner and his employees would treat patients in Haddad's cases for six (6) months, regardless of need, before assigning a PDR.

258.    The defendants implemented a faulty methodology for determining patients' PDRs, which necessarily resulted in the assignment of false and inflated impairment ratings.

259.    If the patient had received a PDR for a prior accident, the protocol was to give a higher or different rating based on the present accident.

34

260.   For example, if patients had multiple impairments due to previous accidents, the defendants merely combined all of the impairment ratings to create a new rating (i.e., if the patient's PDR from a previous injury was 7%, and the defendants determined the patient's PDR relating to the current accident was 6%, the defendants merely added the two PDRs for a new rating of 13%).

261.   Moreover, the defendants' PDRs were fabricated whereas the defendants routinely overstated the causal nexus between the automobile accident and the alleged PDR to create the appearance that the patient's injuries were directly related to the present accident (to obtain coverage for the accident under an Allstate insurance policy), and the patient's injuries were more severe that actually sustained (to obtain a larger payment/settlement that would otherwise be paid by Allstate).

262.   The assignment of an impairment rating creates the perception of extensive injury, and a difficult recovery.

263.   The defendants assigned PDRs in virtually every case, which suggests that none of the defendants' patients will ever fully recover.

264.   Such findings are not clinically probable.

265.   The defendants included these false and misleading permanent disability ratings in patients' medical records—which were submitted either directly to Allstate or indirectly as part of settlement demand packages—to increase the settlement value of each patient's claim.

266.   Allstate made payment decisions in reasonable reliance on the defendants' findings.

**D.   MEDICAL SERVICES NOT ACTUALLY PERFORMED**

267.   The defendants also billed Allstate for medical services not actually rendered.

268.   The federal government's investigation revealed that the defendants prepared inaccurate and/or falsified SOAP notes, whereas these notes were routinely created without the patient being first examined by a chiropractor or physician.

269.   In these instances, even though the patients were never examined before receiving treatment, Allstate was billed for initial examinations and/or evaluations.

35

270.    Further, even in certain circumstances where the patient was examined by a licensed professional, SOAP notes were also prepared to include subjective complaints, clinical findings, and/or diagnoses that were inconsistent with the patient's subjective assessment or true medical condition.

271.    Specifically, Netter, Carbone and their co-conspirators, fabricated medical records to bolster a patient's case, and prepared false final reports—often fabricating the patient's injuries and medical condition—when in fact, Netter and/or Carbone never performed a medical examination.

272.    Additionally, Marshall prescribed unduly strong narcotics to persons who were not his patients, and would further write prescriptions—at the direction of Carbone and others—without personally meeting, examining, or consulting with patients who would receive the pain medication.

273.    These final reports and information concerning the unwarranted prescriptions were then included in settlement packages submitted to Allstate by Haddad.

274.    The defendants submitted medical records and bills for services that were not actually rendered knowing that Allstate would rely on the apparent legitimacy of these records when (a) making direct payments, and (b) making decisions to settle patients' bodily injury claims.

E.    UNIFORM TREATMENT PROTOCOL

275.    The defendants purportedly performed patient examinations and re-evaluations to injured persons, including persons supposedly involved in motor vehicle accidents.

276.    These initial examination reports virtually always concluded that PC Defendant patients/Allstate's claimants had "bilateral" soft-tissue injuries that necessitated a treatment plan that included the provision of numerous treatments and tests.

277.    Based upon their findings from the initial examination of each patient, the defendants uniformly ordered a protocol of treatments and tests, regardless of the patient's individual needs.

278.    During the course of treatment, employees of the PC Defendants—at Kirshner's direction—rendered specific modalities to motor vehicle accident victims: (a) 97010 – hot packs; (b)

36

97124 – therapeutic procedure; (c) 97014 – electrical stimulation unattended; (d) 97140 – massage, (e) 97012 – mechanical traction, and (f) chiropractic manipulations and/or adjustments.

279.    The defendants also ordered useless tests regardless of the patient's individual needs and/or condition.

280.    The defendants knew that the intentionally fabricated medical findings—findings that they personally documented in the patients' records—were presented as a justification for performing treatment and testing that was unnecessary and/or fraudulently performed.

