# EXHIBIT 2

Not Reported in F.Supp., 1989 WL 25214 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,421
**(Cite as: 1989 WL 25214 (S.D.N.Y.))**



United States District Court, S.D. New York.
FIRST MERCHANTS ENTERPRISE, INC., and
William Roche, Plaintiffs,
v.
Frank SHANNON, Eugene Laff, Marge Laff,
"Forco" International Inc., "Everson" Development
Corp., "Banda" International Inc., "Yarrimup" Inc.,
and John Does I–XX, Defendants.

No. 88 CIV. 8254 (CSH).
March 16, 1989.

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:

**\*1** This action is now before the Court on the motion of the United States for permission to intervene in order to stay certain discovery.

*Facts*

The government seeks to intervene in this action pursuant to Fed.R.Civ.P. 24, for the limited purpose of staying the deposition of Stanley Aslanian, Jr. ("Aslanian") and document production by Aslanian. Defendant Frank Shannon ("Shannon") opposes the motion.

The civil action in which the government seeks to intervene alleges in substance that the defendants, including Shannon, conspired to defraud the plaintiffs in violation of the securities laws. The complaint alleges that the "Manipulated Securities included, but were not limited to, the securities of the following issuers: Big O Tires, Inc., T.S. Industries, Inc., [and] Flores de New Mexico, Inc." Complaint at ¶ 13. Plaintiffs contend that "[t]he goal of the Conspiracies was to cause the market price of the Manipulated Securities to increase while the distribution of the securities was spread amongst the public and the Active Conspirators and those acting in concert with or aiding and abetting them took trading and other monies out." *Id.* at ¶ 14. In essence, plaintiffs contend that the defendants en-

gaged in stock manipulation.

Aslanian, who is not a party to the captioned litigation, has been cooperating with the United States Attorney's office in a grand jury investigation of alleged violations of the federal securities laws.[FN1] *Ex parte* Affirmation of Assistant United States Attorney Peter M. Lieb dated January 23, 1989 at ¶¶ 3–5 ("Lieb *Ex parte* Affirmation"). That grand jury investigation has resulted in the filing of a criminal complaint against Shannon, *United States v. Frank Shannon,* 88 Mag. 1862. Affirmation of Assistant United States Attorney Peter M. Lieb dated January 23, 1989 at ¶ 2 ("Lieb Affirmation").

The pending criminal charges against Shannon focus on the filing with the Securities and Exchange Commission of an allegedly false and misleading Schedule 13D concerning his ownership of stock in TS Industries, Inc., a stock enumerated in the civil complaint as a "manipulated security." Complaint at ¶ 13. At oral argument, the government represented that although Shannon has to date been charged only with the filing of an allegedly false Schedule 13D, criminal charges arising out of the grand jury stock manipulation investigation might yet be filed against him. *See also* Lieb *Ex parte* Affirmation at ¶ 3.

Discovery in the civil action is ongoing, and defendant Shannon noticed the deposition and production of documents by non-party witness Aslanian[FN2] for January 24, 1989.[FN3] By order to show cause heard on February 7, 1989, the government moved to stay the deposition of Aslanian and any accompanying document production.

*Discussion*

The government argues that "[a]ny deposition of Stanley Aslanian in this lawsuit would severely prejudice [its] interest in the *Shannon* case, 88 Mag. 1862, as well as an active grand jury investigation." Lieb Affirmation at ¶ 6. Specifically, the govern-

ment contends that the planned deposition of Aslanian would "entirely frustrate the purpose of the Jencks Act, Title 18, United States Code, Section 3500, which governs discovery of prior statements by Government witnesses in criminal cases, and of Fed.R.Crim.P. 6(e), which governs grand jury secrecy." *Id.* The government advances the same arguments in support of its contention that any document production by Aslanian should be stayed pending conclusion of the grand jury investigation and any trial arising out of the investigation. *See id.*

**\*2** Rule 24 of the Federal Rules of Civil Procedure governs intervention. Rule 24(b)(2) provides that permissive intervention is appropriate "when an applicant's claim or defense and the main action have a question of law or fact in common." In the case at bar, where the government contends that an ongoing criminal investigation would be prejudiced were certain civil discovery concerning the same facts and circumstances to proceed, permissive intervention to argue that claim is appropriate.FN4 *See SEC v. Chestman,* 861 F.2d 49 (2d Cir.1988) (per curiam).

I now address the merits of the government's application. The question of whether discovery in a civil action should be stayed pending resolution of a related criminal investigation involves a balancing of the interests at stake. *See, e.g., Founding Church of Scientology v. Kelley,* 77 F.R.D. 378 (D.C.Cir.1977); *Campbell v. Eastland,* 307 F.2d 478 (5th Cir.1962), *cert. denied,* 371 U.S. 955 (1963).

Defendant Shannon contends that the deposition of Aslanian and accompanying document production is essential to the defense of the instant action. Walpin Affidavit at ¶ 22. Defendant asserts that while he would suffer severe prejudice if discovery from Aslanian were stayed, the government would suffer no such prejudice if no stay were granted. Specifically, Shannon states that Aslanian has, in connection with other civil actions, been noticed for deposition. On each of those occasions,

Aslanian has invoked his fifth amendment rights, declining to answer any questions. *Id.* at ¶ 21. Defendant thus concludes that "the only substantive effect of a stay will be to protect Aslanian from having to assert his Fifth Amendment privilege and thereby subject himself to the negative inference that may later be drawn therefrom." *Id.* Defendant further argues that "[i]f the stay is denied, however, the Government, is in the same position in which it currently stands." *Id.*

While the argument has surface appeal, it is not dispositive. If the government would be prejudiced by Aslanian's giving deposition testimony and producing documents, it should not be required to take its chances that no testimony will be given or production made in the absence of a stay.

As to the balancing of interests at stake with regard to a stay, the government argues that because the ongoing criminal investigation involves the same facts, albeit not the identical charges, as are at issue in the civil complaint, the general policy of limiting criminal discovery by a defendant in advance of trial would be frustrated absent a stay. Defendant Shannon maintains that the criminal charges centering on the filing of an allegedly false Schedule 13D are distinct from the stock manipulation charged in the civil complaint, and discovery in the two actions would in turn be dissimilar. However, as the government points out, the undisclosed purchases at issue in the criminal case might well be construed as evidence of the sort of stock manipulation alleged in the civil action. This connection between the cases could certainly result in the obtaining of discovery in the civil action for use in the criminal action, thereby circumventing the more stringent rules governing discovery in criminal cases. Indeed, at the February 7 hearing, counsel for Shannon FN5 conceded that apart from questions going directly to the stock manipulation charges alleged in the civil complaint, "other areas of background" may well be probed during the course of Aslanian's deposition.

**\*3** The Second Circuit has sanctioned a stay of

Not Reported in F.Supp., 1989 WL 25214 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,421
**(Cite as: 1989 WL 25214 (S.D.N.Y.))**

discovery in precisely this situation, that is, where the "same underlying facts" were at issue in both the criminal and civil cases. *Chestman, supra,* at 50. In that case the court of appeals found that a stay of discovery is not *per se* prejudicial to the defendant in the civil action, where the district court merely stayed certain discovery for some period of time, "an order which the ... court could have entered *sua sponte* ", *id.,* as opposed to placing an absolute bar on such discovery. The instant case presents an identical situation. The government seeks only a stay of certain discovery, not its absolute bar; and Shannon will not be unduly prejudiced by such a stay.[FN6] However, the government has a clear interest "in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *Chestman, supra,* at 50. *See also SEC v. Drexel Burnham Lambert, Inc.,* 88 Civ. 6209 (MP) (S.D.N.Y. Sept. 27, 1988); *SEC v. Yagoda,* 88 Civ. 763 (MP) (S.D.N.Y. March 18, 1988); *Wilson v. Clark,* 84 Civ. 5076 (LBS) (S.D.N.Y. Feb. 13, 1987); *Clark v. Kidder Peabody & Co.,* 86 Civ. 377 (LBS) (S.D.N.Y. Feb. 13, 1987).

Because the balance of interests at stake clearly tips in favor of the government, it is entitled to the requested relief. I accept Shannon's argument that in principle I have discretion to grant or withhold the stay; but *Chestman* is instructive on the factors that inform that discretion in practice, and I exercise mine in the government's favor in the case at bar.

*Conclusion*

The government's motion to intervene and to stay the deposition of and document production by Aslanian, pending conclusion of the grand jury investigation and any criminal charges brought against Shannon as a result of that investigation, is granted in its entirety.

SO ORDERED.

FN1. On January 5, 1989, the United States Attorney filed a criminal information charging Aslanian with conspiring to violate the federal securities laws by manipulating the securities of Big O Tires, Inc., T.S. Industries, Inc., Flores de New Mexico, Inc, and Cliff Engle Ltd. *United States v. Aslanian,* 89 Cr. 3 (SWK). Aslanian pled guilty to that charge on January 6, 1989. Lieb Affirmation at ¶ 4.

FN2. Shannon characterizes Aslanian as "the key witness in the civil case." Affidavit of Gerald Walpin sworn to on February 2, 1989 at ¶ 22 ("Walpin Affidavit"). Shannon contends that "Aslanian was an original principal in First Merchants and, contrary to the allegations in the complaint, our information is that he still retains such ownership.... it would [thus] appear that Aslanian is the party in interest behind this lawsuit and therefore his testimony is essential to the case." *Id.*

FN3. At a February 7, 1989 hearing on the instant application, the parties agreed that any deposition of Aslanian and any accompanying document production would await the resolution of the government's motion.

FN4. I express no view as to whether the government may intervene as of right pursuant to Rule 24(a)(2).

FN5. Defendant Shannon is represented by the same attorney in both the civil and criminal actions. Lieb Affirmation at ¶ 2.

FN6. I am mindful of defendant's argument that if he is not able to vindicate himself in this action by obtaining the necessary discovery from Aslanian, he might be added as a defendant in various other civil complaints currently pending. Walpin Affidavit at ¶ 22. Shannon argues that the decision to add him as a defendant in these various actions "hinges on the outcomes [sic] of both

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1989 WL 25214 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,421
**(Cite as: 1989 WL 25214 (S.D.N.Y.))**

the civil and criminal matters against [him]." *Id.* There is little force to this argument. I have no reason to think that the criminal action will not quickly be brought to trial as is required by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Moreover, there is no reason to believe that if Shannon is improperly named as a defendant in other civil actions, such actions would not be dismissed as against him prior to trial.

S.D.N.Y.,1989.

First Merchants Enterprise, Inc. v. Shannon

Not Reported in F.Supp., 1989 WL 25214 (S.D.N.Y.), Fed. Sec. L. Rep. P 94,421

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 22126 (S.D.N.Y.)
**(Cite as: 1993 WL 22126 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
SECURITIES AND EXCHANGE COMMISSION
Plaintiff,

v.

Edward R. DOWNE, Jr., Steven A. Greenberg,
Martin Revson, David Salamone, Fred R. Sullivan,
Thomas Warde, Milton Weinger, and Broadsword,
Ltd., Defendants.

No. 92 Civ 4092 (PKL).
Jan. 26, 1993.

(Richard H. Walker, Regional Administrator, for
Securities and Exchange Commission, New York
CityRichard S. Biegen, Carmen J. Lawrence,
Robert B. Blackburn, Daniel R. Schnipper, David
A. Barnett, Janet A. Broeckel, of counsel), for the
Securities and Exchange Commission.

Fried, Frank, Harris, Shriver & Jacobson, New
York City, (Harvey L. Pitt, Michael H. Rauch, John
C. Sullivan, of counsel), for defendant Steven A.
Greenberg.

Roger B. Hayes, Acting U.S. Atty. for the Southern
District of New York City, (Scott A. Edelman, of
counsel), for the U.S.

OPINION AND ORDER

LEISURE, District Judge,

**\*1** This is an action arising out of alleged in-
sider trading activity involving the defendants in
connection with various securities transactions ex-
ecuted between 1987 and 1989. Defendant Steven
A. Greenberg ("Greenberg") has now moved, pur-
suant to Rule 12(c) of the Federal Rules of Civil
Procedure, for judgment on the pleadings with re-
spect to the alleged violations of Section 10(b) of
the Securities Exchange Act of 1934, 15 U.S.C. §
78j(b), and Rule 10b–5 thereunder, 17 C.F.R. §
240.10b–5, relating to alleged transactions in the
securities of Bally Manufacturing Corporation
("Bally"). It is alleged that Greenberg violated the
federal securities laws by conveying to defendant
Edward R. Downe, Jr. ("Downe") material, non-
public information, in connection with the purchase
and sale of securities, in breach of duties owed to
Bally, its shareholders, and/or an investor group in-
terested in making an offer to acquire Bally (the
"investor group"). For the reasons stated below, de-
fendant Greenberg's motion is denied in its entirety.

In addition, the United States of America,
through the United States Attorney for the Southern
District of New York, has made an application to
intervene, pursuant to Rule 24, for the purpose of
staying discovery in this action with respect to the
testimony and production of documents relating to
defendant Downe. The Court, for the reasons stated
below, will stay *all* discovery in this action until
March 17, 1992 (*i.e.* three months from the date of
the U.S. Attorney's application). However, if an in-
dictment is pending at that time, the Court will ex-
tend the stay of discovery until the conclusion of a
trial of any prosecution brought as a result of the
Grand Jury investigation.[FN1]

BACKGROUND

On June 4, 1992, the Securities and Exchange
Commission (the "SEC"), filed the complaint in
this action alleging insider trading by defendants
Greenberg, Downe, Martin Revson, David Sala-
mone, Fred R. Sullivan ("Sullivan"), Thomas
Warde ("Warde"), Milton Weinger ("Weinger"),
and Broadsword, Ltd. The complaint seeks the fol-
lowing relief: an order enjoining defendants from
future violations of certain provisions of the federal
securities laws and barring defendant Downe from
serving as a director of a public company; disgorge-
ment, including prejudgment interest; penalties un-
der the Insider Trading Sanctions Act of 1984, 15
U.S.C. § 78u–1; and such other relief as the Court
may deem necessary and appropriate.[FN2]

Defendant Greenberg's motion for judgment on

Not Reported in F.Supp., 1993 WL 22126 (S.D.N.Y.)
**(Cite as: 1993 WL 22126 (S.D.N.Y.))**

the pleadings is directed only to the allegations concerning Bally. According to the complaint, Greenberg breached his fiduciary duty or other duty of trust and confidence to Bally, Bally's shareholders and investor group by conveying material, nonpublic information to Downe relating to the consideration given by Bally and the investor group, between approximately March 1987 and June 1987, to effectuating a corporate restructuring of the company. Complaint, dated June 4, 1992 ("complaint"), at ¶¶ 92–94, 96. Defendant Greenberg allegedly headed this investment group which considered several possible restructurings of Bally including a leveraged buyout (LBO), a recapitalization plan, and other financial options such as the issuance of a cash dividend without reducing the shareholder's percentage ownership in Bally. Complaint, at ¶¶ 92–94. It is alleged that Greenberg then communicated this material, nonpublic information to defendant Downe knowing or having reason to know that Downe would effect transactions in Bally securities. Complaint, at ¶ 96. After receiving this information from Greenberg, Downe allegedly directed purchases in Bally securities for his personal securities account, the accounts of two nominee companies, and the accounts of his family and friends. Complaint, at ¶¶ 98–105. Defendant Downe also allegedly conveyed information to defendants Warde and Weinger, who then purchased Bally securities for their personal accounts. Complaint, at ¶¶ 103–104, 106–109. These securities were allegedly sold from approximately July 10, 1987 to August 20, 1987 and resulted in the realization of illegal profits of approximately $4,901,195. Complaint, at ¶¶ 100–115, IV. The Complaint does not allege that Greenberg is liable for the profits derived by defendants Warde and Weinger and, thus, Greenberg's alleged liability with respect to the Bally transactions is approximately $4,825,197. Complaint, at IV(2).

### DISCUSSION
### 1. MOTION FOR JUDGMENT ON THE PLEADINGS

**\*2** Defendant Greenberg has moved to dismiss the 10b–5 claim alleged in the complaint with respect to the Bally transactions on the grounds that the complaint: (1) fails to allege fraud; (2) fails to allege the violation of any duty requiring him to abstain from using his own or Bally's ideas; (3) fails to identify the use any material, nonpublic information; and (4) would expand the definition of insider trading beyond the limits imposed by the Supreme Court.

Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint should contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The Court finds that the complaint in the instant case adequately alleges facts which, if proven, would establish a claim upon which relief can be granted against Greenberg for violating Section 10(b) and Rule 10b–5 by improperly disclosing material, nonpublic information to Downe concerning Bally, in connection with the purchase and sale of Bally's securities.

A. *Standard for Motion for Judgment on the Pleadings*

Rule 12(h)(2) of the Federal Rules of Civil Procedure provides that a defense of failure to state a claim upon which relief can be granted, typically raised pursuant to 12(b)(6), can be made after an answer has been filed by a motion for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). Therefore, defendant Greenberg has brought his motion to dismiss the complaint under Rule 12(c). Nevertheless, in considering this 12(c) motion, the Court will apply the same standards that are used for a motion to dismiss a complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). *See Juster Associates v. City of Rutland,* 901 F.2d 266, 269 (2d Cir.1990); *Ad–Hoc Committee of the Baruch Black and Hispanic Alumni Assoc. v. Bernard M. Baruch College,* 835 F.2d 980, 982 (2d Cir.1987). Accordingly, "[i]n reviewing a motion to dismiss on the pleadings, 'the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff.' " *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (*quoting Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir.1988)), *petition for cert. filed,* 61 U.S.L.W. 3446 (U.S. December 2, 1992) (No. 92–956). "The district court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Walker,* 974 F.2d at 298 (*quoting Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991)).[FN3]

B. *Insider Trading Liability under 10b–5*

It is well-established under the traditional theory of insider trading, pursuant to Section 10(b) and Rule 10b–5 promulgated thereunder (collectively referred to as "10b–5"), that liability may be imposed on a corporate insider who discloses material, nonpublic information to an outsider in breach of his fiduciary duty to the corporation's shareholders. *See Chiarella v. United States,* 445 U.S. 222, 227–235 (1980). A corporate insider breaches his fiduciary duty if he improperly discloses material, nonpublic information for personal benefit. *See Dirks v. SEC,* 463 U.S. 646, 662 (1983). The Supreme Court has held that the insider's conveying of a gift of material, nonpublic information to a personal friend or relative, who trades with the information, may constitute a personal benefit to the insider for purposes of 10b–5 liability. *See Dirks,* 445 U.S. at 663–64.

**\*3** The Second Circuit has also adopted a second general theory of liability, the misappropriation theory, which states that "a person violates Rule 10b–5 when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *United States v. Chestman,* 947 F.2d 551, 566 (2d Cir.1991), *cert. denied,* 112 S.Ct. 1759 (1992); *see also United States v. Carpenter,* 791 F.2d 1024, 1028–29 (2d Cir.1986), *aff'd by an equally divided Court,* 484 U.S. 19 (1987); *SEC v. Materia,* 745 F.2d 197, 201 (2d Cir.1984), *cert. denied,* 471 U.S. 1053 (1985); *United States v. Newman,* 664 F.2d 12, 17–18 (2d Cir.1981), *cert. denied,* 464 U.S. 863 (1983).[FN4] The critical distinction between these two theories of liability is that the traditional theory of insider trading liability involves a breach of a duty to the shareholders and issuer of the securities purchased or sold, whereas liability under the misappropriation theory does not require that the buyer or seller of securities be defrauded. Instead, under the misappropriation theory, the predicate act of fraud can be perpetrated on the source of the nonpublic information with whom the individual had a relationship of trust and confidence, even though the source may be unaffiliated with any buyer or seller of the securities at issue. For instance, the Second Circuit has found 10b–5 liability in situations where an employee breached a duty to his employer by misappropriating material, nonpublic information from his employer and using that information in a securities transaction. *See, e.g., Carpenter,* 791 F.2d at 1032 (financial columnist breached duty to his newspaper); *Newman,* 664 F.2d at 17 (investment banker breached duty to his firm).