281.    The defendants benefited from their pre-determined and fraudulent findings in numerous ways: (a) the defendants' fraudulently fabricated test results justified the diagnosis of radiculitis; and (b) the defendants' fraudulently fabricated findings supported the medical necessity of other tests and treatments.

282.    The defendants also intentionally misrepresented the severity of the motor vehicle accidents in patients' medical records to exaggerate the patients' injuries to establish a basis for reimbursement of insurance proceeds.

283.    Specifically, as discussed above, the defendants assigned false and/or inflated PDRs to patients for the express purpose of creating the appearance that the patient's injuries were directly related to the present accident, and the patient's injuries were more severe than actually sustained.

284.    Moreover, the defendants routinely referred patients to a physician for pain medication, without any explanation recorded in the patients' medical records, in an effort to create the impression that the injuries sustained were more serious.

285.    Carbone and/or Marshall provided prescriptions for narcotic pain medication to these patients (even when not needed) to suggest that the patients had suffered significant medical injury.

286.    In many instances, Carbone and/or Marshall wrote prescriptions without even examining or meeting the patients.

287.    This was accomplished with the specific intent to increase the eventual settlements

paid out by Allstate.

288.    This evidence indicates that the defendants manipulated patients' medical records to exaggerate the patients' injuries and to justify the continuation of treatment, even if such prolonged care was unjustified based on the patients' actual injuries.

289.    All of the conduct described in the paragraphs above was designed to (a) maximize the charges submitted to Allstate on a per patient basis, or (b) increase the eventual settlements paid out by Allstate.

290.    The defendants submitted, and/or caused to be submitted, claims for payment under Connecticut's insurance laws to Allstate based on this false medical documentation.

291.    The defendants also submitted, and/or caused to be submitted, invoices to Allstate as part of settlement demand packages mailed to Allstate by patients and/or their legal representatives in connection with personal injury claims, settlements, or lawsuits.

292.    The defendants also created such documents with knowledge that this documentation would be relied upon by Allstate in making coverage decisions.

293.    During the relevant period, the defendants created and submitted false medical documentation to Allstate—directly or indirectly—through the U.S. Mail demanding payment.

294.    At all relevant times, the defendants acted with the specific intent to inflate their patients' medical bills by creating the appearance that such treatment and testing was necessary and warranted based on the nature and extent of the patients' purported injuries.

## VII.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

295.    The defendants created, prepared and submitted false medical documentation, and intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized depository for mail matter,

things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

296.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT code tally sheets, referrals, letters and request for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

297.    Every automobile insurance claim detailed herein involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

298.    The defendants either personally used the mails to further their fraudulent scheme by causing fraudulent medical bills and records to be mailed to Allstate and/or counsel for claimants, or acted with knowledge that the use of the mails would follow in the ordinary course of business.

299.    The defendants knew that their office, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider or the plaintiffs would use the mails in connection with each of the fraudulent claims, including issuing payments based upon the defendants' fraudulent documentation.

300.    Allstate estimates that the defendants' fraudulent medical billing scheme generated hundreds of mailings. A table highlighting selected examples of mailings is annexed hereto at Exhibit 7.

301.    The defendants' fraudulent scheme went undetected until Allstate had sustained substantial financial injury. The nature of defendants' fraudulent scheme was self-concealing by its very nature—false medical reports and false invoices appearing legitimate on their face.

## VIII.   ALLSTATE'S JUSTIFIABLE RELIANCE

302.   Through the submission of patient records, invoices, and other medical documentation included in the settlement demand packages submitted by Haddad, the defendants attested to the medical necessity of medical, physical therapy and chiropractic treatments that were purportedly performed and billed to Allstate.

303.   As licensed medical and legal professionals, the defendants are obligated—legally and ethically—to act with honesty, integrity, and in accordance with their professional oaths and pledges.

304.   When making payments directly to the defendants, or making coverage decisions on claims involving treatment rendered by the defendants, Allstate reasonably believed that the defendants' actions conformed to all applicable laws, and that they were bound by their avowed ethical obligations.

305.   Evidence of fraudulent activity was not revealed until Allstate discovered the defendants' pattern of unlawful activity occurring over a significant period of time.

306.   To induce Allstate to promptly pay the fraudulent charges for treatment and testing, the defendants submitted, or caused to be submitted, to Allstate false medical documentation which represented that the treatment was legitimate and/or actually rendered, and thus compensable under Connecticut law.