In order to sustain liability under either theory, the defendant must have acted with scienter. *See Aaron v. SEC,* 446 U.S. 680, 701–02 (1980). Moreover, the nonpublic information disclosed must be material, *i.e.,* there must be a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See Basic Inc. v. Levinson,* 485 U.S. 224, 232 (1988) (adopting the materiality standard set forth in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449–450 (1976)); *United States v. Bilzerian,* 926 F.2d 1285, 1298 (2d Cir.), *cert. denied,* 112 S.Ct. 63 (1991).

Applying these standards in the instant case, the Court finds that the SEC has adequately pled a 10b–5 claim against Greenberg under both theories of liability based upon his alleged tipping of defendant Downe about Bally's consideration of vari-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ous restructuring options. First, with respect to the traditional theory of liability under 10b–5, the complaint alleges that Greenberg was a corporate insider in that "[a]t all relevant times, Greenberg [was] retained by Bally ... as [a] financial public relations consultant [ ]." Complaint, at ¶ 11. The complaint, *inter alia*, alleges that "Greenberg, for his direct or indirect benefit and in breach of a fiduciary duty or other duty of trust and confidence to Bally [and] its shareholders, ... knowingly and recklessly disclosed to Downe, in words or substance" the material, nonpublic information relating to Bally's consideration of proposed extraordinary corporate events. Complaint, at ¶ 96. More specifically, the complaint sets forth the description of several of these extraordinary corporate events such as an LBO, a recapitalization, and the "exploring [of] other financial options for the company, including the issuance of a more modest cash dividend." Complaint, at ¶¶ 92–94. It also is alleged that Greenberg communicated this information to Downe knowing or having reason to know that Downe would effect transactions in Bally securities. Complaint, at ¶ 96. Accordingly, the complaint alleges that: (1) Greenberg, as Bally's financial public consultant, breached his duty to Bally and its shareholders by disclosing material, nonpublic information to defendant Downe in connection with sale or purchase of securities; (2) Greenberg derived a personal benefit from this breach; and (3) Greenberg acted with scienter in tipping Downe. Finally, the complaint alleges that as a result of Greenberg's tipping Downe as to this information, several defendants—including Downe, Weinger and Warde—purchased Bally securities and realized illegal profits from the eventual sale of such securities. Complaint, at ¶¶ 98–115. Based upon the allegations in the complaint, the Court finds that the SEC has sufficiently stated a cause of action under 10b–5 for traditional insider trading liability with respect to the Bally transactions.

**\*4** The Court also finds that the 10b–5 claim survives a motion to dismiss under the misappropriation theory based on Greenberg's tipping Downe in breach of his duty to the investor group. The complaint alleges that defendant Greenberg, as well as an individual named Michael Scharf, headed an investor group interested in effectuating a Bally restructuring, and that Greenberg, acting with scienter, misappropriated material, nonpublic information concerning these proposals by communicating such information to Downe in breach of his duty to the investor group, in connection with the sale or purchase of Bally's securities. Thus, the allegations in the complaint adequately sets forth all of the requisite elements under the misappropriation theory of liability. *See Carpenter,* 791 F.2d at 1028–29; *SEC v. Willis,* 777 F.Supp. 1165, 1169 (S.D.N.Y.1991); *United States v. Willis,* 737 F.Supp. 269, 272–273 (S.D.N.Y.1990); *SEC v. Musella,* 748 F.Supp. 1028, 1036–38 (S.D.N.Y.1989), aff'd, 898 F.2d 138 (2d Cir.), *cert. denied,* 111 S.Ct. 57 (1990).

### (1) *Public Announcements*

Defendant Greenberg argues that the 10b–5 claim should be dismissed because "the subsequent public disclosure of the previously nonpublic material facts" is an essential element of 10b–5 liability that has not been alleged in the complaint. *See* Defendant Greenberg's Memorandum, at 7. The Court finds this contention to be without merit.

Insider trading liability is based on the use of material, nonpublic information in connection with the sale or purchase of securities in breach of a duty. While the public announcement of such information may bear on the issue of damages, the public announcement certainly is not an element of insider trading liability itself. In *Basic,* the Supreme Court noted that when addressing contingent or speculative information or events "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " *Basic,* 485 U.S. at 238 (*quoting SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968), *cert. denied,* 394 U.S. 976 (1969)). Nonpublic information con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

cerning a company's consideration of extraordinary corporate events may be material, even though it is never formally announced to the public.

Courts have repeatedly held that public disclosure is not a requisite element of insider trading liability. In *United States v. Victor Teicher & Co.,* 1990 WL 29697, at *4 [Transfer Binder 1989–90] Fed.Sec.L.Rep. ¶ 94,975 (S.D.N.Y. March 9, 1990), *motion to vacate denied,* 88 Cr. 796 (CSH) (S.D.N.Y. February 25, 1992), *appeal pending,* No. 92–1301 (2d Cir.) (notice of appeal filed May 8, 1992), the defendants were charged with violating Section 10(b) for, *inter alia,* purchasing securities in American Brands, Inc. while in possession of material, nonpublic information. The Court denied defendants' Rule 29(a) motion for judgment of acquittal even though the proposed acquisition of American Brands by B.A.T. Industries never took place and was never publicly disclosed by either party. *See also Rothberg v. Rosenbloom,* 771 F.2d 818, 821–22 (3d Cir.1985) (finding 10b–5 liability even though there was no public announcement of the information concerning insider's control over the company's board of directors), *cert. denied,* 481 U.S. 1017 (1987); *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 855 (2d Cir.1981) (finding information concerning the company's backlog, projections of increases in earnings per share, and likelihood of obtaining projects was material, even though the information never was publicly announced, and permitting plaintiffs to amend complaint to include insider trading liability relating to that information).

**\*5** Similarly, in *SEC v. Willis,* 777 F.Supp. 1165 (S.D.N.Y.1991), the Court denied the defendant's motion to dismiss for failure to state a claim even though the defendant's profits were not linked to a public announcement. In *Willis,* defendant Sloate allegedly purchased BankAmerica Corp. ("BankAmerica") securities while in possession of material, nonpublic information concerning Sanford Weill's interest in pursuing a change in BankAmerica's management. *Id.* at 1168. The motion to dismiss was denied even though the defendant had purchased and sold the BankAmerica securities *prior* to a public announcement.[FN5]

Defendant Greenberg's reliance on several cases which address the issue of public announcements in the 10b–5 context is misplaced. The cases cited by Greenberg did not find public disclosure to be an essential element of liability, but rather took into account public announcements of the information at issue only in an effort to determine damages. For instance, in *SEC v. MacDonald,* 699 F.2d 47 (1st Cir.1983), the Second Circuit considered the timing of the public announcement for the purpose of determining whether the district court properly calculated the disgorgement remedy. The Second Circuit reversed the district court's disgorgement order and remanded the case so that the Court could determine a disgorgement figure based upon how long it took for the investing public to learn of and react to the disclosed facts. *Id.* at 52–55. Similarly, in *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1388 (2d Cir.), *cert. denied,* 404 U.S. 1005 (1971), the Second Circuit only considered the subsequent public disclosure of the information at issue in determining whether the damages assessed by the district court with respect to profits gained from a 10b–5 violation were excessive.

Defendant Greenberg argues that "[g]iven plaintiff's concession that the Bally information in issue here was never made public in any fashion, and the complaint's failure to allege that any unfair advantage was gained by Mr. Downe, the allegations in the complaint concerning Bally fail to state a claim of fraud against Mr. Greenberg." Reply Memorandum in Support of Motion of Defendant Steven A. Greenberg for Judgment on the Pleadings, dated October 14, 1992 ("Greenberg's Reply Memorandum"), at 3. Greenberg claims that there is no allegation that the information had any market impact or that Mr. Downe or his partners made "secret profits" from such information. Under these circumstances, Greenberg contends that to hold otherwise would be to reach impermissible beyond the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

limits of liability set forth in *Chiarella* and *Dirks*.

The Court finds this argument to be without merit. The complaint clearly alleges that Downe gained an unfair advantage by trading in Bally securities while he possessed material, nonpublic information, relating to Bally's restructuring considerations, which was supplied by Greenberg in breach of his duty to Bally, its shareholders, and/or the investor group. Moreover, the complaint alleges that the price in Bally's stock increased more than 45 percent in a six week period from June 10 to July 30, 1987 and that Downe realized illegal profits as a result of this trading activity. Complaint, at ¶ 95. Thus, the complaint clearly alleges the type of activity—the reaping of an unfair advantage and secret profits from insider trading—which falls within the confines of 10b–5 and is consistent with the Court's teachings in *Chiarella* and *Dirks*. While defendant Greenberg seems to use the failure to allege a public announcement as a means to question the merits of these allegations and the SEC's ability to prove the existence of these alleged illegal profits or the proper calculation of any disgorgement remedy, such considerations are not appropriate on a motion to dismiss for failure to state a claim upon which relief can be granted, where all of the allegations are accepted as true and reasonable inferences are drawn in favor of the pleader. *See Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985) ("[t]he court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient"); *see also Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) ("the district court should not be swayed into granting the motion because the possibility of ultimate recovery is remote").

**\*6** In sum, liability under 10b–5 is triggered when an individual, acting with scienter, uses material, nonpublic information in connection with the purchase or sale of securities in breach of a fiduciary duty or some other type of duty of trust or

confidence. While a subsequent public disclosure of this information, or lack thereof, may be relevant for determining the amount of unrealized profits reaped by the defendants, it is not an essential element of 10b–5 insider trading liability itself. In the instant case, the complaint clearly sets forth all of the essential elements of liability under 10b–5 and, thus, the Court rejects Greenberg's claim that the complaint's failure to specifically allege that this material information concerning Bally was the subject of a public announcement requires dismissal of that claim as a matter of law.

(2) *Existence of a Duty*

Defendant Greenberg also argues that the complaint fails to allege that he had a duty not to tip the Bally-related information. Insider trading liability under 10b–5 exists only if an individual " 'fails to disclose material information prior to the consummation of a transaction ... *when he is under a duty to do so.* ' " *United States v. Chestman,* 947 F.2d 551, 565 (2d Cir.1991) (emphasis added) (*quoting Chiarella,* 445 U.S. at 228), *cert. denied,* 112 S.Ct. 1759 (1992). The Court recognizes that this obligation to disclose or abstain from trading " 'does not arise from the mere possession of nonpublic market information.' " *Chestman,* 947 F.2d at 565 (*quoting Chiarella,* 445 U.S. at 235). As the Supreme Court noted in *Chiarella,* "neither the Congress nor the Commission ever has adopted a parity-of-information rule." 445 U.S. at 233. Instead, it is well-established that "a duty to disclose or abstain arises only from 'a fiduciary or other similar relation of trust and confidence between [the parties to the transaction].' " *Chestman,* 947 F.2d at 565 ( *quoting Chiarella,* 445 U.S. at 228).

In the instant case, the Court finds that the complaint sufficiently sets forth allegations of Greenberg's breach of duty under both the traditional theory of liability and the misappropriation theory and, thus, survives a motion to dismiss. First, with respect to Bally's own restructuring plans, the complaint alleges that Greenberg acted as a "financial public relations consultant" and "a con-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

fidential adviser" to Bally and Bally's CEO. It is alleged that Greenberg, as a result of this relationship with Bally, owed a "fiduciary duty" to Bally and its shareholders.

It is well-established that financial consultants of a corporation may become "temporary insiders" of that corporation and, thus, have a fiduciary duty to the corporation's shareholders. As the Supreme Court stated, in dictum, in *Dirks:*

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders. The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes.... For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

**\*7** *Dirks,* 463 U.S. at 655 n. 14. The Second Circuit has noted that "[t]his theory clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of 'a special confidential relationship' " and, thus, "[t]he temporary insider thereby acquires a correlative fiduciary duty to the corporation's shareholders." *Chestman,* 947 F.2d at 565; *see also SEC v. Tome,* 638 F.Supp. 596, 621 (S.D.N.Y.1986) ("persons ... given access to confidential corporate information solely for corporate purpose become temporary insiders of that corporation, thereby acquiring the same fiduciary duties to the corporation as other insiders").

In *Tome,* Giuseppe Tome was an informal financial consultant to Joseph E. Seagram & Co.

("Seagram") and a close personal friend with the Chief Executive Officer (CEO) of Seagram. As a result of his professional and personal contacts with the CEO, Tome learned that Seagram intended to announce a hostile tender offer for St. Joe Minerals Corporation. The Court noted that "[t]he relationship between the management of a corporation and its financial advisors and consultants regarding prospective hostile tender offers is inherently one which implies a duty of confidentiality." *Tome,* 638 F.Supp. at 621. Thus, even though Tome was not a corporate officer or director, he was found to have owed a fiduciary duty to Seagram with respect to this information. Applying this standard, the Court held that Tome breached this duty and violated 10b–5 when he purchased St. Joe Minerals Corp. securities while in possession of material, nonpublic information which he obtained as a confidential consultant to Seagram and its CEO. *Id.* at 621–22.

The allegations in the instant case allege the same type of breach of duty as set forth in *Tome.* Greenberg is alleged to have been a financial consultant to Bally, as well as a confidential adviser to Bally's CEO. Complaint, at ¶ 11, 94. Moreover, it is alleged that Greenberg, as this temporary insider, breached his fiduciary duty to Bally and violated Rule 10b–5. Under these circumstances, the complaint adequately alleges that Greenberg had a duty not to use this information and breached that duty by tipping defendant Downe.

In addition to the alleged breach of his fiduciary duty to Bally and its shareholders, the Court also finds that the complaint adequately sets forth a 10b–5 claim under the misappropriation theory based upon Greenberg's alleged breach of duty to the investor group which was interested in effectuating a corporate restructuring of Bally and considered several possible options. The complaint alleges that the investor group was headed by defendants Greenberg and Scharf and that Greenberg tipped defendant Downe as to these considerations in breach of a fiduciary duty or other duty of trust and confidence to the investor group.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant Greenberg, relying on *United States v. Chestman, supra,* contends that these allegations are insufficient. In *Chestman,* the Second Circuit held that a breach of either a common law fiduciary relationship or the breach of another type of relationship of trust and confidence could provide the basis of a 10b–5 claim under the misappropriation theory. However, the Court also noted that the "similar relationship of trust and confidence" must be the "functional equivalent" of a fiduciary relationship in that it contains certain characteristics such as "reliance" and "de facto control and dominance." *Chestman,* 947 F.2d at 568. Defendant Greenberg argues that the SEC has failed to allege facts in the complaint setting forth the "control" exercised by Greenberg over the investor group or the reliance that Mr. Scharf or any other members of the investor group placed on the exercise of control.

**\*8** A motion for judgment on the pleadings for failure to state a claim is granted only when "plaintiff can prove no set of facts in support of his claim which would entitle him to belief." *Walker, supra,* 974 F.2d at 298. The allegations set forth in the complaint relating to Greenberg's participation in the investment group, the considerations made by the investor group, and the specific conduct by Greenberg which allegedly breach his duty to the investor group are sufficient to survive a motion for failure to state a claim under Rule 12. Of course, at trial, the SEC will have to present sufficient evidence to satisfy the fact intensive standards set forth in *Chestman* in proving that a fiduciary relationship or similar relationship of trust and confidence existed between Greenberg and the investor group.

(3) *Materiality*

Defendant Greenberg also argues that the complaint fails to state a claim as to Bally because it does not identify any material, nonpublic information. The complaint alleges that the "material, nonpublic information" conveyed by Greenberg to defendant Downe in violation of 10b–5 consisted of consideration by Bally and an investor group of corporate restructuring plans such as the "recapitalization plan involving the placement of debt ... to pay a cash dividend of $18 to $20 per share to Bally shareholders" and "the issuance of a more modest cash dividend." Complaint, ¶¶ 93–94. FN6

Defendant Greenberg contends that this alleged information is not material because: (1) there is no allegation that these proposals were given consideration at Bally's highest corporate level; (2) the alleged recapitalization proposal was contingent upon approval by the New Jersey Casino Control Commission (NJCCC); and (3) Bally concedes it "did not effect or announce its restructuring considerations."

**\*9** In *Basic,* the Supreme Court held that information is considered material " 'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.' " *Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988) (*quoting TSC Indus., Inc. v. Northway,* 426 U.S. 438, 449 (1976)). The Court further explained that " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic,* 485 U.S. at 231–32 (*quoting TSC Indus.,* 426 U.S. at 449); *see generally Glazer v. Formica Corp.,* 964 F.2d 149, 154–55 (2d Cir.1992) (applying the *Basic* test for materiality). As noted earlier, the Court also stated that the materiality of "contingent or speculative" occurrences should be assessed by balancing " 'both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.' " *Basic,* 485 U.S. at 238 (*quoting SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2d Cir.1968), *cert. denied,* 394 U.S. 976 (1969)).

One factor which the Court should consider in assessing probability that the event will occur is to look to "indicia of interest in the transaction at the highest corporation levels" such as "board resolutions, instructions to investment bankers, and actual

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

negotiations between principals or their intermediaries." *Basic,* 485 U.S. at 239. Defendant Greenberg argues that the alleged consideration of the corporate restructuring in Bally is not material because "[t]he complaint is devoid of allegations that Bally's board of directors adopted any resolutions regarding these matters, or that any Bally representative gave instructions to investment bankers to implement various course of action, or attempted to arrange financing, or otherwise took any steps to implement either Mr. Greenberg's thoughts or Bally's exploration." Defendant Greenberg's Memorandum, at 20–21.

The Supreme Court did not intend the list of factors enumerated in *Basic* to be exhaustive, *see Basic,* 485 U.S. at 239, but rather the Court may consider other factors which demonstrate the probability that a corporate event will occur. The complaint alleges that, when it appeared that the LBO was not feasible, the investor group began considering a leveraged recapitalization plan involving the placement of debt to raise money that would be used to pay a cash dividend of $18 to $20 per share to Bally shareholders. Moreover, it is alleged, under this plan, the equity interest of those shareholders that received the dividend would be reduced and members of the investor group would obtain a significant equity stake in Bally. Finally, the complaint alleges that, when Bally became concerned about the New Jersey Casino Control Commission might not approve the proposed recapitalization, the investor group explored other financial options for Bally, including issuing a more modest cash dividend without reducing the shareholders' percentage ownership. At all relevant times during these various considerations, defendant Greenberg, in addition to heading the investor group, is alleged to have been retained by Bally as a financial public relations consultant.

Thus, the complaint clearly alleges that an investor group was formed, specific restructuring plans were being given serious consideration by an investor group headed by Greenberg, a financial consultant to Bally. Based upon the allegations in the complaint, the Court finds that the alleged information is not, as a matter of law, too inchoate to be considered material.

Defendant also argues that, since the alleged recapitalization proposal was contingent upon approval by the NJCCC, these events were less probable and less likely to be material. The fact that the corporate occurrence may be contingent upon factors beyond defendant's control is relevant in assessing probability. *See Taylor v. First Union Corp. of South Carolina,* 857 F.2d 240, 244 (4th Cir.1988), *cert. denied,* 489 U.S. 1080 (1989); *Hartford Fire Ins. Co. v. Federated Dept. Stores, Inc.,* 723 F.Supp. 976, 985 (S.D.N.Y.1989). However, the Court notes that at least some of the alleged tips from Greenberg to Downe concerned proposals which were being considered in order to avoid any conflict with the NJCCC and, thus, approval was not a factor. In any event, the contingency of the event is only one factor in the consideration. Information can be material even though it is contingent upon certain factors beyond the defendant's control. *See Teicher, supra,* 1990 WL 29697, at *4 (found information concerning the possible B.A.T. acquisition of American Brands to be material even though subject to antitrust restrictions). The Court finds that, despite this potential regulatory obstacle posed by the NJCCC, the information, at the time it was considered, cannot be found immaterial as a matter of law based upon the allegations in the complaint.