307.   Allstate is required, under statutory and contractual obligations, to promptly and fairly process claims within thirty (30) days.

308.   The facially valid documents submitted to Allstate in support of the charges at issue—combined with the material misrepresentations described above—were designed to (and in fact did) induce Allstate to rely on the accuracy of such documents.

309.   In reliance on the representations of the defendants, Allstate paid money to the defendants to its detriment—monies that Allstate otherwise would not have paid if the defendants

had provided true and accurate information.

310.    As a result, Allstate has paid in excess of $345,868.00 based upon the defendants'
false medical documentation.

## IX.    DAMAGES

311.    The pattern of fraudulent conduct by the defendants injured Allstate in its business
and property by reason of the aforesaid violations of state and federal law.  Although it is not
necessary for Allstate to calculate damages with specificity at this stage in the litigation, and
Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory
damages for:

1.    payments in connection with first-party claims in excess of
$94,308.00, the exact amount to be determined at trial.  The chart
annexed hereto as Exhibit 8, and incorporated herein, identifies
Allstate's payments to the defendants in connection with first-party
claims determined to be fraudulent and non-compensable as of the
filing of this Complaint;

2.    payments in connection with third-party claims in excess of
$251,560.00, the exact amount to be determined at trial.  The chart
annexed hereto as Exhibit 9, and incorporated herein, identifies
Allstate's payments to the defendants in connection with third-party
claims determined to be fraudulent and non-compensable as of the
filing of this Complaint; and

3.    expenses incurred to review, adjust, investigate, litigate and pay the
false and fraudulent claims created by the defendants, the exact
amount to be determined at trial.

## X.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### Health First Medical, P.C. Enterprise
### (Against Marc Kirshner, D.C., Jennifer Netter, D.C., Lorelei Davidson, M.D., Jennifer Lynne, D.C., James W. Marshall, Jr., D.O., Francisco Carbone, and Joseph Haddad)

312.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth
above as if fully set forth herein.

313.    In connection with each of the claims identified in the plaintiffs' Complaint, Kirshner, Netter, Davidson, Lynne, Marshall, Carbone, and Haddad ("Count I Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

314.    The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

315.    Among other things, settlement packages, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

316.    Policies of insurance were delivered to insureds through the U.S. Mail.

317.    Medical reports and invoices were delivered to Allstate through the U.S. Mail.

318.    Payments to the defendants traveled via the U.S. Mail.

319.    As documented above, the Count I Defendants repeatedly and intentionally submitted false medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Health First, to collect payment from Allstate under the Allstate insurance policies and applicable Connecticut insurance laws.

320.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Health First, for the benefit of the Count I Defendants, that would not otherwise have been paid.

321.    The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

322.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

323.    By filing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

324.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Health First, for the benefit of the Count I Defendants.

325.    Allstate is in the business of writing insurance and paying claims in the State of Connecticut.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

326.    Health First Medical, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

327.    The Count I Defendants associated with the foregoing enterprise, and participated— both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

328.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

329.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

330.    By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### Health First Medical, P.C. Enterprise
**(Against Marc Kirshner, D.C., Jennifer Netter, D.C., Lorelei Davidson, M.D.,  Jennifer Lynne, D.C., James W. Marshall, Jr., D.O., Francisco Carbone, and Joseph Haddad)**

331.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

43

332.    Defendants Kirshner, Netter, Davidson, Lynne, Marshall Carbone, and Haddad conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Health First.

333.    Defendants Kirshner, Netter, Davidson, Lynne, Marshall, Carbone, and Haddad agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Health First by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents, to Allstate.

334.    The purpose of the conspiracy was to obtain insurance proceeds from Allstate on behalf of Health First for medical treatment and testing that the defendants knew was not compensable under Connecticut's insurance laws.

335.    Kirshner, Netter, Davidson, Lynne, Marshall, Carbone, and Haddad were aware of this purpose, and agreed to take steps to meet the conspiracy's objective, and the creation of insurance claim documents containing material misrepresentations and/or material omissions.

336.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the defendants' unlawful conduct described herein.