**\*10** Defendant Greenberg also contends that since the complaint concedes that Bally "did not effect or announce its restructuring considerations," *see* Complaint, at ¶ 95, the information cannot be considered material. However, a Court in appraising probability must consider the facts as they existed at the time of the alleged insider trading, not with the hindsight knowledge that the transaction was or was not completed. *See, e.g., Reiss v. Pan American World Airways, Inc.,* 711 F.2d 11, 13 (2d Cir.1983) (a claim that disclosure was necessary to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

make another statement not misleading must be viewed " 'in light of the facts existing at the time of the release' " (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d at 863). Moreover, the fact that Bally did not announce its restructuring considerations does not render such information immaterial. *Accord Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 732 (2d Cir.1987) ("[a]n insider may be liable for trading on the basis of, or 'tipping' third parties concerning, information at a time when the corporation to which the information pertains is not yet under any duty to disclose it"), *cert. denied,* 485 U.S. 1007 (1988); *SEC v. MacDonald,* 699 F.2d 47, 50 (1st Cir.1983) ("if for valid reasons, a corporation does not deem material information ripe for public disclosure, so that disclosure by the insider would be a breach of fiduciary duty, the insider must refrain from dealing in the corporation's securities in the interim").

In addition to assessing the probability that the event will occur, the Court must also appraise the magnitude of the information at issue in the instant case. A recapitalization plan involving an $18 to $20 cash dividend, on a stock trading in the $18 to $26.125 range, would be an event of great magnitude in a corporation. *See, e.g., Holdsworth v. Strong,* 545 F.2d 687, 698 (10th Cir.1976) (the materiality of information concerning a corporation's ability to pay dividends "cannot be challenged"), *cert. denied,* 430 U.S. 955 (1977). Moreover, the dividend under consideration by Bally also would have altered Bally's corporate structure and, thus, would have some of the attributes of a sale of the company. Finally, the payment of the more modest cash dividend, though smaller in magnitude, cannot be considered immaterial as a matter of law in this context. Therefore, a jury could reasonably find that the proposals allegedly under consideration by the investor group were extraordinary corporate activities which a reasonable investor would consider important in making investment decisions.

It is inappropriate to grant a motion to dismiss for failure to allege that the information was materi-

al unless the alleged information is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985); *see also TSC Indus.,* 426 U.S. at 450 ("The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts ... and these assessments are peculiarly ones for the trier of fact."); *United States v. Bilzerian,* 926 F.2d 1285, 1298 (2d Cir.) ("[d]etermination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination"), *cert. denied,* 112 S.Ct. 63 (1991). Having considered both the probability and magnitude that the alleged considerations by the investor group with respect to Bally's restructuring would occur, the Court finds that the allegations set forth in the complaint cannot be deemed immaterial as a matter of law.

**\*11** In sum, the Court concludes that the complaint alleges all of the necessary elements of insider trading liability and survives a motion for judgment on the pleadings with respect to the Bally claims.

## II. APPLICATION FOR A STAY OF DISCOVERY

The United States of America, through the United States Attorney for the Southern District of New York (the "United States Attorney"), has made an application to intervene in this civil action, pursuant to Rule 24 of the Federal Rules of Civil Procedure, for the limited purpose of seeking a partial stay of discovery.[FN7] More specifically, the United States Attorney requests a stay of discovery relating to defendant Downe including, but not limited to, the taking of testimony from Downe, the production of documents relating to Downe from any party or witness (including the Securities and Exchange Commission) which documents a defendant in a criminal action would only receive pursuant to 18 U.S.C. § 3500. The United States Attorney also requests that the partial stay, if granted, continue in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

effect until March 17, 1993 (three months from the date of its application) or the conclusion of a trial of any prosecution brought as a result of the Grand Jury investigation, whichever occurs later.

A. *Application to Intervene by the United States Attorney*

The United States Attorney has moved to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure which provides for permissive intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). It is well-established that the United States Attorney may intervene in a federal civil action to seek a stay of discovery when there is a parallel criminal proceeding, which is anticipated or already underway, that involves common questions of law or fact. *See SEC v. Chestman,* 861 F.2d 49, 50 (2d Cir.1988). As the Second Circuit noted in *Chestman,* "[t]he government had a discernible interest in intervening in order to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *Chestman,* 861 F.2d at 50; *see also Board of Governors of the Federal Reserve System v. Pharaon,* 140 F.R.D. 634, 638 (S.D.N.Y.1991) (allowing District Attorney to intervene in civil action for purpose of seeking stay of discovery); *First Merchants Enterprise, Inc. v. Shannon,* 1989 WL 25214, Fed.Sec.L.Rep. ¶ 94,421 (S.D.N.Y. March 16, 1989) (allowing United States Attorney to intervene in civil action).

In the instant case, the United States Attorney seeks to intervene for purpose of staying certain discovery in this civil action while a criminal investigation takes place. The Court is satisfied that the civil action and corresponding criminal investigation arise out of common questions of law and fact and, thus, the United States Attorney has demonstrated a sufficient interest in the present action to permit intervention under Rule 24(b)(2).

**\*12** Defendant Greenberg argues that the United States Attorney is not entitled to intervention because the interests of the United States of America are adequately represented in this case in the presence of the SEC as a plaintiff. Greenberg contends that the United States Attorney can take a position in this matter through the SEC and, thus, intervention is inappropriate. The Court finds this position to be without merit. The Court must recognize that various branches within the United States Government often have diverging interests. Thus, even though the SEC is involved in this action, the United States Attorney may have an interest in this litigation which is qualitatively different from the SEC's interest. Moreover, the United States Attorney is better equipped to explain its need for intervention in the instant case due to a parallel criminal investigation, rather than using the SEC as a conduit for such arguments. Courts have repeatedly allowed the United States Attorney to intervene in civil cases brought by the SEC where it is believed that the case would interfere with a criminal prosecution. *See, e.g., Chestman,* 861 F.2d at 50; *In re Ivan F. Boesky Securities Litigation,* 128 F.R.D. 47, 48–49 (S.D.N.Y.1989). Accordingly, the application of the United States Attorney's to intervene for the purpose of seeking a stay of discovery is granted.[FN8]

B. *Application for a Partial Stay of Discovery*

The United States Attorney has made an application to have the Court stay discovery as it relates to defendant Downe in the instant case. The United States Attorney states that defendant Downe is presently cooperating with an ongoing Grand Jury investigation which is closely intertwined with the subject matter of this action. It is argued that, if discovery as to Downe is not stayed, the defendants in this case will be able to obtain testimony and documents through civil discovery, which could not be obtained at this time in a criminal proceeding. Thus, the United States Attorney contends that the Grand Jury investigation would be irreparably harmed if such testimony and document production with respect to defendant Downe were permitted to proceed at this time.

The Court finds the argument presented by the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

United States Attorney to be compelling under the circumstances of the instant case. The power of this Court to issue a stay of discovery cannot be questioned. *See generally Landis v. North American Co.,* 299 U.S. 248, 255 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). In deciding whether a stay of discovery in a civil proceeding is appropriate, the Court must balance the competing interests at stake. *Id.* at 255. The Court recognizes that a stay of discovery is often necessary where liberal discovery rules will allow a litigant to undermine, or gain an unfair advantage in, a potential criminal prosecution which parallels the subject matter of the civil action. *See, e.g., Campbell v. Eastland,* 307 F.2d 478, 487 (5th Cir.1962) (Wisdom, J.) ("[i]n handling motions for a stay of a civil suit until the disposition of a criminal prosecution on related matters and in ruling on motions under the civil discovery procedures, a judge should be sensitive to the difference in the rules of discovery in civil and criminal cases"), *cert. denied,* 371 U.S. 955 (1963). As this Court has recently noted:

*13 "A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal trial. Judicial discretion and procedural flexibility should be utilized to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other."

*Pharaon,* 140 F.R.D. at 639 (*quoting Campbell v. Eastland,* 307 F.2d at 487). Thus, where a party or witness in a civil case is cooperating with a grand jury investigation relating to the subject matter of the civil suit, there is a compelling reason to stay discovery of the civil case pending resolution of the criminal investigation.

Defendant Greenberg argues that United States

Attorney has failed to demonstrate good cause for the stay because an indictment has not been returned with respect to the subject matter of the instant case. Defendant Greenberg contends that, in the absence of an indictment, the purported disadvantage to the United States Attorney in allowing civil discovery is "purely speculative" at this juncture.

The Court finds this argument to be unpersuasive. Courts have granted stays of discovery in order to protect the integrity of the pending criminal investigations, even where an indictment has not yet been returned. *See, e.g., Pharaon,* 140 F.R.D. at 641 (stay granted pending grand jury investigation in New York involving defendant); *SEC v. Control Metals Corp.,* 57 F.R.D. 56, 57 (S.D.N.Y.1972) (staying civil action pending grand jury investigation); *see also United States v. Hugo Key and Son, Inc.,* 672 F.Supp. 656, 658–59 (D.R.I.1987) (staying civil action while Department of Justice considered bringing criminal proceeding based on certain allegations that were the subject matter of the civil claim); *Founding Church of Scientology of Washington, D.C., Inc. v. Kelley,* 77 F.R.D. 378, 381 (D.D.C.1977) (refusing to compel federal officials to answer interrogatories during pendency of federal criminal grand jury investigation).[FN9]

In the instant case, defendant Downe pled guilty (1) to securities trading through an off-shore account; and (ii) to failing to make public filings under section 16 of the Securities Exchange Act of 1934. Pursuant to a cooperation agreement, Downe is presently providing information against others in connection with the ongoing Grand Jury investigation. Under the circumstances of this case, the Court finds that the pendency of this Grand Jury investigation, and the prospect of an indictment resulting therefrom, demonstrates "good cause" for staying discovery with respect to defendant Downe in this case pending the outcome of the related criminal investigation.

Moreover, defendant Greenberg, as well as the other defendants, have failed to demonstrate that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

they will suffer any prejudice if all discovery is stayed in the civil action for a limited duration. As the Second Circuit has noted, "so far as preparation for trial in the civil action is concerned, appropriate opportunities for discovery can be allowed when the stay is lifted." *Chestman,* 861 F.2d at 50.

**\*14** Accordingly, having weighed the competing interests of the various parties, the Court finds that a stay of discovery relating to defendant Downe is warranted. While the United States Attorney has only requested this partial stay of discovery, defendant Greenberg argues that, if the Court stays discovery relating to Downe, it should stay discovery of the entire action. Having carefully reviewed the positions of the parties, the Court, in the interest of fairness and avoidance of duplication of effort, will stay *all* discovery in this action.

Even a cursory review of the complaint reveals that defendant Downe is the central figure in this action and, thus, the taking of Mr. Downe's deposition will be critical for the other defendants in this civil action. It would be unfair and prejudicial to the defendants to require them to continue with discovery without first having an opportunity to depose Downe and receive any other information relating to Downe which might otherwise be available to them in the absence of a stay.FN10 The SEC would be the beneficiary of an unfair litigation advantage if the Court instituted a limited stay, rather than a stay of the entire action.

Moreover, a partial stay would lead to duplicative depositions since, once the partial stay is lifted and Downe is deposed, the defendants would probably find it necessary to conduct a second deposition of individuals who were deposed prior to Downe's deposition. Thus, a partial stay would likely result in additional expenses for the parties without expediting the discovery process.

Finally, the SEC has not demonstrated any prejudice that will result from a stay of all discovery in this action. The Court is sensitive to the concerns of both sides that this litigation reach a final determination as expeditiously as possible. Thus, the Court is imposing a stay of a limited duration. The Court is staying discovery until March 17, 1993. However, if an indictment relating to the subject matter of the civil action is pending at that time, the Court will extend the stay until the conclusion of the prosecution of that matter.

CONCLUSION

For the reasons stated above, defendant Greenberg's motion for judgment on the pleadings is denied in its entirety. In addition, the Court hereby orders a stay of all discovery until March 17, 1993. However, if an indictment relating to the subject matter of this civil suit is pending at that time, the Court will extend the stay until the conclusion of a trial of any prosecution brought as a result of the Grand Jury investigation.

SO ORDERED

FN1. Defendant Greenberg has also brought a motion to compel the SEC to produce certain documents and respond to interrogatories. Several other defendants have joined in this motion. The SEC opposes the motion on the grounds that the documents at issue are protected by the attorney work product doctrine and certain privileges (*i.e.,* attorney-client, deliberative process, and law enforcement privileges). In addition, the SEC argues that its response to Greenberg's interrogatories complied with the Local Rules and the Federal Rules of Civil Procedure. The Court will postpone consideration of that motion until the stay of discovery is lifted.

FN2. Subsequent to the filing of the complaint, defendant Sullivan consented to the entry of a permanent injunction. In addition, both defendants Downe and Weinger pled guilty to criminal charges arising out of the SEC's investigation into these allegations, but remain parties to this civil action.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**FN3.** In the Memorandum in Support of the Motion for Judgment on the Pleadings, dated September 16, 1992 ("Defendant Greenberg's Memorandum"), defendant Greenberg has made factual assertions concerning matters outside the complaint including newspaper articles (pp. 3 & 5), the performance of securities of the gaming industry companies generally (p. 14), and a portion of the SEC's response to an interrogatory (p. 24). Reliance on these extraneous materials by the Court is improper on a motion to dismiss for failure to state a claim. *See Fonte v. The Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988) ("[f]actual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading for purposes of Rule 12(b)"); *see also Allen v. West-Point–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Thus, the Court has excluded consideration of these factual allegations contained in defendant's memorandum of law on this 12(c) motion. While the Court has the power to convert this motion into one for summary judgment, *see* Fed.R.Civ.P. 12(c), the Court expressly declines to do so in the instant case.

**FN4.** In *Carpenter v. United States,* 484 U.S. 19, 24 (1987), an "evenly divided" Court affirmed a securities fraud conviction brought under the misappropriation theory. Since an affirmance of an evenly divided court is "not entitled to precedential weight" *Neil v. Biggers,* 409 U.S. 188, 192 (1972), this theory has not been adopted by the Supreme Court. However, in addition to the Second Circuit, several other circuits have recognized the misappropriation theory under 10b–5. *See, e.g., SEC v. Cherif,* 933 F.2d 403, 410 (7th Cir.1991), *cert. denied,* 112 S.Ct. 966 (1992); *SEC v. Clark,* 915 F.2d 439, 449 (9th Cir.1990);

*Rothberg v. Rosenbloom,* 771 F.2d 818, 822 (3d Cir.1985), *cert. denied,* 481 U.S. 1017 (1987).

**FN5.** While a subsequent public announcement was eventually made, the announcement occurred after Sloate had completed his trading in the securities and had no effect on defendant Sloate's status. The facts regarding the public announcement are set forth in *United States v. Willis,* 737 F.Supp. 269, 271 (S.D.N.Y.1990) (public announcement of Weill's efforts to become Chief Executive Officer of BankAmerica was made on February 21, 1986).

**FN6.** The Court recognizes that the other plan allegedly considered by the investor group—the LBO plan—appeared to be no longer feasible when Downe engaged in the initial Bally transactions, according to the complaint. Complaint, at ¶¶ 92–95. Nevertheless, this allegation is relevant to the determination of "materiality" because the deliberations of the investor group were allegedly ongoing and the fact that a specific LBO plan had already been considered, but rejected, provides support for the seriousness of the group's alleged later discussions concerning other options such as the recapitalization plan involving the payment of a cash dividend.

> With respect to the LBO consideration, the complaint alleges that Greenberg and Scharf, who headed an investor group, met with Bally's CEO, proposed an LBO of Bally, and Bally's CEO authorized them to explore this concept with Bally's financial adviser, Drexel. More specifically, the investor group allegedly contemplated executing the LBO in the range of $28 per share and purchased at least 500,000 Bally shares to impress Bally's CEO with their commitment to the transaction. Complaint, at ¶ 92.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Thus, the consideration of this specific plan in the same time frame as the other restructuring options considered by the investor group is relevant in assessing the seriousness of these later proposals and the probability that such proposals would be implemented. In other words, the alleged serious consideration given to the specific LBO proposal undermines the argument that the later proposals, or the restructuring plans as a whole, were too inchoate as a matter of law to be "material."

FN7. The United States Attorney relies in part on the Ex Parte Sealed Affidavit of Scott A. Edelman, Esq. submitted in support of its application. Defendant Greenberg has objected to the filing of this affidavit under seal and asks the Court to disregard it. *See* Greenberg's Reply Memorandum, at 5. However, it is well-established that the district court may read *in camera* submissions from the Government where an interest in grand jury secrecy is at issue. *See In re Doe,* 711 F.2d 1187, 1194 (2d Cir.1983) (noting that the Second Circuit has "approved the use of *in camera* submissions by the government in situations where an " 'ongoing interest in grand jury secrecy is at stake' ") (citing *In re John Doe Corp.,* 675 F.2d 482, 490 (2d Cir.1982)). Under the circumstances of the instant case, the Court finds the *ex parte* submission of the Edelman Affidavit to be appropriate. Moreover, even if the Court disregarded the contents of the Edelman Affidavit in its entirety, there is sufficient information within the Application itself, which is available to defendant Greenberg, to support a stay of discovery in the instant case.

FN8. Defendant Greenberg argues that the motion to intervene must be rejected be-

cause the motion does not contain "a pleading setting forth the claim or defense for which intervention is sought." Fed.R.Civ.P. 24(c). The Court finds that the papers filed by the United States Attorney have fulfilled the substance of the requirements of Rule 24(c) and provided adequate notice to the defendants as to the grounds for the motion to intervene. Under such circumstances, the failure to comply with the technical requirements of Rule 24(c) does not bar consideration of the motion on the merits. *See Belgian American Mercantile Corp. v. De Groeve–Marcotte & Fils,* 433 F.Supp. 1098, 1101 (S.D.N.Y.1977) (noting that "[t]he Second Circuit has held that in the face of strong circumstances the formal requirements of Rule 24 need not be insisted on") (citing *Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1074 n. 1 (2d Cir.1972)); *see also Nelson v. Greenspoon,* 103 F.R.D. 118, 121 (S.D.N.Y.1984) (finding that non-party seeking intervention had not met the formalities of Rule 24(c), but nevertheless considered the merits of the motion because "denying its motion on that ground would exalt form over substance").

FN9. The Court also rejects Greenberg's contention that the fact that the Government is a plaintiff in this action, rather than a defendant, makes a stay inappropriate. Courts have repeatedly granted stays in cases brought by the Government where discovery in the civil case would interfere with a parallel criminal proceeding or investigation. *See, e.g., SEC v. Control Metals Corp.,* 57 F.R.D. at 57–58; *United States v. Hugo Key and Son, Inc.,* 672 F.Supp. at 658; *In re Ivan F. Boesky Securities Litigation,* 128 F.R.D. at 51.

FN10. As noted earlier, defendant Green-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 22126 (S.D.N.Y.)
**(Cite as: 1993 WL 22126 (S.D.N.Y.))**

berg has brought a motion to compel the SEC to produce documents and respond to interrogatories. The motion, to a large extent, involves documents relating to defendant Downe. Several other defendants have joined in this motion. The Court finds consideration of the motion to compel to be premature at this juncture in light of the decision to impose a stay of all discovery. When the stay is lifted, the Court will invite the parties to revise their arguments to the extent that developments during the pendency of the stay have altered their positions with respect to the motion to compel.

S.D.N.Y.,1993.
S.E.C. v. Downe
Not Reported in F.Supp., 1993 WL 22126 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
PHILIP MORRIS INCORPORATED, Plaintiff,
v.
Michael HEINRICH, Masta Displays Co., AM–PM
Sales Co., Inc., Richard Billies, Sidney Rothenberg,
John Billies, Sonia Graphics, Jose Rivera, Jomar
Displays, Inc., Martin Neier, Joel Spector, Visart
Mounting and Finishing Corp., Dani Siegel, C.D.
Baird & Co., Inc., Paul Bielik, Richard T. Billies,
Jr., Manufacturers Corrugated Box Co., Inc., Irving
Etra, Southern Container Corp., Steven Grossman,
Donald Kasun, Barry Besen, Winko New Jersey,
Inc. (formerly known as Republic Container Corp.,
a New York corporation), Republic Container
Corp., a New Jersey corporation, Stanley Winikoff,
Amy Winikoff, and X–L Services, Inc., Defend-
ants.