337.    By virtue of the defendants' violations of 18 U.S.C. § 1962(d), defendants, Kirshner, Netter, Davidson, Lynne, Marshall, Carbone, and Haddad, are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT III**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**Midas Medical Center, P.C. Enterprise**
**(Against Marc Kirshner, D.C., Lorelei Davidson, M.D., James W. Marshall, Jr., D.O.,**
**Francisco Carbone, and Joseph Haddad)**

338.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth
above as if fully set forth herein.

339.    In connection with each of the claims identified in the plaintiffs' Complaint,
Kirshner, Davidson, Marshall, Carbone, and Haddad ("Count III Defendants") intentionally caused to
be prepared and mailed false medical documentation in connection with Allstate insurance claims, in
furtherance of their scheme to defraud.

340.    The Count III Defendants employed one or more mailings to demand and/or receive
payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

341.    Among other things, settlement packages, medical billing invoices, medical reports,
applications for insurance, and premium checks were routinely delivered to Allstate through the U.S.
Mail.

342.    Policies of insurance were delivered to insureds through the U.S. Mail.

343.    Medical reports and invoices were delivered to Allstate through the U.S. Mail.

344.    Payments to the defendants traveled via the U.S. Mail.

345.    As documented above, the Count III Defendants repeatedly and intentionally
submitted false medical documentation to Allstate for medical expenses and/or services that were
purportedly performed at Midas, to collect payment from Allstate under the Allstate insurance
policies and applicable Connecticut insurance laws.

346.    As a result of, and in reasonable reliance upon these misleading documents and
misrepresentations, Allstate, by its agents and employees, issued drafts to Midas, for the benefit of
the Count III Defendants, that would not otherwise have been paid.

347.    The Count III Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

348.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

349.    By filing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

350.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Midas, for the benefit of the Count III Defendants.

351.    Allstate is in the business of writing insurance and paying claims in the State of Connecticut.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

352.    Midas Medical Center, P.C. constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

353.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

354.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

355.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

356.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**Midas Medical Center, P.C. Enterprise**
**(Against Marc Kirshner, D.C., Lorelei Davidson, M.D., James W. Marshall, Jr., D.O.,**
**Francisco Carbone, and Joseph Haddad)**

357.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth

above as if fully set forth herein.

358.    Defendants Kirshner, Davidson, Marshall, Carbone, and Haddad conspired with each

other to violate 18 U.S.C. § 1962(c) through the operation of Midas.

359.    Defendants Kirshner, Davidson, Marshall, Carbone, and Haddad agreed to participate

in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Midas by means

of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7,

and through the preparation and/or submission of fraudulent insurance claim documents, to Allstate.

360.    The purpose of the conspiracy was to obtain insurance proceeds from Allstate on

behalf of Midas for medical treatment and testing that the defendants knew was not compensable

under Connecticut's insurance laws.

361.    Kirshner, Davidson, Marshall, Carbone, and Haddad were aware of this purpose, and

agreed to take steps to meet the conspiracy's objective, and the creation of insurance claim

documents containing material misrepresentations and/or material omissions.

362.    Allstate has been injured in its business and property by reason of this conspiratorial

conduct whereas Allstate has been induced to make claim payments as a result of the defendants'

unlawful conduct described herein.

363.    By virtue of the defendants' violations of 18 U.S.C. § 1962(d), defendants, Kirshner,

Davidson, Marshall, Carbone, and Haddad, are jointly and severally liable to Allstate, and Allstate is

entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together

with the costs of suit, including reasonable attorneys' fees.

## COUNT V
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### The Physical Medicine and Rehabilitation Center, P.C. d/b/a
### The Medical Center, P.C. Enterprise
### (Against Marc Kirshner, D.C., Lorelei Davidson, M.D., James W. Marshall, Jr., D.O.,
### Francisco Carbone, and Joseph Haddad)

364.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

365.    In connection with each of the claims identified in the plaintiffs' Complaint, Kirshner, Davidson, Marshall, Carbone, and Haddad ("Count V Defendants") intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of their scheme to defraud.

366.    The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 7.

367.    Among other things, settlement packages, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

368.    Policies of insurance were delivered to insureds through the U.S. Mail.

369.    Medical reports and invoices were delivered to Allstate through the U.S. Mail.

370.    Payments to the defendants traveled via the U.S. Mail.

371.    As documented above, the Count V Defendants repeatedly and intentionally submitted false medical documentation to Allstate for medical expenses and/or services that were purportedly performed at The Medical Center, to collect payment from Allstate under the Allstate insurance policies and applicable Connecticut insurance laws.