No. 95 CIV. 0328 (LMM).
June 28, 1996.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**\*1** This case involves allegations by the
Plaintiff, Philip Morris ("Philip Morris"), of a
broad bid-rigging conspiracy on the part of the De-
fendants to allocate contracts for the production and
supply of temporary cardboard "point-of-purchase"
graphic displays, used for advertising Philip Morris
products at retail locations. Philip Morris primarily
charges antitrust violations, invoking the Sherman
Act and New York State's Donnelly Act. It also
brings claims for common law fraud, breach of fi-
duciary duty, participation in breaches of fiduciary
duty, commercial bribery and commercial bribe re-
ceiving.

Most of the Defendants, mainly graphic display
vendors, have moved to dismiss the Amended
Complaint, filing ten separate notices of motion,
with independent supporting and reply briefs. They
variously argue that the case should be dismissed
pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and
12(b)(6). The Court has examined the motions col-
lectively, to the extent that the arguments apply
equally to all Defendants, and individually, to the
extent that Defendants raise arguments particular to
their own circumstances. For the reasons stated be-
low, the motions to dismiss are denied as to: Counts
I, II, III, and IV to the extent that they accrued after
March 4, 1989; and Count VIII. The motions to dis-
miss are granted as to Counts I, II, III and IV to the
extent that they accrued prior to March 4, 1989,
without prejudice to Plaintiff's right to replead
fraudulent concealment within 60 days; Counts V,
VI and VII, without prejudice to Plaintiff's right to
replead with particularity, within 60 days; and
Counts IX–XIII.

The United States of America ("the Govern-
ment") moves separately to intervene in this action
and to stay the depositions of John E. Clemence
("Clemence") and all other witnesses, as well as the
answering of all interrogatories, until the disposi-
tion of what it characterizes as a closely-related
criminal investigation it is currently conducting in
this judicial district. For the reasons stated below,
the Court grants the motion to intervene and grants
the stay until December 31, 1996. The Government
is also granted leave to request an extension of this
stay prior to its expiration date, should one become
necessary.

Finally, the Court denies the request of Defend-
ants Visart Mounting and Finishing Corp.
("Visart"), Dani Siegel ("Siegel") and Genetra Af-
filiates, Inc. ("Genetra") for access to the *ex parte*
supplemental affidavit submitted by Rebecca
Meiklejohn in support of the Government's opposi-
tion to their cross-motion for a show cause hearing.
They had cross-moved for the show cause hearing
to determine whether the Antitrust Division had
breached grand jury secrecy with regard to its in-
vestigation. The Court has not considered these ma-
terials in connection with the present motions. The

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

cross-movants are directed to submit their reply brief concerning the cross-motion within 10 days of this decision, without the benefit of access to the unreviewed *ex parte* materials.

### I. Facts

**\*2** Philip Morris is a Virginia corporation engaged in the sale of tobacco products. Its Purchasing Department is responsible for buying retail promotional materials, including point-of-purchase cardboard graphic displays and packaging for consumer incentives. (Amend.Compl. at ¶ 5.) The company employed Defendant Michael Heinrich as Director of the Purchasing Department from 1988 through September of 1991. (Amend.Compl. at ¶ 6.) The remainder of the Defendants are manufacturing and service companies, their owners and their affiliates, who sought and received contracts to furnish Philip Morris with graphic display materials and services. In its Amended Complaint, Philip Morris groups these so-called Vendor Defendants into two categories: 1) the Mounting and Finishing Vendor Defendants; and 2) the Corrugated Vendor Defendants. The first group produced graphic displays on lightweight cardboard which they generally purchased from other vendors, while the second group produced displays on a heavier cardboard which they manufactured themselves. (Amend.Compl. at ¶¶ 7–9.)

The essence of Philip Morris' Amended Complaint is that these Vendor Defendants, together with Heinrich and other Philip Morris employees, conspired to manipulate Philip Morris' bidding procedures for awarding contracts in order to ensure that the Vendor Defendants would obtain them. Philip Morris' formalized bidding process for purchasing graphic displays required that for purchases of printed materials between $10,000 and $25,000, the Purchasing Department secure one written bid and at least one alternative verbal price quotation. Purchases between $10,000 (*sic* ) and $100,000 required competitive bids from at least three qualified suppliers, with approval of the Director of Purchasing and the Vice President of Marketing Services

needed before the job could be awarded to other than the lowest bidder. Purchases exceeding $100,000 required sealed bids from a minimum of three qualified suppliers, with the bids opened and the contract awarded to the lowest bidder at a bid review meeting. Louis T. Cappelli ("Cappelli"), the Graphics Purchasing Manager during all relevant periods, was responsible for soliciting and processing bids. As of 1988, he reported directly to Heinrich. (Amend.Compl. at ¶¶ 42–44.)

#### A. The Alleged Mounting and Finishing Vendors' Scheme

Philip Morris alleges that beginning no later than 1982, Cappelli ceded his responsibility for the bidding process to Ed Reitman, a sales representative of Defendant Masta Displays Co. ("Masta") who is now deceased, in return for bribes and kickbacks. Reitman, with the cooperation of Defendants AM–PM Sales Co. ("AM–PM"), Richard Billies ("Billies"), Sidney Rothenberg ("Rothenberg") and John Billies, all of whom are affiliates, officers or employees of Masta (collectively, "the Masta Group"), agreed with Cappelli that the Masta Group would supply the two or three requisite bidders for Philip Morris mounting and finishing work, but that Masta would always win the bid and subcontract the work to other vendors, including already existing Philip Morris vendors. (Amend.Compl. at ¶ 51.)

##### 1. Mechanics

**\*3** According to Philip Morris, the alleged scheme worked as follows. Defendant Jomar Displays, Inc. ("Jomar"), with the approval, knowledge and participation of its officers, Defendants Martin Neier ("Neier") and Joel Spector ("Spector"), and Defendant C.D. Baird & Co., Inc. ("C.D. Baird"), with the approval, knowledge and participation of its officers, Defendants Paul Bielik ("Bielik") and Richard T. Billies, Jr., provided the Masta Group with blank company stationery and envelopes so that the Masta Group could draw up "dummy bids." Prior to submitting any bids to Philip Morris, the Masta Group would ask Jomar and C.D. Baird for legitimate price quotes on the contract. It then in-

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

flated those quotes substantially on the dummy bids it submitted to Philip Morris on those companies' letterheads, submitting a lower bid for the same contract on behalf of Masta. When Masta won the contract pursuant to this rigged bidding process, it subcontracted with C.D. Baird or Jomar to perform the work, paying the price offered in its original bid. The Masta Group kept the difference between the original bid and the inflated price paid Masta as its "commission," using part of these proceeds to pay off Cappelli. (Amend.Compl. at ¶¶ 52–54.)

For contracts exceeding $100,000, the Masta Group allegedly asked Jomar and C.D. Baird for quotes. After deciding which company should win the contract, the Masta Group directed the companies to submit specific bids directly to Philip Morris, reflecting greater dollar amounts than the original quote. After the subcontractor received the contract, performed the work and got paid, the Masta Group collected its commission by issuing the performing company an invoice for "consulting fees" in the amount of the overcharge. Eventually, to avoid paying income tax, this system was changed to one in which "money men" representing front companies with no operations invoiced the contracting company directly. These money men paid the Masta Group 90% of the commission, keeping the rest for themselves. As always, kickbacks were allegedly paid out of these commissions. (Amend.Compl. at ¶¶ 58–60.)

Philip Morris claims that Reitman bribed Cappelli, at first, by putting Cappelli's wife on the payroll of Clive Industries ("Clive"), a Connecticut corporation run out of his home. (Amend.Compl. at ¶ 55.) Subsequently, in approximately 1984, Cappelli formed a purported clothing business, KAL Associates ("KAL"), in his wife's name, allegedly, to receive kickbacks from Clive disguised as payments for clothing designs. (Amend.Compl. at ¶ 56.) After Reitman died, Philip Morris claims that Billies provided Cappelli with names of other front companies which would provide checks, in return for KAL invoices for services supposedly rendered.

(Amend.Compl. at ¶ 57.)

### 2. Heinrich's Arrival

After Cappelli's immediate supervisor left Philip Morris in 1988, Billies recommended Heinrich, a friend who worked at Pepsi, to Cappelli. Billies apprised Heinrich of the bid-rigging scheme and obtained his assurance that he would cooperate in furthering it in return for kickbacks if he worked for Philip Morris. With Cappelli's assistance, Heinrich eventually obtained the job, becoming Cappelli's immediate supervisor. (Amend.Compl. at ¶ 61.) Shortly thereafter, he advised Cappelli to bring in Defendant Visart as a fourth vendor, with Defendant Siegel signing most of the bids on behalf of Visart. Billies rigged the bids in the same manner as he did with the other vendors, with the Masta Group receiving "commissions" and paying kickbacks to Cappelli and Heinrich. (Amend.Compl. at ¶¶ 62–64.)

**\*4** Philip Morris alleges that Billies and his son, Defendant John Billies, paid Heinrich by hand in cash, sometimes in the staircase at the Stella Mare restaurant in New York City, sometimes on the streets of Manhattan and on one occasion, in the back seat of their car. (Amend.Compl. at ¶¶ 65, 68, 70.) Starting in 1989, they also began paying Cappelli in cash. (Amend.Compl. at ¶ 68.) To generate this cash, Philip Morris claims that the Masta Group's money men would invoice AM–PM for goods and services never provided. AM–PM would pay by check, with the money men keeping 10% and paying the Masta Group the rest in cash. (Amend.Compl. at ¶ 69.) Philip Morris terminated Cappelli and Heinrich on September 30, 1991. (Amend.Compl. at ¶ 71.) After Cappelli was terminated, in the late fall of 1991, Rothenberg allegedly took Cappelli into the bathroom at the Garden City Country Club and made a kickback payment of approximately $9,000. (Amend.Compl. at ¶ 73.) While the total amount of bribes and kickbacks allegedly paid to Heinrich is unknown, Philip Morris estimates that by the fall of 1991, the Mounting and Finishing Defendants had paid Cap-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

pelli over $1 million. (Amend.Compl. at ¶¶ 65, 74.)

In addition to the relationship with Visart, the Masta Group, with the acquiescence of Cappelli and Heinrich, set up Defendant Sonia Graphics ("Sonia") in 1989, ostensibly a minority display products broker, to take advantage of Philip Morris' minority vendor program. Although Defendant Jose Rivera ("Rivera") was purportedly Sonia's sole proprietor, Philip Morris contends that Sonia was set up in Masta's office, shared Masta's telephone and fax numbers and that the same secretary typed Masta's and Sonia's bids. According to Philip Morris, the Masta Group completely controlled Sonia and rigged its bids to facilitate the larger scheme. Rivera knowingly and intentionally either signed falsified, inflated bids, or permitted the Masta Group to do so on his behalf. (Amend.Compl. at ¶ 66.)

Philip Morris charges Cappelli, Heinrich and the Mounting and Finishing Vendor Defendants with furthering their scheme through interstate commerce by use of the mails and the highways. These Defendants also allegedly used the telephone wires to facilitate the scheme by making numerous telephone calls among the conspirators. (Amend.Compl. at ¶¶ 76–78.)

B. The Alleged Corrugated Vendors' Scheme

According to Philip Morris, Cappelli, and eventually Heinrich, engaged in a similar conspiracy with the Corrugated Vendor Defendants, receiving kickbacks in return for offering control of the bidding process to an individual who rigged bids among the Corrugated Vendors. The alleged point man in this network was Harold Roll ("Roll"), also now deceased, who was a sales representative for Defendant Manufacturers Corrugated Box Co., Inc. ("Manufacturers"). The mechanics of this alleged conspiracy were almost identical to those allegedly employed by the Mounting and Finishing Vendors. Roll, with the approval of Manufacturers' Vice President, Defendant Irving Etra, supplied Cappelli with inflated corrugated bids, one from Manufacturers and generally two dummy bids from

other Defendants. Manufacturers would always win the contract and in turn, farm out the work to other vendors, receiving a "commission" in return. As was the case with the Masta Group, a portion of these proceeds would be paid to Cappelli and Heinrich as kickbacks. (Amend.Compl. at ¶¶ 79–80.)

**\*5** Among the bidders Roll supplied Philip Morris were Defendant Genetra, whose bids were often signed by Siegel, and Ultra Print ("Ultra"), a wholly-owned subsidiary of Southern Container Corp. ("Southern"). Clemence was a salesman for Southern who signed Ultra's bids. These Defendants either provided Roll with blank sample stationery or submitted bids directly to Philip Morris under Roll's direction. (Amend.Compl. at ¶¶ 81–83.) Eventually, after Cappelli requested new vendors other than Manufacturers to bid for contracts, Roll provided Southern and Republic Container Corp. ("Republic N.Y.", now known as Winko New Jersey, Inc. ("Winko N.J.")).[FN1] These companies, through Southern's officers, Defendants Steven Grossman ("Grossman") and Donald Kasun ("Kasun"), and Republic N.Y.'s officers, Defendants Stanley Winikoff and Amy Winikoff (who were also affiliated with Republic N.J.), agreed to divide up the corrugated vendor contracts. Roll told the Corrugated Vendors what to bid on contracts and received $1.00 per display upon completion of the work. (Amend.Compl. at ¶¶ 84–86.)

FN1. Republic N.Y., formerly known as Republic Container Corp., is now defunct. In late 1990, it changed its name to Winko Packaging, Inc., ultimately merging with Winko New Jersey, Inc. ("Winko N.J."). Amboy Holdings Inc. ("Amboy") changed its name to Republic Container Corp. after the incorporation of Winko Packaging, Inc. and is referred to in the Amended Complaint as "Republic N.J." Philip Morris alleges that Republic N.J. eventually took the place of Republic N.Y. in the corrugated scheme. (Amend. Compl. at ¶ 95.) Thus, they claim that Winko N.J. and Re-

public N.J. are liable for the acts of Republic N.Y. by virtue of their status as successor and de facto successor, respectively, to Republic N.Y. (Amend.Compl. at ¶¶ 100–101.) The Court concludes that both Winko N.J. and Republic N.J. can be held liable to the same extent as the other Defendants, for purposes of this motion. Furthermore, the statute of limitations, with regard to claims raised against Republic N.J., was tolled when the original complaint was filed. The filing against Republic N.J. as a successor corporation relates back to this date.

In 1989, Philip Morris claims that Billies approached Clemence, promising to use his influence with Heinrich and Cappelli to increase Southern's business with Philip Morris, in return for Southern's paying bribes to Billies instead of Roll. Clemence relayed the proposal to Grossman and Defendant Barry Besen ("Besen"), who was in charge of operations and administration at Southern's Dayton, New Jersey plant, and they instructed him to accept it. Thereafter, Southern paid a commission to the Masta Group for all contracts it received. Roll acquiesced in the deal in order to maintain his position as coordinator of the remainder of the Corrugated Vendor Defendants. (Amend.Compl. at ¶¶ 89–91.)

The Masta Group and Clemence eventually formed Defendant X–L Services, Inc. ("X–L"), in part to provide hand finishing work which Southern could not provide and in part to provide a conduit for Southern to pay commissions to the Masta Group. The procedure called for X–L to invoice Masta for the hand finishing work and Masta to invoice Southern for an amount significantly higher, the difference representing the Masta Group's commission. (Amend.Compl. at ¶¶ 92–93.) Philip Morris claims that Masta, Jomar and Visart also facilitated the Corrugated Vendors' scheme by bidding for corrugated jobs when they had no capacity to perform this type of work, serving merely as dummy bids. (Amend.Compl. at ¶ 94.) Ultimately, Philip Morris alleges, the Corrugated Vendors paid Cappelli hundreds of thousands of dollars in kickbacks in connection with corrugated display work. (Amend.Compl. at ¶ 96.) It claims that Cappelli, the Corrugated Vendors, the Masta Group, Jomar, Neier, Spector, Siegel and Visart availed themselves of interstate commerce in connection with the purportedly fraudulent conduct in the same manner alleged against the Mounting and Finishing Vendors. (Amend.Compl. at ¶¶ 97–99.)

C. Philip Morris' Bidding and Business Policies

**\*6** During the relevant period, Philip Morris disseminated a written Purchasing Policy to Purchasing Department employees, including Heinrich and Cappelli, providing that no employee involved in purchasing could accept any gift from actual or potential suppliers unless it was of nominal value and merely an extension of courtesy. Furthermore, both Cappelli and Heinrich received a written copy of the company's Business Conduct Policy, prohibiting an employee's acceptance of cash from anyone doing or seeking to do business with Philip Morris. During the relevant period, Cappelli and Heinrich signed Certificates attesting that they had read and understood this Policy and had not contravened it in the preceding year. (Amend.Compl. at ¶¶ 45–50.)

D. The Guilty Pleas

Since as early as March 4, 1993, a number of the Defendants have pleaded guilty in this district to various criminal charges related to the events described above. Jomar and Clemence each pleaded guilty to one count of violating the Sherman Act, for engaging in a combination and conspiracy in unreasonable restraint of trade and commerce, to rig bids and allocate contracts. (Amend. Complaint at ¶¶ 102–103, 112–113.) Cappelli, Rothenberg and Billies all pleaded guilty both to a Sherman Act count and a tax evasion count, arising from the same alleged facts. (Amend. Complaint at ¶¶ 104–107.) Robert Berger ("Berger"), one of the Mounting and Finishing Vendors' money men, pleaded guilty to one count of tax evasion, while

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Bert Levine ("Levine"), another of the money men, pleaded guilty to one count of conspiracy to defraud the United States of America and the Internal Revenue Service. (Amend. Compl. at ¶¶ 108–111.)

E. Philip Morris' Claims

Count I of the Amended Complaint brings a claim against Heinrich and the Mounting and Finishing Vendors for violating § 1 of the Sherman Act, 15 U.S.C. § 1, premised upon the alleged bid-rigging scheme. (Amend.Compl. at ¶¶ 118–123.) Count II states the identical claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 124–131.) Counts III and IV charge the Mounting and Finishing Vendors and the Corrugated Vendors, respectively, with violating New York State's Donnelly Act, N.Y.Gen.Bus.Law § 340, by restraining the free exercise of trade. (Amend.Compl. at ¶¶ 132–141.) Count V pleads common law fraud against the Mounting and Finishing Vendors, while Count VI brings the same claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 142–159.) Counts VII and VIII plead fraud and breach of fiduciary duty against Heinrich independently. (Amend.Compl. at ¶¶ 160–172.) Counts IX and X plead breach of fiduciary duty FN2 against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. (Amend.Compl. at ¶¶ 173–184.) Counts XI and XII charge commercial bribery against the Mounting and Finishing Vendors and the Corrugated Vendors respectively, while Count XIII brings a commercial bribe receiving claim against Heinrich. Count XIV seeks a constructive trust in favor of Philip Morris for all bribes received by Heinrich, while Count XV seeks a forfeiture of all compensation paid to him during the period of his alleged disloyalty and dishonesty.

> FN2. Technically, the Plaintiff charges, "breach of fiduciary duty of another." This claim is more accurately styled, "aiding and abetting breach of fiduciary duty," or "inducement to breach of fiduciary duty."

## II. Discussion

A. Rule 12(b)(6) Standard

**\*7** Rule 12(b)(6) provides that a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted." In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court reads the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *accord California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *Allen v. Westpoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960 (1992); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991).

When determining the sufficiency of plaintiff[s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in ... [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit. *Brass,* 987 F.2d at 150 (*citing Cortec,* 949 F.2d at 47–48).

The Court will only dismiss a Complaint for failure to state a claim when the Court finds beyond a reasonable doubt that Plaintiff "can prove no set of facts" to support the claim that Plaintiff is entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957).

The Court is required to draw all reasonable inferences in Plaintiff's favor, but not all possible inferences. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 58 (1st Cir.1990). Only when "the suggested inference rises to what experience indicates is an acceptable level of probability," must the Court accept it as fact for pleading purposes. *Id.* at 52.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

## B. The Sherman Act Claims

The Defendants move, in separate briefs, to dismiss the Sherman Act claims pursuant to Fed.R.Civ.P. 12(b)(6). Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a claim under § 1, a party must allege three elements: (1) a combination or conspiracy; (2) that results in a restraint on interstate or foreign commerce; and (3) injury to the plaintiff's business or property. *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083 (1981). The Defendants, essentially, claim that Philip Morris has failed to satisfy the second requirement.