372.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to The Medical Center, for the benefit of the Count V Defendants, that would not otherwise have been paid.

373.    The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

374.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

375.    By filing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

376.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to The Medical Center, for the benefit of the Count V Defendants.

377.    Allstate is in the business of writing insurance and paying claims in the State of Connecticut. Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

378.    The Physical Medicine and Rehabilitation Center, P.C., d/b/a The Medical Center, P.C., constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

379.    The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

380.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

381.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

382.    By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
**The Physical Medicine and Rehabilitation Center, P.C. d/b/a
The Medical Center, P.C. Enterprise
(Against Marc Kirshner, D.C., Lorelei Davidson, M.D., James W. Marshall, Jr., D.O.,
Francisco Carbone, and Joseph Haddad)**

383.   Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

384.   Defendants Kirshner, Davidson, Marshall, Carbone, and Haddad conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of The Medical Center.

385.   Defendants Kirshner, Davidson, Marshall, Carbone, and Haddad agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of The Medical Center by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 7, and through the preparation and/or submission of fraudulent insurance claim documents, to Allstate.

386.   The purpose of the conspiracy was to obtain insurance proceeds from Allstate on behalf of The Medical Center for medical treatment and testing that the defendants knew was not compensable under Connecticut's insurance laws.

387.   Kirshner, Davidson, Marshall, Carbone, and Haddad were aware of this purpose, and agreed to take steps to meet the conspiracy's objective, and the creation of insurance claim documents containing material misrepresentations and/or material omissions.

388.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make claim payments as a result of the defendants' unlawful conduct described herein.

389.   By virtue of the defendants' violations of 18 U.S.C. § 1962(d), defendants, Kirshner, Davidson, Marshall, Carbone, and Haddad, are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified, three times the damages sustained by

reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**COUNT VII**
**COMMON LAW FRAUD**
**(Against All Defendants)**

390.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

391.    The defendants' scheme to defraud Allstate was dependent upon a succession of misrepresentations of material facts by the defendants with respect to the performance of medical services not warranted and/or performed.

392.    The defendants' misrepresentations included, but are not limited to, the following: (a) preparing and submitting false insurance claims; (b) participating in and/or causing the preparation and submission of fraudulent medical records, treatment notes and medical invoices regarding treatment that was (1) not warranted, and (2) not performed; and (c) falsely documented the existence, nature and/or extent of injury.

393.    The foregoing fraudulent representations were false, or at least required the disclosure of additional facts to render the information furnished by the defendants not misleading. Such misrepresentations and nondisclosures related to matters of fact material to Allstate's decisions regarding payment of claims and were made by the defendants in furtherance of their scheme to defraud Allstate and with the intent to induce Allstate to pay for medical services not performed.

394.    Allstate reasonably relied upon defendants' fraudulent representations to their detriment.

395.    Upon such reasonable reliance, Allstate paid substantial funds to or for the benefit of the defendant and expended substantial funds in its efforts to investigate and defend the scope of the defendants' fraudulent conduct

## COUNT VIII
### VIOLATION OF THE CONNECTICUT UNFAIR TRADE
### PRACTICES ACT (CUTPA)
### Conn. Gen. Stat. §42-110(b)
### (Against All Defendants)

396.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

397.    The defendants' fraudulent medical billing practices as alleged throughout this Complaint constitute unfair and deceptive trade practices in violation of CUTPA.

398.    Allstate is a "person" entitled to protection under the Connecticut Unfair Trade Practices Act.

399.    As a direct and proximate result of the defendants' conduct, Allstate suffered an ascertainable loss of money or property.

## COUNT IX
### VIOLATIONS OF THE CONNECTICUT HEALTH
### INSURANCE FRAUD ACT (CHIFA)
### Conn. Gen. Sat. §53-442
### (Against All Defendants)

400.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

401.    Allstate is a proper party plaintiff under the CHIFA statute as an aggrieved insurer.

402.    The defendants submitted hundreds of false written statements and invoices relating to services allegedly provided to patients with the intent to cause Allstate to pay them money, directly or indirectly.

403.    The defendants submitted medical billing invoices for which the plaintiffs became responsible through contract or tort for unnecessary, unwarranted, and/or wholly fictitious chiropractic care.