While the language of the statute seemingly prohibits any restraint of trade, the Supreme Court has required that an "unreasonable" restraint of trade be demonstrated to establish a violation of § 1 . *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457 (1986). A trade restraint "may be adjudged unreasonable either because it fits within a class of restraints that has been held to be *'per se'* unreasonable, or because it violates what has come to be known as the 'Rule of Reason.' " *Id.* at 458. Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint upon competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977). While the rule of reason requires a demonstration of anticompetitive effects or actual harm to competition in order to establish an antitrust violation, "[w]hen a *per se* offense is alleged, a showing of anticompetitive effect is *not* required to establish a Sherman Antitrust Act violation." *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1283–84 (7th Cir.1983); *see also Barrett v. United States Banknote Corp.,* No. 7420, 1992 WL 232055, at *4 (S.D.N.Y. Sept. 2, 1992) ("The plaintiff who successfully alleges a *per se* violation relieves himself of the requirement of show-ing anticompetitive effect."). A particular course of conduct is not considered a *per se* violation until the courts have had "considerable experience" with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anti-competitive effects. *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 607–08 (1972); *Bunker Ramo,* 713 F.2d at 1284. For the reasons stated below, the Court holds that the conduct alleged in the Amended Complaint falls plainly within the definition of a *per se* violation. Philip Morris has properly pleaded a conspiracy resulting in an unreasonable restraint of trade that injured its business. The Defendants' various arguments supporting the motions to dismiss Counts I and II are rejected and the motions denied.

### 1. Applicability of *Per Se* Rule

**\*8** The Supreme Court has stated that "agreements among competitors to fix prices on their individual goods or services are among those concerted activities ... held to be within the *per se* category." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 8 (1979). In determining whether particular conduct qualifies as price fixing, the Court does not take a literal approach, looking for the mere act of "fixing" a "price." *Id.* at 9. "Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." *Id.* at 23. Rather, the characterization of particular conduct depends upon its economic impact—"that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less competitive.' " *Id.* at 19–20 (citation omitted).

Thus, in *Broadcast Music,* the Court ruled that the issuance of blanket licenses to copyrighted musical compositions at fees previously arranged was not *per se* unlawful, despite the fact that it involved "price fixing" in the literal sense. It reasoned that

the blanket license was not a "naked restrain [t] of trade," but rather, a practical response to market realities, accompanying "the integration of sales, monitoring and enforcement against unauthorized copyright use." *Id.* at 20. Consequently, given what the Court perceived to be the lawful, useful purposes of the blanket licenses, it reversed the Court of Appeals' application of the *per se* standard to the facts and remanded the case for rule of reason analysis.

In *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643 (1980), the Court reaffirmed its commitment to the proposition that price fixing, as a general rule, is unlawful *per se.* The case involved a group of beer wholesalers who allegedly conspired to fix credit terms for purchases by retailers. In noting that "[i]t has long been settled that an agreement to fix prices is unlawful *per se," id.* at 647, the Court concluded that since an agreement to limit credit was tantamount to the elimination of price discounts, the conduct at issue constituted a practice which fell "squarely within the traditional *per se* rule against price fixing." *Id.* at 648. Given that none of the redeeming virtues which accompanied the *Broadcast Music* price fixing existed in *Catalano,* 446 U.S. at 649, the Court did not engage in an analysis of whether the conduct "would always or almost always tend to restrict competition and decrease output." *Broadcast Music,* 441 U.S. at 19–20.

The conduct alleged in this case involves a conspiracy on the part of commercial suppliers and Philip Morris employees to fix prices for goods and services at artificially inflated rates. The Court, accepting the well-pleaded allegations of the Complaint as true, views this behavior, on its face, as price fixing. It finds no evidence of economic or particularized industry circumstances suggesting that the alleged conspiracy developed as a legitimate business response to factors in the marketplace or served any other redeeming purpose. Further analysis under *Broadcast Music,* or any proof of anticompetitive effect, is therefore unnecessary. The

alleged conspiracy is an example of price fixing that is unlawful *per se.* Thus, Counts I and II, raising claims under § 1 of the Sherman Act, state claims upon which relief can be granted and may not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**\*9** Furthermore, the allegations here form a textbook case of bid rigging. Courts have specifically classified bid-rigging as a form of price fixing that constitutes a *per se* violation. *United States v. Koppers Co.,* 652 F.2d 290, 294 (2d Cir.1981), *cert. denied,* 454 U.S. 1083 (1982); *see also United States v. W.F. Brinkley & Son Constr. Co., Inc.,* 783 F.2d 1157, 1161 (4th Cir.1986) ("[W]here two or more persons agree that one will submit a bid for a project higher or lower than the others or that one will not submit a bid at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act."); *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1192 (3d Cir.1984) ("[P]rice fixing and bid rigging are *per se* violations."), *cert. denied,* 470 U.S. 1029 (1985); *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 325 (4th Cir.1982) ("Any agreement between competitors pursuant to which contract offers are submitted to or withheld from a third party constitutes bid rigging *per se.* "); *United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101, 1106 (7th Cir.) ("An agreement among competitors to rig bids is illegal"), *cert. denied,* 444 U.S. 840 (1979); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977) ( "Conspiracies between firms to submit collusive, non-competitive, rigged bids are *per se* violations of the statute"); *Barrett,* 1992 WL 232055, at \*4 ("Price fixing and bid rigging generally constitute *per se* violations.... Unlike bid rigging arrangements, however, not every price fixing agreement constitutes a *per se* violation."). As a result, Counts I and II state claims for *per se* violations of the Sherman Act. Demonstration of anticompetitive effect is unnecessary.

The Defendants' argument that the facts of this case constitute nothing more than commercial bribery, outside the scope of the Sherman Act, is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

without merit. Unlike the cases cited by Defendants, *see, e.g., Calnetics Corp. v. Volkswagen,* 532 F.2d 674, 687 (9th Cir.) (no antitrust violation where commercial bribery alleged without allegations of price fixing or bid rigging), *cert. denied,* 429 U.S. 940 (1976); *Federal Paper Bd. Co. v. Amata,* 693 F.Supp. 1376, 1380 (D.Conn.1988) (bribery, standing alone without allegations of collusion, does not establish antitrust claim), Philip Morris has alleged more than mere commercial bribery: it has alleged facts detailing an extensive bid rigging scheme involving the Defendants. This is precisely the type of conduct that the Sherman Act prohibits. Thus, the cases cited by the Defendants are distinguishable.

### 2. Rule of Reason

The Court need not apply the rule of reason to Counts I and II. Nonetheless, it holds that even if the claims did not state *per se* price fixing violations, they would properly allege Sherman Act claims for unreasonable restraint of trade under this analysis as well.

### 3. Statute of Limitations

**\*10** A majority of the Defendants contend that the Sherman Act counts should be dismissed for failing to satisfy the statute of limitations for filing antitrust actions. "Any action to enforce any cause of action under sections 15, 15a or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Philip Morris filed its initial complaint on January 17, 1995. Thus, according to the Defendants, any conduct alleged to constitute a Sherman Act violation which accrued prior to January 17, 1991 is time-barred. In the context of a continuing conspiracy to violate antitrust laws, a separate cause of action is said to accrue each time an act of the defendant injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). This requires an overt act: claims premised upon damages which result from conduct which occurred outside the limitations period are time-barred. *Argus Inc. v. Eastman Kodak Co.,* 552

F.Supp. 589, 594 (S.D.N.Y.1982), *aff'd,* 801 F.2d 38 (2d Cir.1986), *cert. denied,* 479 U.S. 1088 (1987). Since Philip Morris alleges that bid rigging continued "from the early 1980s through 1991," (Amend.Compl. at ¶¶ 120, 126), then it is possible to conclude, reading the facts in favor of the Plaintiff, that antitrust injuries accrued subsequent to January 17, 1991. To the extent that Counts I and II derive from antitrust injuries alleged to have accrued during this period, the counts, on their face, satisfy the statute of limitations and may not be dismissed.

#### i. § 16(i) Tolling

Furthermore, the federal government's filing of a criminal information against Defendant Jomar on March 4, 1993 tolled the statute of limitations as of that date, pursuant to 15 U.S.C. § 16(i). This provision provides:

> [w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws ... the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

Philip Morris brings its Sherman Act claims pursuant to § 15. Consequently, if counts I and II are deemed to be "based in whole or in part on any matter complained of in" the federal government's criminal proceeding against Jomar, then the counts are timely to the extent that they are premised upon antitrust causes of action which accrued after March 4, 1989.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

**\*11** Several Defendants argue that the government's action against Jomar involves a different conspiracy among different Defendants, and thus, may only toll the statute of limitations for the specific parties named in the government's action, or at the very least, for the parties allegedly involved in the Mounting and Finishing conspiracy. The Supreme Court has held, however, that "[t]he private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants." *Leh v. General Petroleum Corp.,* 382 U.S. 54, 59 (1965). In fact, the statute of limitations may be tolled against defendants to the private suit even if they were "named neither as a defendant nor as a coconspirator by the Government." *Zenith Radio,* 401 U.S. at 335.

> We see nothing destructive of Congress' purpose in holding that [§ 16(i) ] tolls the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein; indeed, to so hold materially furthers congressional policy by permitting private litigants to await the outcome of Government suits and use the benefits accruing therefrom.

> *Id.* at 336.

Nonetheless, the Court must exercise care to insure that "reliance upon the government proceeding is not mere sham and that the matters complained of in the government proceeding bear a real relation to the private plaintiff's claim for relief." *Leh,* 382 U.S. at 59. It does so by comparing the plaintiff's complaint with the complaint in the government proceeding on which the plaintiff relies. *Id.* While the complaints need not be identical, the Third Circuit has defined "real relation" by stating that there must be a "substantial identity" in order to invoke § 16(i) tolling. *New Jersey v. Morton Salt Co.,* 387 F.2d 94, 98 (3d Cir.1967), *cert. denied,* 391 U.S. 967 (1968). The Second Circuit has not provided a definition for when the similarity between the two complaints is enough for tolling,

but it has ruled that there is an insufficient basis when the only similarity is that some of the defendants are the same. *Peto v. Madison Square Garden Corp.,* 384 F.2d 682, 682 (2d Cir.1967) (no "real relation" between claims where conspiracies in two complaints are entirely different, involve different sports activities and cover different periods of time), *cert. denied,* 390 U.S. 989 (1968); *see also Charley's Tour and Transp., Inc. v. Interisland Resorts, Ltd.,* 618 F.Supp. 84, 86 (D.Haw.1985) (no tolling where cases involved different markets [rental rates for hotel rooms versus charter bus market], different defendants and different means of proof).

In this case, the Court holds that there is a "real relation" between the criminal information filed against Jomar and Philip Morris' Amended Complaint. The Jomar information alleges that Jomar and its coconspirators engaged in a combination and conspiracy to unreasonably restrain trade by rigging bids and allocating contracts for the supply of graphic materials to Philip Morris. (Amend.Compl. at ¶ 102.) Philip Morris, in its Amended Complaint, makes the same allegations against a number of Defendants, elaborating upon the mechanics of the scheme. The fact that Philip Morris identifies two overlapping cells of Defendants which arranged the schemes to accommodate Philip Morris' bidding process does not alter the fact that the participants, objects and mechanics of the Mounting and Finishing Vendors' and the Corrugated Vendors' schemes were essentially the same. At the very least, this is a factual question. Thus, the Court finds that Philip Morris can argue a set of facts that the criminal information filed against Jomar tolled the statute of limitations pursuant to § 16(i) as to all other Defendants, as of March 4, 1993. The Court need not determine when this tolling terminated, since the criminal information filed against Cappelli on January 3, 1994, (Amend.Compl. at ¶ 104), in any event, was filed prior to the termination of the Jomar proceedings. Thus, it may be tacked onto the Jomar tolling. As the Cappelli proceedings had not terminated as of

the date the Amended Complaint was filed, the Sherman Act claims are timely to the extent that they are based upon claims which accrued after March 4, 1989.

### ii. Fraudulent Concealment

**\*12** As for claims accruing prior to March 4, 1989, Philip Morris argues that they are timely as well on the theory that the statute of limitations tolled from the start on account of the Defendants' fraudulent concealment. An antitrust plaintiff may prove fraudulent concealment sufficient to toll the statute of limitations by establishing: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir.1988), *cert. denied,* 488 U.S. 848 (1988). The Second Circuit has characterized bid-rigging conspiracies as inherently self-concealing activities. The plaintiff satisfies the first prong of the fraudulent concealment test by demonstrating the existence of the conspiracy. *Id.* at 1083–84.

While pleading of the Defendants' affirmative acts is not necessary under *Hendrickson* to meet the first prong of the doctrine in a case of an alleged bid-rigging scheme, "such pleading may be necessary to sufficiently allege the second and third elements." *New York v. Cedar Park Concrete Corp.,* 684 F.Supp. 1229, 1232 (S.D.N.Y.1988). "The burden rests squarely on the party pleading fraudulent concealment.... Courts furthermore require particularity in pleading fraudulent concealment." *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423, 1443 (S.D.N.Y.1986). General assertions of ignorance and due diligence without more specific explanation for the delay in bringing a suit will not satisfy these pleading requirements. *Id.* at 1233. In this case, Philip Morris has not specifically alleged in any detail when it became aware of the conspiracy. While it infers that it learned of it subsequent

to the unsealing of records from criminal proceedings against some of the Defendants, as well as from information provided by Cappelli and Clemence as part of their cooperation agreements, (Amend.Compl. at 14, n. 1, 24, n. 2), nowhere does Philip Morris assert exactly when it acquired the "actual knowledge" of its causes of action against the Defendants. *See Cedar Park,* 684 F.Supp. at 1233.

Furthermore, Philip Morris has not adequately pleaded diligence in attempting to discover the alleged fraud. While it states that it undertook an internal investigation, "[m]ore specific information is required as to the difficulties, if any, [it encountered] with the progression of the investigation.... Moreover, plaintiff should allege, with more specificity, when, despite these obstacles, it acquired 'actual knowledge.' " *Id.* The date by which a Plaintiff should have discovered the existence of fraud may be a question of fact, *American Credit Indemnity Co. v. Legge,* 829 F.Supp. 649, 650–51 (S.D.N.Y.1993), but Philip Morris must nonetheless first allege some facts sufficient to argue that it was diligent and did not learn of the alleged fraud until a time within the statute of limitations period. Thus, even reading the Amended Complaint generously for the Plaintiff, the Court rules that Philip Morris has failed adequately to plead fraudulent concealment. Accordingly, the Court grants the Defendants' motion to dismiss the portions of the Amended Complaint that seek damages for claims arising prior to March 4, 1989, without prejudice to the Plaintiff's repleading the fraudulent concealment sections within 60 days. As discussed below, since antitrust claims do not require pleading with particularity, Philip Morris' assertions in the Amended Complaint that both schemes continued through 1991, given the generous reading accorded plaintiffs' complaints in 12(b)(6) motions, satisfactorily states a claim against each of the Defendants subsequent to March 4, 1989. Thus, dismissal of causes of action accruing prior to this date does not result in dismissal of any individual defendant from the Amended Complaint for purposes of this mo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion.

### 4. Pleading Requirements

**\*13** The liberal system of notice pleading applies to antitrust causes of action. *In re NASDAQ Market–Makers Antitrust Lit.,* 894 F.Supp. 703, 710 (S.D.N.Y.1995); Fed.R.Civ.P. 8(a). Philip Morris need not plead its antitrust claims with the particularity required by Fed.R.Civ.P. 9(b). Thus, while it is not enough to merely state that a conspiracy has taken place, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading." *Id.* (quoting 2A James W. Moore et al., & J. Lucas, Moore's Federal Practice ¶ 8.17(5) (1986)); *see also Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (citation omitted); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1228, at 221–24 (2d ed. 1990). Furthermore, "[a]n overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim on the merits." *Cedar Park,* 665 F.Supp. at 246–47. Identifying the co-conspirators and describing the nature and effect of the alleged conspiracy is sufficient. *Alco Standard Corp. v. Schmid Bros., Inc.,* 647 F.Supp. 4, 6 (S.D.N.Y.1986).

In the Amended Complaint, Philip Morris more than satisfies the pleading requirements for a Sherman Act claim, identifying all of the coconspirators and explaining in some detail the nature and effect of the alleged conspiracy. The Court rejects the argument of certain defendants that Philip Morris failed to allege necessary particulars as to how and when individual Defendants joined the conspiracy. This degree of specificity is clearly not required by Rule 8(a). *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1047 (S.D.N.Y.1993). The Sherman Act claims satisfy pleading require-

ments.

Furthermore, as the Amended Complaint satisfies the notice requirements for an antitrust action, the demand of Defendants Winko N.J. and Republic N.Y. for a more definite statement pursuant to Fed.R.Civ.P. 12(e) is denied.

### C. The Donnelly Act Claims

New York State's Donnelly Act,[FN3] N.Y.Gen.Bus.Law § 340 (1988), prohibiting restraint of trade, is modeled after the Sherman Act and is generally construed in light of federal precedent. *Anheuser–Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820 (1988); *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 463, 381 N.Y.S.2d 426, 428 (1976). The New York State Court of Appeals has definitively asserted that the *per se* rule applies in price fixing cases under the Donnelly Act. *People v. Rattenni,* 81 N.Y.2d 166, 171–72, 597 N.Y.S.2d 280, 283 (1993). In fact, New York courts have specifically held bid-rigging to be a *per se* violation. *People v. Schwartz,* 554 N.Y.S.2d 686, 686–87 (App.Div.2d Dep't 1990). Thus, the Court holds that Philip Morris has adequately alleged Donnelly Act claims. As the same statute of limitations which applies to the Sherman Act also applies to the Donnelly Act, *see* N.Y.Gen.Bus.Law § 340(5), the motions to dismiss Counts III and IV are assessed in the same manner as Counts I and II. To the extent that the claims arise from causes of action accruing after March 4, 1989, the motions to dismiss are denied. The motions to dismiss causes of action accruing prior to this date are granted, without prejudice to Philip Morris' right to replead the elements of fraudulent concealment within 60 days.

> FN3. The statute provides, in relevant part:
>
> 1. Every contract, agreement, arrangement or combination whereby
>
> A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

may be established or maintained, or whereby

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void. N.Y.Gen.Bus.Law § 340 (1988).

### D. Common Law Fraud

**\*14** Counts V, VI and VII allege common law fraud, respectively, against the Mounting and Finishing Vendors (Amend.Compl. at ¶ 143), the Corrugated Vendors along with the members of the Masta Group who took part in their alleged scheme, (Amend.Compl. at ¶ 151), and Heinrich. (Amend.Compl. at ¶ 161). The majority of the Defendants move to dismiss the fraud claims for failing to plead the counts with particularity, pursuant to Fed.R.Civ.P. 9(b), and failure to satisfy the statute of limitations.

#### 1. Rule 9(b) Particularity

Fed.R.Civ.P. 9(b) states:

(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The purpose of Rule 9(b) is threefold: it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect the defendant from the institution of a strike suit. O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991). In reviewing a decision to dismiss on 9(b) grounds, the truth of plaintiff's allegations is assumed. DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.1987). The pleadings must adequately specify the statements it claims were false or mis-

leading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989); see also McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir.1992); June Ox v. Union Central Life Ins. Co., No. 94–CIV–4754, 1995 WL 296541, at *3 (S.D.N.Y. May 15, 1995). Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. DiVittorio, at 1247. Finally, the complaint must assert that the defendant had an intent to defraud, or allege circumstances from which an inference of such intent may be drawn. Id.; see Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005 (1988), overruled en banc on other grounds, United States v. Indelicato, 865 F.2d 1370 (2d Cir.1989).