## COUNT X
## UNJUST ENRICHMENT
### (Against All Defendants)

404.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

405.    The defendants' retention of amounts paid by Allstate (in excess of $345,868.00) is wrongful because these monies were obtained as the direct result of the defendants' intentional and knowing violation of federal and Connecticut law, as set forth in this Complaint.

406.    Allstate has been harmed by the defendants' acts of wrongfully obtaining and retaining these benefits because Allstate would not have paid the defendants' bills if it had known at the time it paid these claims that the defendants' acts were wrongful and illegal.

407.    The defendants' retention of these benefits violates fundamental principles of justice, equity, and good conscience.

408.    Additionally, the defendants' retention of the excess amounts received from Allstate due to the defendants' fraudulent treatment and billing practices is wrongful.

409.    The defendants have been unjustly enriched, and to allow defendants to retain these amounts would violate fundamental principles of justice, fairness, equity, and good conscience.

## COUNT XI
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against All Defendants)

410.    Allstate re-alleges, re-pleads and incorporates by reference all paragraphs set forth above as if fully set forth herein.

411.    The PC Defendants routinely performed medically unnecessary and fraudulent treatments and tests that were rendered absent any medically-justified criteria and/or were ordered and performed utilizing fabricated diagnoses.

412.    The defendants continue to submit invoices for unnecessary and unlawfully rendered medical services, and/or for treatment that was never provided, to Allstate, and other claims remain

pending with Allstate.

413.    The defendants will continue to bill Allstate for insurance payments absent a declaration by this Court that their activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future claims submitted by any of the defendants.

414.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the PC Defendants, at all relevant times, failed to provide medically necessary and/or warranted services to its patients, and thus the defendants have no standing to submit or receive insurance proceeds.

## XI.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company f/k/a Deerbrook Insurance Company, and Allstate New Jersey Insurance Company (collectively "Allstate" and/or "plaintiffs"), respectfully pray that judgment enter in their favor, as follows:

### COUNT I
### (Violations of 18 U.S.C. § 1962(c))

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT II
### (Violations of 18 U.S.C. § 1962(d))

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT III
### (Violations of 18 U.S.C. § 1962(c))

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT IV
### (Violations of 18 U.S.C. § 1962(d))

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT V
### (Violations of 18 U.S.C. § 1962(c))

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VI
### (Violations of 18 U.S.C. § 1962(d))

(a)    AWARD Allstate's actual and consequential damages to be established at trial;

(b)    AWARD Allstate treble damages, interests, costs and reasonable attorneys' fees;

(c)    GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT VII
### (Fraud)

(a)    AWARD Allstate its actual damages in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)    AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)    GRANT any other relief this Court deems just.

### COUNT VIII
### (Connecticut Unfair Trade Practice Act)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)     AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just.

### COUNT IX
### (Connecticut Health Insurance Fraud Act)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct;

(c)     AWARD Allstate its costs in defending No-Fault suits filed by defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just.

### COUNT X
### (Unjust Enrichment)

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just.

### COUNT XI
### (Declaratory Judgment)

(a)     DECLARE that the PC Defendants provided medically unnecessary and unlawfully-rendered services to its patients, and/or charged Allstate for services which were never rendered;

(b)     DECLARE that the PC Defendants' activities are unlawful;

(c)     DECLARE that Allstate has no obligation to pay pending, previously-denied and/or future

insurance claims submitted by the defendants; and

(d)     GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

                            Respectfully Submitted,
                            *Allstate Insurance Company, Allstate*
                            *Indemnity Company, Allstate Property &*
                            *Casualty Insurance Company, Allstate Fire &*
                            *Casualty Insurance Company, Allstate Vehicle*
                            *& Property Insurance Company f/k/a*
                            *Deerbrook Insurance Company, and Allstate*
                            *New Jersey Insurance Company,*


                            */s/ Richard D. King, Jr.*
                            _____
                            Richard D. King, Jr. (CT23997)
                            rking@smithbrink.com
                            Nathan A. Tilden (CT24011)
                            ntilden@smithbrink.com
                            Michael W. Whitcher (CT27629)
                            mwhitcher@smithbrink.com
                            SMITH & BRINK, P.C.
                            350 Granite Street, Suite 2303
                            Braintree, MA 02184
                            (617) 770-2214



Dated:   August 29, 2012