Rule 9(b) is to be construed in light of Rule 8's more lenient pleading requirement of "a short and plain statement of the claim." Keenan v. D.H. Blair & Co., Inc., 838 F.Supp. 82, 86 (S.D.N.Y.1993). Thus, when the facts are peculiarly within the opposing party's knowledge, a plaintiff may base his allegations upon information and belief. DiVittorio, 822 F.2d at 1247. However, that exception to Rule 9(b)'s particularized pleading requirement "does not constitute a license to base claims of fraud on speculation or conclusory allegations." Karasyk v. Marc Commodities Corp., 770 F.Supp. 824, 830 (S.D.N.Y.1991). Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud, or it will not satisfy a relaxed pleading standard. Id.

**\*15** In this case, the Court finds nothing improper about Philip Morris having pleaded its fraud claims on information and belief, given the reality that a bid rigging conspiracy is by its nature self-concealing. This reality does not release a plaintiff from its burden under Rule 9(b), however. While this standard is normally strict, the Court will relax

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

it in a case where the Plaintiff demonstrates that the Defendants' own conduct has interfered with the discovery of facts necessary to properly plead fraud. *See Bethlehem Steel Corp. v. Fischbach and Moore, Inc.,* 641 F.Supp. 271, 276 (E.D.Pa.1986) ( Rule 9(b) satisfied where plaintiff alleges general time frame, the bid-rigging, its reliance on the conduct and the alleged damage). Philip Morris has not so demonstrated here. While it has stated that "certain of the facts upon which this [complaint] is based are solely within the defendants' knowledge," (Amend.Compl. at 14, n. 1), it has not shown what efforts it has undertaken to discover the necessary facts, explained the problems encountered in doing so, or alleged other information inferring the existence of such facts. On the contrary, the company's cooperation agreements with Cappelli and Clemence, both of whom are alleged to have been key players in the fraudulent schemes, indicate that it has access to more detailed information concerning the alleged fraud. Yet, with the exception of certain instances in which bribes are claimed to have been paid, Philip Morris has largely failed to plead these particulars. *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). Unlike antitrust actions, fraud claims require more than simple notice pleading. If Philip Morris knows specifics about when and how the supposed misrepresentations occurred, it should plead them. If it does not, it should explain why not. As it stands now, Rule 9(b) has not been satisfied. Accordingly, Counts V, VI and VII [FN4] are dismissed. Philip Morris is granted leave to replead within 60 days.

> FN4. Although Heinrich has not submitted a brief requesting that Count VII be dismissed, the Court does so *sua sponte. Fischer v. Yaakov,* 575 N.Y.S.2d 310, 310 (App.Div. 1st Dep't 1991).

### 2. Scienter

Assuming that the fraud counts are repleaded in conformity with Rule 9(b), the Court holds that they properly plead scienter. While Rule 9(b) itself relaxes the scienter requirement, the Plaintiff must still plead a factual basis sufficient to raise a "strong inference" of knowledge. *O'Brien,* 936 F.2d at 676. The Amended Complaint contains numerous facts showing conscious behavior on the part of all the Defendants involved in the alleged fraud to hide from Philip Morris the bid-rigging scheme.

### 3. Duty to Disclose

Some Defendants claim that they have no liability for fraud, based upon concealment or omission, because they had no duty to disclose the information that was allegedly concealed. Contrary to Defendants' arguments, however, in a case such as this, where they are accused of bid-rigging, Defendants have a duty to disclose regardless of whether they have a fiduciary or confidential relationship with the Plaintiff. *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1049 (S.D.N.Y.1993) (duty to disclose where defendants create "artificial market" or "price mirage").

### 4. Statute of Limitations

**\*16** In New York, an "action for fraud must be commenced within six years of the commission of the fraud or within two years from its discovery, whichever is longer." *Chase v. Columbia Nat'l Corp.,* 832 F.Supp. 654, 659 (S.D.N.Y.1993); N.Y.Civ.Prac.L. & R. 208(g), 213(8) (McKinney 1990 and Supp.1995). As the claims have been dismissed for failure to plead with particularity, the Court need not determine whether the statute of limitations has been satisfied. Furthermore, since the counts do not specify when the alleged acts of fraud were committed or discovered, the Court *cannot* determine their timeliness. If the claims are properly repleaded, the Court will assess their conformity with the statute of limitations at that time.

### E. Breach of Fiduciary Duty

Count VIII states a claim for breach of fiduciary duty against Heinrich while Counts IX and X [FN5] allege breach of fiduciary duty of another against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. Most Defendants have moved to dismiss these claims citing the statute of limitations. New York provides no ex-

press statute of limitations for breach of fiduciary duty claims. *Mejia–Ricart v. Bear Stearns & Co.,* No. 95–CIV–582, 1996 WL 94810, at *3 (S.D.N.Y. Mar. 4, 1996). Courts have applied either a three-year or six-year limitations period, depending on the nature of the substantive relief sought. *Ghandour v. Shearson Lehman Bros. Inc.,* 624 N.Y.S.2d 390, 392 (App.Div. 1st Dep't 1995). When the only damages sought are legal, the statute of limitations is generally three years. Where the nature of the relief sought is equitable, the claim is governed by a six-year statute of limitations. *Toto v. McMahan, Brafman, Morgan & Co.,* No. 93–CIV–5894, 1995 WL 46691, at *11 (S.D.N.Y.1995); *see also Renz v. Beeman,* 589 F.2d 735, 749 (2d Cir.1978) (six-year period applied where plaintiff sought imposition of constructive trust), *cert. denied,* 444 U.S. 834 (1979); *Loengard v. Santa Fe Indus., Inc.,* 70 N.Y.2d 262, 266–67, 519 N.Y.S.2d 801, 803–04 (1987) (where breach of fiduciary obligation claim is equitable in nature, six-year statute of limitations governs). Furthermore, courts have applied the six-year period when the plaintiff's claim has its genesis in the parties' contractual relationship. *Mejia–Ricart,* 1996 WL 94810, at *3; *Varnberg v. Minnick,* 760 F.Supp. 315, 333 (S.D.N.Y.1991).

> FN5. The parties have variously characterized this cause of action as aiding and abetting breach of fiduciary duty and inducement to breach of fiduciary duty. The particular label used to describe the substantive action is irrelevant for purposes of this discussion.

While the Plaintiff in this case seeks only damages against the Vendor Defendants in Counts IX and X, it requests equitable relief against Heinrich in Counts XIV and XV in the form of a constructive trust and forfeiture. These counts indirectly reference Count VIII, noting Heinrich's acceptance of bribes and "disloyalty" during his period of employment. Given the nature of the relief sought against Heinrich, as well as the fact that the breach of fiduciary duty claim against him arises from his alleged violations of his employment terms, the Court will apply a six-year statute of limitations to the claim against Heinrich.

**\*17** The Court rejects Philip Morris' contention that *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 19 (2d Cir.1983), establishes a six-year statute of limitations for aiding and abetting breach of fiduciary duty. *Dolmetta* simply held that the purported aiding and abetting breach of fiduciary duty claim at issue, in reality, amounted to nothing more than a simple fraud and thus was subject to the statute of limitations for fraud. In fact, courts in this district have interpreted New York law to apply a three-year statute of limitations to claims for inducing breach of fiduciary duty. *Fireman's Fund Ins. Co. v. Fraund,* No. 88–CIV–2765, 1989 WL 31490, at *9 (S.D.N.Y. March 31, 1989); *Whitney v. Citibank,* No. 81–CIV–5832, 1985 WL 566, at *5 (S.D.N.Y. April 19, 1985) (dictum).

Philip Morris filed its original complaint on January 17, 1995. Claims accruing against Heinrich prior to January 17, 1989 and against the remainder of the Defendants prior to January 17, 1992 must be dismissed as time-barred. As Philip Morris has alleged bid-rigging through 1991, Count VIII against Heinrich is timely.[FN6] Counts IX and X, against the remaining Vendor Defendants, are not. Accordingly, Counts IX and X are dismissed, while Count VIII survives.

> FN6. While Heinrich has not raised any arguments for dismissal of this claim, the Court notes in passing that Count VIII need not be pleaded with particularity.

F. Commercial Bribery

Counts XI and XII allege commercial bribery against the Mounting and Finishing and Corrugated Vendor Defendants respectively, while Count XIII charges Heinrich with commercial bribe receiving. All three counts derive from the New York State Penal Law. N.Y. Penal Law §§ 180.03, 180.08 (McKinney 1988). The Defendants move to dismiss Counts XI and XII, arguing that there is no private

cause of action for violations of the penal code, that they fail to satisfy the statute of limitations and that they are not pleaded with particularity.

In a similar case involving the Texas Commercial Bribery statute, this Court refused to imply a private right of action under the penal statute where one did not expressly exist.

No case has come to the Court's attention in which a private cause of action for commercial bribery has been implied under this statute. In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes. Moreover, courts should consider whether a private right of action is necessary to protect the intended beneficiaries of a statute when determining whether to imply a private right of action.

*In re Integrated Resources, Inc. Real Estate Ltd. Partnership Sec. Lit.,* 851 F.Supp. 556, 564 (S.D.N.Y.1994) (citation omitted). The Court also noted that there was no reason to imply a private right of action because if the plaintiffs' allegations had merit, they would be entitled to recover on their common law claims for breach of fiduciary duty. *Id.* While this case involved Texas law, it is nonetheless instructive. As was true in *Integrated Resources,* if Philip Morris' allegations had been timely and properly pleaded, it would have been entitled to recover for both common law fraud and breach of fiduciary duty. Thus, it seems equally unnecessary to create a private right of action arising from New York penal law in this instance.

**\*18** Furthermore, New York case law is far from clear as to whether a private cause of action exists for New York's Commercial Bribery statute. Some older cases, cited by Philip Morris, seem to accept the possibility, but fall short of affirmatively establishing such a cause of action. *Galella v. Onassis,* 353 F.Supp. 196, 227 (S.D.N.Y.1972) (violations of a prohibitory statute give rise to tort liability), *rev'd on other grounds,* 487 F.2d 986 (2d Cir.1973); *Shemin v. A. Black & Co.,* 240 N.Y.S.2d

622 (App.Div. 1st Dep't 1963) (tacitly acknowledging existence of private right of action, but noting that claim not proven); *31 Hillside Realty Corp. v. Norton,* 101 N.Y.S.2d 437, 440 (Special Term, Bronx Co.1950) (where violation is punishable by penal law, there is no reason why it should not be actionable civilly); *see also Texwood Ltd v. Gerber,* 621 F.Supp. 585, 589–90 (S.D.N.Y.1985) (noting lack of cited authority for proposition that private right of action exists under commercial bribery statute, but allowing that employer may recover bribes paid to employee in violation). Recent case law, however, has cast doubt upon the vitality of these earlier decisions. *Curiale v. Capolino,* 883 F.Supp. 941, 948 (S.D.N.Y.1995) (citing *CPC Int'l v. McKesson Corp.,* 70 N.Y.2d 268, 275–76, 519 N.Y.S.2d 804, 807–08 (1987) (rejecting implied private causes of action for two regulatory statutes)). The New York Court of Appeals has stated that the Legislature should specify in the statute itself whether private litigants are intended to have a cause of action under its provisions. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 325, 464 N.Y.S.2d 712, 716 (1983). Absent such a directive, the courts are to determine themselves, considering such factors as legislative history, consistency with the overall legislative scheme of creating the private right and whether the plaintiff is one of the class for whose special benefit the statute was enacted. *Id.* Given the lack of any clear guidance from the New York courts on this issue, the Court adopts the logic of *Integrated Resources,* declining the invitation to imply a private cause of action under New York's Commercial Bribery statute.

Even if there were a private right of action, the Court holds that the applicable statute of limitations period is three years. Thus, the claims are untimely anyway. Counts XI, XII and XIII are dismissed. FN7

> FN7. Once again, the Court dismisses the claim against Heinrich *sua sponte.* The cause of action cannot be maintained given the Court's view that such a private right

has not been established.

G. The Government's Motions to Intervene And Stay Discovery

Rule 24(a) of the Federal Rules of Civil Procedure provides that a party may intervene as of right in an action "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest...." Fed.R.Civ.P. 24(a)(2). Alternatively, Rule 24(b) permits permissive intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). As a rule, district courts in this Circuit have allowed the government to intervene in civil actions, especially when the government wishes to do so for the limited purpose of moving to stay discovery. *Twenty First Century Corp. v. LaBianca,* 801 F.Supp. 1007, 1009 (E.D.N.Y.1992). In this civil case, as in *LaBianca,* the Government seeks to intervene to protect its companion criminal prosecution from prejudice. Because the Government has a limited purpose for intervention—moving to stay civil discovery by way of interrogatories and depositions, excluding document discovery, however, pending disposition of the criminal case—this intervention will not "unduly delay or prejudice the adjudication." Fed.R.Civ.P. 24(b)(2). In such circumstances, a district court does not abuse its discretion in allowing intervention under either of the provisions of Rule 24. *LaBianca,* 801 F.Supp. at 1009 (citing *SEC v. Chestman,* 861 F.2d 49, 50 (2d Cir.1988)). Therefore, the Government's motion to intervene is granted.

**\*19** A federal district court has the inherent discretionary power to stay an action. *Id.* at 1010. Granting a stay of a civil proceeding to await the outcome of a pending parallel criminal investigation is appropriate when the interests of justice seem to require such action. The Court must balance the competing interests of the litigants, non-

parties, the public interest and the convenience of the courts in making such determinations. *Id.* The Government contends that if the civil discovery is not stayed, the criminal investigation will be prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules. The Court holds that this justification provides grounds for granting the stay. In consideration of the Defendants' interest in expediting litigation of the civil suit, however, discovery (excluding document discovery) is stayed only through December 31, 1996, without prejudice to the Government's right to request an extension should one become necessary. The Government, of course, will have to make such a request and demonstrate its necessity prior to the stay's expiration.

H. *Ex Parte* Status Of Government Affidavit

The Court has not considered the affidavit submitted *ex parte* and will not do so for purposes of deciding the cross-motion for a show cause hearing. Thus, as the document is irrelevant to a determination, it need not be turned over to the Defendants. The Defendants are directed to submit their reply brief on the cross-motion, without reference to the unreviewed *ex parte* affidavit, within 20 days of the date of this decision.

### III. Conclusion

The motions to dismiss Counts I–IV alleging Sherman Act and Donnelly Act claims are denied as to claims which accrued subsequent to March 4, 1989 and granted as to claims which accrued prior March 4, 1989. Philip Morris is granted leave to replead fraudulent concealment within 60 days of the date hereof.

The motions to dismiss Counts V–VI, sounding in common law fraud, are granted, and Count VII is dismissed *sua sponte,* without prejudice to Philip Morris' right to replead the alleged fraud with particularity within 60 days of the date hereof.

The Court retains Count VIII against Heinrich for breach of fiduciary duty.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

The motions to dismiss Counts IX–X, for breach of fiduciary duty of another, are granted, with leave for Philip Morris to replead fraudulent concealment within 60 days of the date hereof.

The motions to dismiss Counts XI–XIII, alleging commercial bribery and commercial bribe receiving, are granted.

The government's motion to intervene is granted, and its motion for a stay of discovery (excluding document discovery) is granted, such stay to expire on December 31, 1996 unless, by application made prior to that date, the government shows reason for an extension thereof.

SO ORDERED.

S.D.N.Y.,1996.
Philip Morris Inc. v. Heinrich
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 121944 (S.D.N.Y.)
**(Cite as: 2001 WL 121944 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Mark ROSENTHAL and Ray Markey, individually, and
on behalf of the members of District Council 37, Amer-
ican Federation of State, County and Municipal Em-
ployees, and on behalf of a class similarly situated; and
Local 983, American Federation of State, County and
Municipal Employees and Local 1930, American Feder-
ation of State, County and Municipal Employees, on be-
half of their members, and on behalf of the class of loc-
al unions affiliated with District Council 37, American
Federation of State, County and Municipal Employees,
and the members of those local unions similarly situ-
ated, Plaintiffs,
v.
Rudolph GIULIANI as Mayor of the City of New York;
Stanley Hill; Robert Myers; Martin Lubin; Mark Shap-
lo; Al Diop; John McCabe; Robert Taylor; Joseph
Tempa; Frederick Perez; Gee Whiz, Inc.; Andreas Kout-
soudakis; Adam Klein; Jose Sierra; David Catala;
Charles Hughes; Martin Hughes; James Rose; Joseph
Alfano; Richard Louis; and John Does 1—15. Defend-
ants.

No. 98 Civ. 8408(SWK).
Feb. 9, 2001.

*MEMORANDUM ORDER AND OPINION*
KRAM, J.

**\*1** The New York County District Attorney
("District Attorney") moves, pursuant to Federal Rule
of Civil Procedure 24(b), to intervene for the sole pur-
pose of moving to stay certain discovery in the above-
captioned action. For the reasons set forth below, the
motion is granted in part.

*BACKGROUND*

On November 30, 1998, plaintiffs, who are union
members and local unions affiliated with regional union
body District Counsel 37, American Federation of State,
County and Municipal Employees ("DC–37"), filed the
above-captioned complaint alleging, *inter alia,* that in-

dividual defendants participated in a scheme to operate
DC–37 in a manner which allowed the defendants to
steal large sums of money from the treasury of DC–37
and its constituent locals. *See* First Amended Complaint
at 2–3. Specifically, plaintiffs claim that the defendants
laundered money, breached their fiduciary duties, fraud-
ulently manipulated local union elections and fraudu-
lently manipulated a ratification vote on a union-wide
collective bargaining agreement with New York City
("the City"). *See id.* Plaintiffs also sue the City, alleging
it was on notice of the alleged ratification fraud and that
it failed to make proper inquiries concerning that fraud.
*See id.*

Starting in April of 1999, seventeen officers at
DC–37 and its affiliated local unions were indicted by a
New York County grand jury. Many of those indicted
were named defendants in this action. *See* Affirmation
in Support of Motion to Intervene at 4. On October 27,
1999, the District Attorney moved this Court, pursuant
to Federal Rule of Civil Procedure 24(b)(2), to inter-
vene and stay discovery relating to the action pending
disposition and resolution of the criminal charges. *See*
Affirmation in Support of a Motion to Intervene at 7.
On October 5, 1999, this Court issued an order staying
the action until further notice.

On January 16, 2001, the District Attorney with-
drew their motion to intervene because—- with the ex-
ception of defendant Albert Diop ("Diop")—- all of the
criminal prosecutions have been completed.[FN1] *See*
Request to Withdraw Motion to Intervene at 2. There-
fore, the District Attorney now moves only to intervene
to stay civil discovery as it relates to Diop. *See id.*

> FN1. Diop was convicted after a jury trial on
> one of two counts against him and is awaiting
> sentencing. The sentencing, as well as further
> proceedings on the second charge, were stayed
> in New York County Supreme Court after a
> finding, on December 22, 2000, that Diop was
> mentally unfit to proceed.

DISCUSSION

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 121944 (S.D.N.Y.)
**(Cite as: 2001 WL 121944 (S.D.N.Y.))**

A. District Attorney's Motion to Intervene

The District Attorney moves to intervene pursuant to Rule 24(b)(2) of the Federal Rules of Civil Procedure, which provides for permissive intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). It is well-established that the Government may intervene in a federal civil action to stay discovery when there is a parallel criminal proceeding, which is anticipated or already underway, that involves common questions of law or fact. *See Securities and Exchange Commission v. Downe,* No., 92 Civ. 4092, 1993 WL 22126,[*] 11 (S.D.N.Y.1993); *see also Board of Governors of the Federal Reserve System v. Pharaon,* 140 F.R.D. 634, 638 (S.D.N.Y.1991) (allowing District Attorney to intervene in civil action for purpose of seeking stay of discovery); *First Merchants Enterprise, Inc. v. Shannon,* No. 88 Civ. 8254, 1989 WL 25214,[*] 2 (S.D.N.Y. March 16, 1989) (allowing United States Attorney to intervene in civil action).

**\*2** In the instant case, the District Attorney seeks to intervene in order to stay discovery as it relates to Diop, a named defendant who presently faces criminal charges. Because the instant action and corresponding criminal proceedings arise out of common questions of law and fact, the Court finds that the District Attorney has demonstrated a sufficient interest in the present action to permit intervention under Rule 24(b)(2).

B. Motion to Stay Discovery

It is well-settled that a court has the discretionary authority to stay a case if the interests of justice so require. *See United States v. Kordel,* 397 U.S. 1, 12 n. 27 (1970); *Kashi v. Gratsos,* 790 F.2d 1050, 1057 (2d Cir.1986) (citing *SEC v. Dresser Indus.,* 628 F.2d 1368, 1375 (D.C.Cir.) (en banc)). Depending on the particular facts of the case, the court may decide to stay civil proceedings, postpone civil discovery, or impose protective orders. *See SEC v. Dresser Indus.,* 628 F.2d at 1375.

When deciding whether to grant a stay, courts consider five factors: (1) the private interests of the plaintiff in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiff if delayed; (2) the private interests of and burden on the defend-

ants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest. *See Arden Way Assoc. v. Boesky,* 660 F.Supp. 1494, 1497 (S.D.N.Y.1987).

These factors clearly counsel in favor of granting the District Attorney's motion. The public has an interest in ensuring the criminal discovery process is not subverted. Denying a stay may undermine a defendant's Fifth Amendment privilege against self-incrimination, *see Dresser Indus.,* 628 F.2d at 1375–76, expand the rights of criminal discovery beyond its limits, and expose the basis of the defense to the prosecution in advance of trial. *See Volmar v. New York Post Co. Inc.,* 152 F.R.D. 36, 39 (S.D.N.Y.1993). Moreover, a stay in the action will streamline later civil discovery since transcripts from the criminal case will be available to the civil parties. Finally, courts are more likely to grant stays when an indictment has already been issued, as is the case here. *See Par Pharmaceutical, Inc. Securities Litigation,* 133 F.R.D. 12, 13 (S.D.N.Y.1990) (citing cases for proposition that courts in this Circuit regularly stay civil proceedings when a "criminal investigation has ripened into an indictment.") Accordingly, and for the reasons set forth above, the District Attorney's motion is granted. Therefore, it is hereby

ORDERED that, with the exception of all material relating to Diop, discovery in the above-captioned matter shall commence immediately and close on May 31, 2001. It is further

ORDERED that the parties attend a pre-trial conference on June 13, 2001 at 2 PM in Room 906, 40 Centre Street, New York, New York.

Various defendants have moved for permission to file motions pursuant to Federal Rule of Civil Procedure 12(b)(6). It is hereby

**\*3** ORDERED that the parties brief the motions in accordance with the following schedule:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 121944 (S.D.N.Y.)
**(Cite as: 2001 WL 121944 (S.D.N.Y.))**

| | |
|---|---|
| Defendants motions due: | March 7, 2001; |
| Plaintiffs responses due: | March 28, 2001; |
| Defendants replies due: | April 11, 2001. |

### CONCLUSION

For the reasons set forth above, the District Attorney's motion for a stay pending final resolution of the state criminal proceedings against Diop is granted. All other discovery in this matter shall commence immediately and close on May 31, 2001.

SO ORDERED.

S.D.N.Y.,2001.
Rosenthal v. Giuliani
Not Reported in F.Supp.2d, 2001 WL 121944 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)
**(Cite as: 2002 WL 31729501 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re WORLDCOM, INC. SECURITIES LITIGA-
TION
In re WORLDCOM, INC. ERISA LITIGATION

Nos. 02 Civ. 3288(DLC), 02 Civ. 4816(DLC).
Dec. 5, 2002.

In securities litigation and litigation under the
Employee Retirement Income Security Act
(ERISA) arising from the collapse of a telecommu-
nications corporation, former corporate officers
who had been indicted for conduct underlying the
civil suits moved for a stay as to them, pending res-
olution of the criminal matters. Additionally, the
U.S. Attorney requested a discovery bar as to
former employee of the corporation who were not
defendants in the civil suits, and underwriter de-
fendants in the securities litigation requested that
any stay granted in favor of the officers be granted
in their favor as well. The District Court, Cote, J.,
held that: (1) stays would be granted as to the of-
ficers, except as to their challenges to service and
personal jurisdiction; (2) underwriter defendants
were not entitled to a stay; and (3) discovery from
non-parties identified by the U.S. Attorney would
be barred.

Ordered accordingly.

West Headnotes

**[1] Action 13 ☞69(5)**

13 Action
    13IV Commencement, Prosecution, and Termin-
ation
        13k67 Stay of Proceedings
           13k69 Another Action Pending
                13k69(5) k. Nature and Subject Matter
of Actions in General. Most Cited Cases

Stay of securities litigation and ERISA litiga-
tion as to a former chief financial officer (CFO) of
a telecommunications corporation was generally
warranted, pending resolution of criminal proceed-
ings against the CFO, who had been indicted; the
underlying facts alleged in the civil and criminal
proceedings were essentially the same, there would
not necessarily be any serious delay in the litiga-
tion, and there was no appreciable risk that evid-
ence would be lost or events forgotten; moreover,
the CFO would effectively forfeit the civil litigation
if he invoked the Fifth Amendment, the U.S. Attor-
ney had an interest in preserving the usefulness of
cooperating defendants, and the public had an in-
terest in preserving the SVP's assets. U.S.C.A.
Const. Amend. 5; Employee Retirement Income Se-
curity Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001
et seq.

**[2] Action 13 ☞69(5)**

13 Action
    13IV Commencement, Prosecution, and Termin-
ation
        13k67 Stay of Proceedings
           13k69 Another Action Pending
                13k69(5) k. Nature and Subject Matter
of Actions in General. Most Cited Cases

Stay of securities litigation as to a former seni-
or vice president (SVP) of a telecommunications
corporation was generally warranted, pending res-
olution of criminal proceedings against the SVP,
who had pled guilty; the underlying facts alleged in
the civil and criminal proceedings were essentially
the same, there would not necessarily be any seri-
ous delay in the litigation, and there was no appre-
ciable risk that evidence would be lost or events
forgotten; moreover, the financial burden on the
SVP of defending both criminal and civil proceed-
ings appeared substantial, the U.S. Attorney had an
interest in preserving the usefulness of cooperating
defendants, and the public had an interest in pre-
serving the SVP's assets.

Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)
**(Cite as: 2002 WL 31729501 (S.D.N.Y.))**

**[3]** Action 13 ⟲69(5)

13 Action
    13IV Commencement, Prosecution, and Termination
       13k67 Stay of Proceedings
        13k69 Another Action Pending
          13k69(5) k. Nature and Subject Matter of Actions in General. Most Cited Cases

    Stay of securities litigation and ERISA litigation as to a former chief financial officer (CFO) and a former senior vice president (SVP) of a telecommunications corporation pending resolution of criminal proceedings against them was not warranted as to their challenges to service and personal jurisdiction; to discover months or years later that there was a defect in service or a lack of jurisdiction could raise a host of thorny legal issues and delay completion of discovery or a trial. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[4]** Action 13 ⟲69(5)

13 Action
    13IV Commencement, Prosecution, and Termination
       13k67 Stay of Proceedings
        13k69 Another Action Pending
          13k69(5) k. Nature and Subject Matter of Actions in General. Most Cited Cases

    Underwriter defendants in securities litigation arising from the collapse of a telecommunications corporation were not entitled to a stay, even though two former officers were entitled to a stay pending resolution of criminal proceedings against them; while the underwriters claimed that they could not mount an effective defense without discovery from the officers, they had not shown that they would be substantially prejudiced at the motion to dismiss stage, and they could renew the stay request if they could show prejudice at the discovery stage.

**[5]** Federal Civil Procedure 170A ⟲1271

170A Federal Civil Procedure

    170AX Depositions and Discovery
      170AX(A) In General
        170Ak1271 k. Proceedings to Obtain.
Most Cited Cases

    U.S. Attorney would be granted a bar of discovery of non-parties to securities litigation arising from the collapse of a telecommunications corporation; discovery would allegedly have impaired the usefulness of the non-parties as cooperating witnesses in related criminal proceedings.

Max W. Berger, John P. Coffey, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, Leonard Barrack, Gerald J. Rodos, Jeffrey W. Golan, Barrack, Rodos, Bacine, Philadelphia, PA, for Lead Plaintiff in Securities Litigation.

Lynn Lincoln Sarko, Keller Rohrback L.L.P., Seattle, WA, Elizabeth Cabraser, John Low-Beer, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA, Jerold C. Feuerstein, Kriss & Feuerstein, LLP, New York, NY, for Plaintiffs in Erisa Litigation.

Paul Curnin, Simpson Thacher & Bartlett, New York, NY, for WorldCom Director Defendants.

Jay B. Kasner, John Gardner, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Underwriter Defendants.

Eliot Lauer, Curtis, Mallot, Prevost, Colt & Mosley, New York, NY, for Defendant Arthur Anderson, LLP.

David Wertheimer, Lyndon Tretter, Hogan & Hartson, New York, NY, for Defendant Bernard J. Ebbers.

Juliet Rotenberg, Arnold & Porter, Washington, DC, for Defendant Scott Sullivan.

N. Richard Janis, S. Robert Sutton, Janis, Schuelke & Wechsler, Washington, D.C., for Defendant David F. Myers.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*OPINION AND ORDER*

COTE, J.

**\*1** This Document Relates to: All Actions

These two related civil actions, *In re World-Com, Inc. Securities Litigation,* 02 Civ. 3288(DLC) (the "*Securities Litigation"* ), and *In re WorldCom, Inc. ERISA Litigation,* 02 Civ. 4816(DLC) (the "*ERISA Litigation"* ), arise from the recent collapse of the telecommunications giant WorldCom, Inc. ("WorldCom"). Since June of this year, WorldCom has made a series of disclosures suggesting that all of its publicly-reported financial results since at least as early as 1999 require restatement. A significant amount of civil and criminal litigation has followed. On July 21, WorldCom filed for bankruptcy in the Bankruptcy Court of this district.

Two of the individual defendants who have been indicted in this district for conduct that underlies these civil actions have moved to stay one or both of these civil actions as to them until the criminal charges pending against them have been resolved. Certain other defendants request that in the event a stay is entered, it be entered as to them as well.

Specifically, Scott D. Sullivan ("Sullivan"), formerly the Chief Financial Officer and a Director of WorldCom and now a defendant in both the *Securities Litigation* and the *ERISA Litigation,* and David F. Myers ("Myers"), formerly the Controller and a Senior Vice President of WorldCom and now a defendant in the *Securities Litigation,* submitted motions to stay the instant actions as to them pending the resolution of criminal charges brought against them. The United States Attorney for the Southern District of New York ("U.S.Attorney"), which is conducting a criminal investigation of WorldCom's accounting and business practices, submitted a letter supporting (1) the granting of a stay as to Sullivan, Myers, and Buford Yates, Jr. ("Yates"),[FN1] formerly the Director of General Accounting at WorldCom and now a defendant in the *Securities Litigation,* as well as (2) the entry of a discovery bar as to former WorldCom employees

Troy Normand ("Normand") and Betty L. Vinson ("Vinson"), who are not defendants in these civil actions. Certain Underwriter Defendants in the *Securities Litigation,*[FN2] have requested that if a stay is granted in favor of Sullivan or Myers, it be granted in their favor as well. Bernard J. Ebbers ("Ebbers"), formerly the President and Chief Executive Officer and a Director of WorldCom and now a defendant in both actions, and the Director Defendants in the *Securities Litigation*[FN3] and potentially also in the *ERISA Litigation,*[FN4] initially requested similar relief, but now reserve the right to move for a stay at a later stage.

> FN1. Yates has not yet appeared in either the *Securities Litigation* or the *ERISA Litigation* and has not moved for a stay.

> FN2. As defined in the consolidated amended complaint, the Underwriter Defendants in the *Securities Litigation* consist of Salomon Smith Barney Inc., J.P. Morgan Chase & Co., Banc of America Securities LLC, Deutsche Bank Securities Inc., now known as Deutsche Bank Alex. Brown Inc., Chase Securities Inc., Lehman Brothers Inc., Blaylock & Partners, L.P., Credit Suisse First Boston Corp., Goldman, Sachs & Co., UBS Warburg LLC, ABN/AMRO Inc., Utendahl Capital, Tokyo-Mitsubishi International plc, Westdeutsche Landesbank Girozentrale, BNP Paribas Securities Corp., Caboto Holding SIM S.p.A ., Fleet Securities, Inc., and Mizuho International plc. According to their counsel, not all Underwriter Defendants have been served with the consolidated amended complaint.

> FN3. As defined in the consolidated amended complaint, the WorldCom Director Defendants in the *Securities Litigation* consist of Clifford Alexander, Jr., James C. Allen, Judith Areen, Carl J. Aycock, Max E. Bobbitt, Francesco Galesi, Stiles A. Kellett, Jr., Gordon S. Macklin, John A.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Porter, Bert C. Roberts, Jr., John W. Sidg-more, and Lawrence C. Tucker.

FN4. The consolidated amended complaint in the *ERISA Litigation* has not yet been filed. By Order dated November 18, 2002, the Court appointed lead plaintiffs and lead counsel in the *ERISA Litigation* and ordered them to file a consolidated amended complaint by December 20, 2002, and defendants to answer or move with respect to the complaint by January 17, 2003. Both Sullivan and Ebbers are named in each of the actions that were consolidated as the *ERISA Litigation,* and certain Director Defendants were also named in several of those actions.

Sullivan's motion was fully submitted on November 22, and further submissions were made up to November 25. Myers' motion is not yet fully submitted, but the plaintiffs in the *Securities Litigation* have filed their opposition. For the reasons stated below, Sullivan's and Myers' motions to stay are granted in part. The U.S. Attorney's request for the entry of a discovery bar as to Normand and Vinson is also granted. The Underwriter Defendants' request for a stay is denied.

*Background*
*Criminal Action Against WorldCom's Officers*
**\*2** On August 28, a grand jury returned an indictment (the "Indictment") charging Sullivan and Yates with one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) & 78ff and 17 C.F.R. § 240.10b-5, and five counts of making false filings with the Securities and Exchange Commission ("SEC") in violation of 15 U.S.C. §§ 78m(a) & 78ff and 17 C.F.R. § 240.13a-1. Specifically, the Indictment charged that from approximately October 2000 through June 2002, Sullivan and Yates, along with unindicted co-conspirators Myers, Normand, and Vinson, participated in a scheme to inflate artificially World-Com's publicly reported earnings by falsely redu-

cing the company's reported "line cost" FN5 expenses in violation of Generally Accepted Accounting Principles. The conspirators allegedly carried out their scheme by directing and making improper journal entries which had the effect of transferring billions of dollars in line costs from expense accounts in WorldCom's general ledger to certain general ledger accounts for capital expenditures.

FN5. Pursuant to long-term lease agreements, WorldCom paid third parties fixed fees to lease certain telecommunications facilities and connections. WorldCom referred to these fees as "line costs."

On September 4, Sullivan and Yates were arraigned before the Honorable Barbara S. Jones and released on bail. On September 26, Myers pleaded guilty before the Honorable Richard C. Casey, pursuant to a cooperation agreement with the U.S. Attorney, to a three-count felony Information (the "Information") charging him with conspiracy to commit securities fraud, securities fraud, and false filings with the SEC. On October 7, Yates pleaded guilty before Judge Jones, pursuant to a cooperation agreement with the U.S. Attorney, to the conspiracy and fraud counts of the Indictment. On October 10, Vinson pleaded guilty before the Honorable Andrew J. Peck and Normand pleaded guilty before the Honorable Gerard E. Lynch, pursuant to cooperation agreements, to felony informations charging them with conspiracy and fraud. Judge Jones has scheduled Sullivan's next pre-trial conference for December 9.

In a letter dated November 15, the U.S. Attorney requests that the time by which Sullivan, Myers, and Yates be required to answer or move in the *Securities Litigation* be adjourned until the end of the criminal proceedings against them. The U.S. Attorney further objects to the service of any deposition notices, interrogatories, or document requests on Sullivan, Myers, Yates, Normand, and Vinson.

*The SEC Civil Action Against WorldCom and Indi-*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)
**(Cite as: 2002 WL 31729501 (S.D.N.Y.))**

*vidual Defendants*

On June 26, the SEC filed a civil complaint against WorldCom. On September 26, it filed a civil complaint against Myers. On October 7, it filed a civil complaint against Yates.

On November 14, the Honorable Jed S. Rakoff approved a settlement between the SEC and Myers and Yates granting the SEC certain injunctive relief, but deferring until a later date any judgment with respect to the amount in fines, if any, that Myers and Yates will pay. On November 26, Judge Rakoff approved a comparable settlement between the SEC and WorldCom.

*The Securities and ERISA Plaintiffs' Civil Actions Against WorldCom*

**\*3** The first securities class action filed against defendants in connection with the above-referenced events was filed in this district on April 30, 2002, under the caption *Albert Fadem Trust and Bruce A. Fadem v. Worldcom, Inc., et al.* Thereafter, approximately twenty related class actions were filed. By Order dated August 15, 2002, these cases were consolidated as the *Securities Litigation* and the New York State Common Retirement Fund ("NYSCRF") was appointed lead plaintiff.

By Order dated September 18, *Gail M. Grenier v. WorldCom, Inc., et al.,* 02 Civ. 4816(DLC), and *John T. Alexander v. WorldCom, Inc. et al.,* 02 Civ. 5140(DLC), both of which allege breaches of fiduciary duty under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.,* by WorldCom and certain WorldCom fiduciaries in connection with the WorldCom 401(k) Salary Savings Plan (the "Plan"), were consolidated as the *ERISA Litigation.* By Order dated October 8, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation ordered the centralization in this Court of approximately forty WorldCom-related class action cases, which included both securities and ERISA class actions.

On October 11, NYSCRF filed a consolidated amended complaint (the "Consolidated Complaint")

in the *Securities Litigation.* The Consolidated Complaint repeatedly cites to the Indictment and alleges, *inter alia,* essentially the same facts with regard to the conduct of Sullivan, Myers, and Yates as are alleged in the Indictment. The Consolidated Complaint also alleges that Ebbers knowingly participated in the scheme to inflate artificially World-Com's publicly reported earnings. It further alleges that the Director Defendants violated the securities laws by participating in the filing of false information with the SEC, the dissemination of false registration statements and press releases, and the making of false public statements. The Consolidated Complaint alleges that the Underwriter Defendants violated the securities laws by failing to perform a reasonable investigation of WorldCom's financial statements in connection with their underwriting of certain notes issued by WorldCom. With respect specifically to Salomon Smith Barney, Inc., Citigroup, Inc., and Jack B. Grubman, the Consolidated Complaint further alleges, *inter alia,* that they violated the securities laws by knowingly issuing false analyst reports. The defendants in the *Securities Litigation* must answer or move by December 13.

*Discussion*

[T]he Constitution ... does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings.... Nevertheless, a court may decide in its discretion to stay civil proceedings ... when the interests of justice seem ... to require such action.

*Kashi v. Gratsos,* 790 F.2d 1050, 1057 (2d Cir.1986) (citations omitted). A stay is one of several procedures available to the district court to balance the interests of the other parties in moving forward with the litigation against the interests of a defendant asserting Fifth Amendment rights who faces the choice of being prejudiced in the civil litigation if those rights are asserted or prejudiced in the criminal litigation if those rights are waived. *See United States v. Certain Real Property and Premises Known As: 4003-4005 5th Ave.,* 55 F.3d 78, 84 & n. 6 (2d Cir.1995). In deciding whether to enter a stay, courts in this dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

trict consider numerous factors, including:

**\*4** 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Trustees of the Plumbers and Piperfitters Nat'l Pension Fund v. Transworld Mechanical, Inc.,* 886 F.Supp. 1134, 1139 (S.D.N.Y.1995) (citations omitted). *See also Travelers Cas. & Sur. Co. v. Vanderbilt Group, LLC,* 01 Civ. 7927(DLC), 01 Civ. 10695(DLC), 2002 WL 844345, at \*2 (S.D.N.Y. May 2, 2002), *vacated,* 01 Civ. 7927, 01 Civ. 10695 (S.D.N.Y. June 17, 2002); *Sterling Nat'l Bank v. A-1 Hotels Intern., Inc.,* 175 F.Supp.2d 573, 576 (S.D.N.Y.2001) (six-factor test); *Jackson v. Johnson,* 985 F.Supp. 422, 424 (S.D.N.Y.1997) (five-factor test); *Volmar Distribs., Inc. v. New York Post Co.,* 152 F.R.D. 36, 39 (S.D.N.Y.1993) (five-factor test); *Arden Way Assoc. v. Boesky,* 660 F.Supp. 1494, 1496-97 (S.D.N.Y.1987) (five-factor test).

*A. Stay as to Sullivan and Myers*

[1][2] An examination of the factors identified in *Transworld* indicates that, with a possible limited exception, a stay is appropriate as to Sullivan in the *Securities Litigation* and the *ERISA Litigation* and as to Myers in the *Securities Litigation*.

*1. Overlap of Issues*

"The first question to be resolved is the extent to which the issues in the criminal case overlap with those present in the civil case, since self-incrimination is more likely if there is a significant overlap." *Transworld,* 886 F.Supp. at 1139. *See also Volmar Distribs.,* 152 F.R.D. at 39.

The facts alleged with respect to Sullivan and Myers in the Consolidated Complaint are essen-

tially identical with those alleged with respect to them in the Indictment and the Information. In the Consolidated Complaint, the *Securities Litigation* plaintiffs borrow liberally from the Indictment and cite to it repeatedly. They do not contend that their claims are based on facts not alleged by the U.S. Attorney in the Indictment and Information.

*2. Status of the Criminal Case*

Courts in this district have generally refused to stay a civil proceeding where the defendant has not been indicted but is under criminal investigation. *See Sterling Nat'l Bank,* 175 F.Supp.2d at 576-77; *United States v. District Council of New York City and Vicinity of the United Bhd. of Carpenters and Joiners of America,* 782 F.Supp. 920, 925 (S.D.N.Y.1992) (collecting cases). Courts have been more divided on whether to impose stays after criminal indictments have been filed. *Compare Travelers,* 2002 WL 844345, at \*2 (S.D.N.Y. May 2, 2002) (declining to stay civil proceedings where defendants under indictment); *Arden Way Assoc.,* 660 F.Supp. at 1496-1500 (declining to stay civil proceedings where defendant facing sentencing); *and Paine, Webber, Jackson & Curtis Inc. v. Malon S. Andrus, Inc.,* 486 F.Supp. 1118, 1119 (S.D.N.Y.1980) (declining to stay where defendant under indictment); *with Travelers,* 01 Civ. 7927, 01 Civ. 10695 (S.D.N.Y. June 17, 2002) (granting stay where defendants under indictment and where stay requested by district attorney); *Trustees,* 886 F.Supp. at 1141 (granting stay following indictment of individual defendants); *and Volmar Distribs.,* 152 F.R.D. at 39 (same). *See also United States v. Simon,* 373 F.2d 649, 653 (2d Cir.1967), *vacated as moot sub nom. Simon v. Wharton,* 389 U.S. 425, 88 S.Ct. 577, 19 L.Ed.2d 653 (1967) ("We cannot agree that civilized standards of procedure and evidence require that a witness under indictment be given the option of nonappearance in any proceedings in related civil or criminal cases until his own trial is concluded." (citation omitted)).

**\*5** "[T]he strongest case for granting a stay is where a party under criminal indictment is required

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)
**(Cite as: 2002 WL 31729501 (S.D.N.Y.))**

to defend a civil proceeding involving the same matter." *Volmar,* 152 F.R.D. at 39. *See also SEC v. Dresser Industries, Inc.,* 628 F.2d 1368, 1375 (D.C.Cir.1980) (en banc). This is because "the likelihood that a defendant may make incriminating statements is greatest after an indictment has issued, and ... the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to Speedy Trial Act considerations." *Transworld,* 886 F.Supp. at 1139. *See also Sterling Nat'l Bank,* 175 F.Supp.2d at 577.

Sullivan is under indictment for the same conduct that is at the center of these civil actions. Myers has pleaded guilty to charges stemming from conduct that is also at the center of these actions, but has not yet been sentenced.

### 3. The Interests of the Plaintiffs

Before receiving the U.S. Attorney's November 15 letter in support of a limited stay, the plaintiffs had argued that they would be severely prejudiced by the granting of a stay as to Sullivan and Myers. Following receipt of that letter, the plaintiffs in the *Securities Litigation* proposed that Sullivan be required to move with respect to the Consolidated Complaint on December 13. They proposed, however, that if he chooses not to move on that date, then he be allowed to answer no later than the date on which any other defendant who has moved to dismiss the Consolidated Complaint files an answer. They consented to the entry of an order barring discovery of Sullivan and the four individuals cooperating with the U.S. Attorney. In a "Supplemental Memorandum" also submitted after receipt of the U.S. Attorney's November 15 letter, plaintiffs in the *Securities Litigation* assume that the stay requested by the Government will be granted as to Sullivan, but continue to argue against it as to any other defendants. In their recent opposition to Myers' motion, they urge that no stay be imposed as to Myers and that he be offered the same set of alternatives as they had proposed should be offered to Sullivan.

The plaintiffs have identified three separate

ways in which the entry of a stay as to an individual defendant could prejudice their pursuit of this litigation. They argue that the filing of a motion to dismiss by the individual defendants when the stay is lifted would delay the proceedings as a whole, that a stay as to a wealthy defendant, such as Sullivan, would impede settlement, and that a stay would risk the loss of important evidence through the dimming of recollections.

A motion to dismiss filed by an individual defendant to test the sufficiency of the pleadings after a stay is lifted, even if filed long after such motions have been resolved as to the other defendants, need not cause any serious delay in the litigation. The Opinion addressing similar motions by co-defendants will be the law of the case and should guide the parties in their briefing and expedite a ruling. The length of any delay can also be limited by an appropriate briefing schedule. In the case of Myers, this issue has very little impact. With the entry of his plea and his cooperation with the Government, he has already sacrificed his ability to contest liability in the *Securities Litigation*. It is reasonable to expect that he will attempt at some point to resolve the litigation instead of defending against it.

**\*6** In response to the plaintiffs' concerns about Sullivan's participation in settlement discussions, Sullivan has expressed a willingness to engage in such discussions even if the litigation is stayed. In any event, the plaintiffs have not shown that Sullivan's absence from the bargaining table will impede their ability to settle with the remaining defendants. It is also important to note that Government authorities, including the U.S. Attorney and the SEC, will no doubt be seeking restitution from Sullivan. There may be multiple avenues, therefore, for Sullivan to provide financial recovery to shareholders.

Finally, plaintiffs argue that the longer the case against an individual defendant is delayed, the greater the risk that witnesses will begin to lose their recollection of key events. Plaintiffs have not identified the witnesses whose recollections are at

Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)
**(Cite as: 2002 WL 31729501 (S.D.N.Y.))**

stake. Assuming that the litigation survives any motion to dismiss that may be filed, the litigation will proceed against most of the defendants and recollections will be preserved during the course of discovery. This argument has little weight with respect to Sullivan himself since, if no stay as to him is granted, it is entirely speculative as to whether he would submit to a deposition. He would be free to invoke his Fifth Amendment rights, and is likely to do so, having already done so before Congress and in the face of criminal charges. In any event, there is little risk that a delay in taking his deposition will cause his memory of the relevant events to fade. Given the seriousness of the charges he faces, it is reasonable to assume that he is already focusing intently on his conduct while at WorldCom. With respect to Myers, he is cooperating with the U.S. Attorney. Plaintiffs cannot reasonably argue that his recollection of key events will be impaired by a stay. In sum, there is no appreciable risk that any evidence will be lost or key events forgotten with respect to plaintiffs' claims against Sullivan and Myers while the stay is in effect.

[3] There are two ways in which plaintiffs may be significantly prejudiced, however, by any stay. First, Sullivan and Myers have explicitly reserved their right to contest service and personal jurisdiction. These issues should be resolved now and not left for future resolution. To discover months or even years from now that there is a defect in service or a lack of personal jurisdiction with respect to the Consolidated Complaint in the *Securities Litigation* or the consolidated amended complaint to be filed in the *ERISA Litigation* could raise a host of thorny legal issues and significantly delay the completion of discovery or a trial. Therefore, the parties are ordered to show cause no later than December 13, 2002, why Sullivan or Myers should not be required to move promptly to dismiss for failure to serve or a lack of personal jurisdiction or waive those defenses. The U.S. Attorney may also address this issue in a submission on or before December 13.

*7 In addition, at the time depositions addressed to the merits of this action begin, it may be appropriate to revisit the breadth of the stay. No deposition should have to be repeated to give Sullivan or Myers an opportunity to question the deponent. Any party may move at an appropriate time to modify the stay imposed as to any individual defendant to reduce or eliminate this prejudice.

*4. The Interests of the Defendants*

Sullivan and Myers each point to the impact of this litigation on their Fifth Amendment rights and on their financial resources. There can be little doubt that an indicted defendant ordinarily faces a very substantial risk of self-incrimination if he chooses to defend against civil charges. Conversely, an adverse inference may be drawn if he chooses instead to invoke his Fifth Amendment privilege. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify.").

The Securities and ERISA Plaintiffs argue that since Sullivan has already invoked his Fifth Amendment privilege before Congress, he will suffer no additional prejudice if he again invokes the Fifth Amendment when he answers on December 13, and that he may, at the Court's discretion, amend his answer thereafter. This argument is unpersuasive. Sullivan invoked his Fifth Amendment privilege in July in a wholly different context. Whereas the House Committee on Financial Services was performing an essentially investigative function, plaintiffs in the instant action have brought civil charges against Sullivan which have the potential to bankrupt him. If he invokes the Fifth Amendment here, he risks effectively forfeiting the actions. The additional prejudice is enormous.

Myers stands in a different position. He has already entered a guilty plea. While the right against self-incrimination ordinarily survives until sentencing, *Mitchell v. United States,* 526 U.S. 314,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

325-26, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), Myers has entered into a cooperation agreement with the U.S. Attorney which also requires him to cooperate with the SEC. It can be assumed that he is answering the Government's questions regarding all of the factual issues raised by this litigation. It is unnecessary, however, given the other reasons that favor a stay of civil litigation as to him, to determine the impact of his participation in this litigation on his Fifth Amendment rights.

Sullivan argues that he lacks the financial resources simultaneously to defend against both the criminal and civil actions brought against him. He points out that WorldCom has refused to indemnify him for his costs incurred in defending himself, and the insurance carrier responsible for Sullivan's directors' and officers' insurance at WorldCom has disclaimed coverage of Sullivan under the policy. Plaintiffs respond that Sullivan is currently constructing a residential palace in Florida and has hired a prominent law firm.

**\*8** The burden imposed on Myers by the simultaneous defense of both the criminal and civil actions brought against him appears to be substantial. Myers states, and plaintiffs have not disputed, that he currently faces enormous debts and has more limited financial resources. Furthermore, in light of Myers' cooperation with the Government, it is probable that he will face further pressure on his financial resources as part of any settlement with the SEC or order of restitution.

*5. The Court's Interest*

The Court shares with all parties an interest in the efficient resolution of the instant actions. Nonetheless, a concern for judicial efficiency does not necessarily militate against the granting of a stay. *Compare Transworld,* 886 F.Supp. at 1140 ("Judicial efficiency also weighs in favor of granting a stay.") *with Jackson,* 985 F.Supp. at 425 ("[J]udicial efficiency would not be achieved by a stay of this action."). The conviction of a civil defendant as a result of the entry of a plea or following a trial can contribute significantly to the nar-

rowing of issues in dispute in the overlapping civil cases and promote settlement of civil litigation not only by that defendant but also by co-defendants who do not face criminal charges. *See Rosenthal v. Giuliani,* No. 98 Civ. 8408(SWK), 2001 WL 121944, at *2 (S.D.N.Y. Feb.9, 2001) ("[A] stay in the action will streamline later civil discovery since transcripts from the criminal case will be available to the civil parties.").

Counsel for lead plaintiffs in the *ERISA Litigation* argue that a stay may result in piecemeal litigation, in which plaintiffs may be required to relitigate certain issues against those in whose favor a stay has been granted. The risk of piecemeal litigation has already been addressed and can be diminished by careful management of the litigation.

Of greater significance to judicial efficiency is the uncertainty as to when the criminal proceedings will conclude. *Compare Transworld,* 886 F.Supp. at 1140 (granting stay as to defendants who "have been indicted and will face trial within six months") *with Jackson,* 985 F.Supp. at 425 (denying stay as to defendant whose criminal proceedings were two years old and where there was no assurance that they would soon be concluding). Myers has already pleaded guilty and is awaiting sentencing. The uncertainty as to his sentencing date is of minimal concern. He is no longer in a position to contest at least those matters to which he admitted in his plea allocution. Sullivan has been indicted but no trial date has been set. If he has not entered a plea or proceeded to trial by the time deposition discovery on the merits of plaintiffs' claims begins, the plaintiffs may move to lift the stay as to Sullivan. Should they do so, the advisability of a stay can be analyzed in light of the status of his prosecution at that time.

*6. The Public Interest*

The U.S. Attorney identifies three reasons why the stay it requests as to Sullivan and Myers would serve the public interest in the effective prosecution of those who violate the securities laws. First, it argues that the requested stay would "prevent discov-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ery in a civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *SEC V. Chestman,* 861 F.2d 49, 50 (2d Cir.1988) (per curiam). Because Sullivan is the only defendant who has not pleaded guilty, it would appear that this argument applies to Sullivan alone. So long as Sullivan (and all other parties) are barred from obtaining discovery from individuals who are cooperating with the U.S. Attorney, however, this argument has less force.

**\*9** The U.S. Attorney's second argument is more compelling. The U.S. Attorney has a significant interest in preserving the usefulness of cooperating defendants as Government witnesses. For this reason, the U.S. Attorney does not wish Myers (or Yates) to file verified pleadings. To the extent that the U.S. Attorney and Sullivan are exploring his co-operation with the Government, this argument applies with equal weight to him.

Finally, the U.S. Attorney relies on the public's interest in preserving Sullivan's and Myers' assets as a source of payment of potential restitution orders. Given the enormity of the losses at issue here, this is an important consideration. When a defendant faces a criminal prosecution that is likely to accomplish as much if not more than can be achieved through civil litigation, there is little reason to deplete his resources through payment of attorney's fees to defend or participate in civil litigation that, while important, is essentially duplicative.

Plaintiffs cite *Arden Way,* 660 F.Supp. at 1500, for the proposition that "the public interest in the integrity of the securities markets militates in favor of the efficient and expeditious prosecution of these civil litigations." *Id.* In *Arden Way,* however, the court explicitly noted that no government agency supported a stay, and that "therefore it must be assumed that they consider that a threat to the public interest has not as yet ripened at the pleading stage of this case." *Id.* at 1499-1500. Here, the U.S. Attorney has argued in favor of a stay with respect to Sullivan and Myers and has done so in the name of the public's interest in an effective prosecution of

those who violate the securities laws. *See Volmar Distribs.,* 152 F.R.D. at 40.

Considering the factors identified by courts in this circuit, a stay as to Sullivan and Myers is appropriate. The necessity of a stay as to these two defendants is particularly compelling in light of the clear overlap between the criminal and civil cases brought against them, the request by the U.S. Attorney for a stay, and the public interest in preserving their assets.

*B. Stay as to Ebbers, the Underwriter Defendants, and the Director Defendants*

[4] The Underwriter Defendants request a stay as to them in the event that a stay is entered as to Sullivan or Myers.[FN6] This request is denied. The U.S. Attorney has not brought criminal charges against the Underwriter Defendants, nor does the U.S. Attorney request that a stay be imposed as to them. These defendants thus stand in a radically different position from Sullivan and Myers as to a stay.

> FN6. In their submission responding to Myers' request for a stay, the Underwriter Defendants request only that the action be stayed as to them after their motions to dismiss have been resolved.

The Underwriter Defendants rely principally on the claim that they will not be able to mount an effective defense without the benefit of discovery from Sullivan and Myers. Specifically, they argue that evidence of Sullivan's and Myers' alleged attempt to conceal WorldCom's true financial condition would go directly to any due diligence defense they may mount. To the extent any documents will be necessary to maintain this defense, the bulk of those documents would appear to be in the possession of WorldCom and the Underwriter Defendants themselves. The WorldCom documents already provided to Government investigators have, with limited exceptions, already been made available to all parties in the *Securities Litigation.*[FN7] More to the point, the Underwriter Defendants have not

shown that the entry of a stay as to Sullivan and Myers, but not as to them, will substantially prejudice them at the motion to dismiss stage of these actions. If they can show at the discovery stage that they are substantially prejudiced by the stay as to Sullivan and Myers, then they may renew their request for a stay.

> FN7. In *In re WorldCom, Inc. Securities Litigation,* No. 02 Civ. 3288(DLC), 234 F.Supp.2d 301, 2002 WL 31628566, at *5 (S.D.N.Y. Nov.21, 2002), the Court partially lifted the discovery stay imposed pursuant to Section 21D(b)(3)(B) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3)(B), to permit plaintiffs to obtain copies of certain documents and materials which related non-party WorldCom had already produced to other entities.

**\*10** The Underwriter Defendants also cite several cases from this district in support of the proposition that the granting of a complete stay as to all defendants would result in a more efficient resolution of the instant actions. *See, e.g., Transworld,* 886 F.Supp. at 1141 ("[I]t is more efficient to grant a complete stay as to all defendants rather than only a partial stay as to the individual ones."); *SEC v. Downe,* No. 92 Civ. 4092(PKL), 1993 WL 22126, at *14 (S.D.N.Y. Jan.26, 1993) (a "partial stay would likely result in additional expenses for the parties without expediting the discovery process"); *and Volmar Distribs.,* 152 F.R.D. at 41-42 (granting complete stay). *But see Philip Morris Inc. v. Heinrich,* No. 95 Civ. 0328(LMM), 1997 WL 781907, at *12 (S.D.N.Y. Dec.18, 1997) (granting stay as to one defendant while allowing action to continue against other defendants); *Philip Morris Inc. v. Heinrich,* No. 95 Civ. 0328(LMM), 1998 WL 167333, at *1 (S.D.N.Y. Apr.8, 1998) (extending individual defendant's time to answer complaint while allowing action to continue as to other defendants). Ultimately, any decision as to a stay is fact bound and must be made after careful consideration of the circumstances peculiar to the action. In this case, the Underwriter Defendants have not shown any reason for a stay of the litigation as to them at this time.

The Director Defendants and Ebbers do not at this stage of the proceedings request that a stay be granted as to them as well. Rather, they reserve the right at a later date to request a stay. As with the Underwriter Defendants, if they can make a showing of substantial prejudice at the discovery stage, then they may move for a stay at that time.

### C. Stay as to Yates, Normand, and Vinson

[5] The U.S. Attorney has requested a stay of the litigation with respect to defendant Yates and a bar of discovery of non-parties Vinson and Normand. Each of these three individuals has entered a plea of guilty pursuant to a cooperation agreement. Defendant Yates has taken no position on this request. Should he make an application for a stay, it will be considered promptly.

No party has made a particularized showing that the bar requested by the Government will interfere substantially with any party's ability to prosecute or defend this action. Indeed, no party has opposed the Government's request for a bar of discovery of non-parties Vinson and Normand. The Government represents that the usefulness of its cooperating witnesses will be impaired if they are subjected to depositions or required to answer interrogatories before the completion of the criminal proceedings. Given the strong public interest in the effective enforcement of the nation's securities laws through criminal proceedings, and the representation that premature discovery of testimonial evidence from cooperating witnesses will impair that effective enforcement, the U.S. Attorney's request for a bar order is granted.

### Conclusion

**\*11** For the reasons stated, Sullivan's and Myers' requests for a stay are granted in part. A bar against discovery of Vinson and Normand is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)
**(Cite as: 2002 WL 31729501 (S.D.N.Y.))**

entered. The Underwriter Defendants' requests for a stay are denied.

The parties are ordered to show cause no later than December 13, 2002, why Sullivan or Myers should not be required to move now to dismiss to the extent that they wish to contest service or personal jurisdiction.

SO ORDERED:

S.D.N.Y.,2002.
In re Worldcom, Inc. Securities Litigation
Not Reported in F.Supp.2d, 2002 WL 31729501 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.